FILED
2012 Jun-20  AM 10:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ELIZABETH ANN HOLLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | |
| | ) | _____ |
| AMERICAN MEDIA, INC. and | ) | |
| THE NATIONAL ENQUIRER, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR THE TORT OF OUTRAGE
## AND INVASION OF PRIVACY

COMES NOW Plaintiff, Elizabeth Ann Holloway, and respectfully states her Complaint against Defendants, American Media, Inc. and The National Enquirer, Inc., d/b/a *The National Enquirer*, as follows:

### PRELIMINARY STATEMENT

1.     This Complaint for the tort of outrage and invasion of privacy arises from the publication of false and horrific headlines, statements, photographs and articles by American Media, Inc. and The National Enquirer, Inc. (collectively, "Defendants"). The headlines, statements, photographs and articles were an attempt by Defendants to profit off the tragic and still unresolved disappearance of Natalee Holloway ("Natalee") and the plight of her mother, Plaintiff Elizabeth Ann Holloway ("Holloway"). Defendants' conduct in publishing these false statements

and accompanying manufactured photographs has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious, and utterly intolerable in a civilized community. Furthermore, by publishing these false and disgusting statements and photographs, Defendants intentionally and maliciously intruded into Holloway's emotional sanctum.

## JURISDICTION AND VENUE

2.      Plaintiff Elizabeth Ann Holloway is an individual who is domiciled and resides in Jefferson County, Alabama.

3.      Defendant American Media, Inc. ("American Media") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business being located in Boca Raton, Florida.

4.      Service of process can be perfected upon American Media by service upon its registered agent, CT Corporation System, at its registered office, 1200 South Pine Island Road, Plantation, Florida 33324.

5.      Defendant The National Enquirer, Inc., d/b/a *The National Enquirer* ("The National Enquirer") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business being located in Boca Raton, Florida.

6.      Service of process can be perfected upon The National Enquirer by

service upon its registered agent, CT Corporation System, at its registered office, 1200 South Pine Island Road, Plantation, Florida 33324.

7.    There is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees.  Therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

8.    Defendants transact business in the State of Alabama and have committed tortious acts in the State of Alabama and are, therefore, subject to the jurisdiction of this Court pursuant to Rule 4.2 of the Alabama Rules of Civil Procedure.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), based on the fact that Defendants are subject to personal jurisdiction in this District and a substantial part of the events giving rise to the claim occurred in this District.

10.    Among other corporate activities, American Media and The National Enquirer own, publish, and distribute *The National Enquirer*, a weekly tabloid magazine.

11.    American Media and The National Enquirer publish and distribute *The National Enquirer* throughout the United States on a weekly basis, including weekly publication and distribution to subscribers in the State of Alabama and to retail magazine stands in numerous stores located throughout the State of Alabama.

12.     American Media and The National Enquirer also own, operate, and maintain an Internet website known as NationalEnquirer.com and located at www.nationalenquirer.com.

13.     The cover of each issue of *The National Enquirer* is published worldwide by American Media and The National Enquirer on The National Enquirer website.

## STATEMENT OF FACTS

14.     Plaintiff's daughter, Natalee Holloway ("Natalee"), was one of about 120 students from Mountain Brook High School in Birmingham, Alabama, who took a senior class graduation trip to the island of Aruba in May 2005.

15.     The students began their trip on May 26, 2005, and were scheduled to return to the United States on May 30, 2005.

16.     At approximately 1:30 a.m. on the morning of May 30, 2005, Natalee was last seen entering a car with Joran van der Sloot, Deepak Kalpoe, and Satish Kalpoe.

17.     Hours after she was last seen by her classmates on the morning of May 30, 2005, getting into the car with van der Sloot and the Kalpoes, Natalee failed to meet her classmates for their return flight to the United States.

18.     Despite repeated searches of Aruba and its waters, neither Natalee nor Natalee's remains have ever been located.

19.     Joran van der Sloot, Deepak Kalpoe, and Satish Kalpoe have repeatedly been arrested and released from prison as suspects in Natalee's disappearance.

20.     As time passes, the probability that Natalee is dead increases.

21.     In June of 2011, seeking some closure in his daughter's disappearance, Natalee's father filed paperwork seeking to have her declared dead.

22.     Natalee was declared legally dead in January of 2012, but her body has never actually been found.  Thus, whether she is actually dead is still unknown.

23.     Holloway disagreed with her ex-husband's decision to have Natalee declared dead and has been quoted as saying that she "will always hope and pray for Natalee's safe return."

24.     The manner of Natalee's death, if she is even actually dead, is unknown.

25.     Holloway continues to work tirelessly to learn of her daughter's fate.

26.     Natalee's disappearance was the subject of an unprecedented international media frenzy with literally round-the-clock coverage of the investigation into her disappearance by members of the print and broadcast media.

27.     Beginning in July 2005 and continuing until at least through April 25, 2011, American Media and the National Enquirer have published numerous false headlines, articles, and statements with accompanying photographs about Natalee's

disappearance that are so outrageous in character, and so extreme in degree, they go beyond all possible bounds of decency, and are to be regarded as atrocious, and utterly intolerable in a civilized community.

28. Defendants published numerous false headlines, articles, and statements with accompanying photographs regarding Natalee and her family in 2005 and 2006.

29. Defendants continued to publish similar, additional false headlines, articles, and statements with accompanying photographs through at least April 25, 2011.

30. Here, Holloway seeks damages for false headlines, articles, and statements with accompanying photographs published on June 28, 2010, December 6, 2010, and April 25, 2011 ("false and outrageous articles and photographs").

31. Defendants originated many of the false and outrageous articles and photographs.

32. The false and outrageous articles and photographs graphically describe the purported despicable treatment of Natalee's corpse.

## COUNT ONE: TORT OF OUTRAGE

33. Holloway hereby incorporates, adopts, and re-alleges Paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34. Between June 28, 2010 and April 25, 2011, Defendants published at

least three articles containing false and outrageous statements and photographs describing the alleged treatment of Natalee's corpse.

### *Article 1*

35.    In the June 28, 2010 issue of *The National Enquirer*, American Media, and The National Enquirer published or caused to be published a false and outrageous cover article entitled:

**JORAN'S SECRET HAND-DRAWN MAP TO**
**NATALEE'S GRAVE FOUND!**
**Killer tricked into FINALLY revealing truth**
**BOMBSHELL NEW EVIDENCE**

36.    A true and correct copy of the June 28, 2010 article in *The National Enquirer* is attached hereto as Exhibit "1" and incorporated by reference herein ("Article 1").

37.    Publication of Article 1 and the following false statements and photographs, among others, published therein, constituted extreme and outrageous conduct:

- The headline entitled "JORAN'S SECRET HAND-DRAWN MAP TO NATALEE'S GRAVE FOUND!  Killer tricked into FINALLY revealing truth; BOMBSHELL NEW EVIDENCE."

- An inside headline entitled "Investigator:   Killer's map to NATALEE'S GRAVE FOUND."

- "It's believed that Natalee's body is buried at the Bubali Bird Sanctuary – a large wetland supplied with water from the Caribbean island's water treatment facility."

- "…The Enquirer has learned that suspected killer Joran van der Sloot drew a secret map showing the location where he says he buried her [Natalee's] body."

- "'We have a map that was hand-drawn by Joran van der Sloot, revealing where he now claims he buried Natalee's body,'" Texas Equusearch director Tim Miller told The Enquirer in a world-exclusive interview."

- "It gives a precise location in the Bubali area of Aruba where Joran says Natalee's body was buried."

- "Called the Bubali Bird Sanctuary, the terrain is ideal for the disposal of a body.  It is a large wetland, supplied with treated water from the Caribbean island's water treatment facility."

- "'That's a very tough area to search,' says Miller.  'It is large, marshy and overgrown with high weeds.  The map is new evidence in the Natalee Holloway case – and we have to pursue it.'"

- "'We have it [the map],' Miller told The Enquirer.  'Jaap provided a copy of it to Dave Holloway.  Dave did not pay for it.  It shows exactly where Joran claims that he buried Natalee.'"

- "Jaap told Dave Holloway that Joran's map locates his beloved daughter's burial site in the Bubali Bird Sanctuary, located near the island nation's southwest coast."

- A cover photograph of a scenic view of an "Aruba Nature Park" juxtaposed with a photograph of Natalee and a mug shot of van der Sloot.

- An inside photograph of a scenic view of an "Aruba Nature Park" juxtaposed with a photograph of Natalee and a mug shot of van der Sloot.

- An inside photograph of an aerial view of the "Bubali Bird Sanctuary" juxtaposed with photographs of Natalee and van der Sloot.

38.    Article 1 is false because whether Natalee is dead or alive is unknown.

39.     Article 1 is false because if Natalee is dead, the method of her body's disposal is unknown.

40.     Article 1 is false because if Natalee is dead, the location of her disposed body is unknown.

41.     Article 1 is false because if a map was made of the location of Natalee's "grave," no grave was ever found.

42.     Article 1 was published with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

43.     Defendants had actual knowledge prior to publication of Article 1 that Natalee's death was not confirmed.

44.     Defendants had actual knowledge prior to publication of Article 1 that the method of disposing of Natalee's body was undetermined.

45.     Defendants had actual knowledge prior to publication of Article 1 that the location of Natalee's disposed body was undetermined.

46.     Defendants had actual knowledge prior to publication of Article 1 that no map of Natalee's "grave," was found.

47.     Defendants originated, manufactured, or otherwise created the photograph of a scenic view of an "Aruba Nature Park" depicted on the cover of *The National Enquirer* containing Article 1.

48.     Defendants originated, manufactured, or otherwise created the

photograph of a scenic view of an "Aruba Nature Park" depicted in Article 1.

49.     Defendants originated, manufactured, or otherwise created the photograph of an aerial view of the "Bubali Bird Sanctuary" depicted in Article 1.

50.     In support of Article 1, Defendants cite to statements allegedly made by Tim Miller.

51.     Defendants had clear and compelling reasons to doubt the veracity of Miller and the truth or accuracy of Miller's uncorroborated false factual statements in Article 1.

52.     Upon information and belief, Miller received financial remuneration in consideration for concocting the sensationalized statements cited in Article 1.

53.     Defendants knew prior to publication that Miller was not a reliable source.

54.     In support of Article 1, Defendants cite to statements allegedly made by Jaap Amesz.

55.     Defendants had clear and compelling reasons to doubt the veracity of Amesz and the truth or accuracy of Miller's uncorroborated false factual statements in Article 1.

56.     Upon information and belief, Amesz received financial remuneration in consideration for concocting the sensationalized statements cited in Article 1.

57.     Defendants knew prior to publication that Amesz was not a reliable

source.

58.   In support of Article 1, Defendants cite to statements allegedly made by unidentified "investigators."

59.   Defendants had clear and compelling reasons to doubt the veracity of the unidentified investigators and the truth or accuracy of the unidentified investigators' uncorroborated false factual statements in Article 1.

60.   Upon information and belief, if the unidentified investigators even exist, the unidentified investigators received financial remuneration in connection with their statements to Defendants.

61.   If the unidentified investigators even exist, Defendants knew prior to publication of Article 1 that the unidentified investigators were not reliable sources.

62.   Defendants intentionally or recklessly published Article 1 and the false statements and photographs contained therein.

63.   Article 1 and the false statements and photographs contained therein constituted extreme and outrageous conduct that caused Holloway emotional stress so severe that no reasonable person could be expected to endure it.

64.   Holloway's emotional stress was compounded because she continues to work tirelessly to learn of her daughter's fate.

### *Article 2*

65.    In the December 6, 2010 issue of *The National Enquirer*, American Media and The National Enquirer published or caused to be published a false and outrageous cover article entitled:

**NEW BONE EVIDENCE:**
**NATALEE WAS BURIED ALIVE!**
**Joran's secret graveyard with 5 MORE BODIES;**
**Killer's sickening confession**
**CAUGHT ON TAPE!**
**HER TERRIFYING LAST MINUTES**

66.    A true and correct copy of the December 6, 2010 article in *The National Enquirer* is attached hereto as Exhibit "2" and incorporated by reference herein ("Article 2").

67.    Publication of Article 2 and the following false statements and photographs, among others, published therein, constituted extreme and outrageous conduct:

- The headline entitled "NEW BONE EVIDENCE: NATALEE WAS BURIED ALIVE!  Joran's secret graveyard with 5 MORE BODIES; Killer's sickening confession CAUGHT ON TAPE!"

- An inside headline entitled "BURIED ALIVE! INVESTIGATORS' FILE:  Natalee's TERRIFYING FINAL MINUTES in Joran's private graveyard; PLUS:  Killer's chilling confession CAUGHT ON TAPE."

- "Natalee was buried alive – that's the shocking conclusion of investigators after a female human jawbone was found near a swamp in Aruba, where Alabama teen Natalee Holloway disappeared, insiders revealed to The Enquirer."

- "Her sudden disappearance baffled authorities for years, but

discovery of the jawbone – even though it wasn't immediately identified as Natalee's – triggered an explosion of renewed activity by investigators, who have finally pieced together a scenario for Natalee's terrifying last minutes…and her grisly death."

• "Soon after tourists stumbled upon the jawbone on Nov. 12, it was identified as being from a young white woman.  Incredibly, it was found next to a swampy area where van der Sloot had previously admitted to burying Natalee's body – and even draw a map to the spot!"

• "Stunned by the discovery, investigators have been taking a new look at previous taped confessions from Joran…and uncovered chilling clues indicating the beautiful blonde cheerleader could have been buried alive!"

• "In 2008, Patrick van der Eem, a Dutch undercover investigator who'd befriended Joran, secretly filmed him as he talked openly about Natalee's final moments.  Joran divulged he and the perky blonde enjoyed a wild night of drinking and then had a tryst on the beach – where she suddenly went into convulsions."

• "Investigators believe she was possibly slipped a date-rape drug."

• "Van der Eem asked him [van der Sloot]:  'How were you so sure she was dead?'  In a horrifying admission, Joran replied, 'I wasn't (expletive deleted) sure about that…but it really scared me to death.'"

• "When van der Eem suggested that Natalee was alive and simply in a coma when they buried her, the steely-eyed brute coldly and unemotionally answered:  'That's very possible.'"

• "Their [investigators'] analysis of his chilling words paints a shocking picture of Natalee's demise – that she was buried and left to die in a filthy, boggy swamp."

• "'If she wasn't unconscious, imagine the horror that young girl went through in her final minutes,' said the close source.  'That monster doesn't even know if she was dead.  He had her buried

anyway!'   Poor Natalee could have been in and out of consciousness as she was dragged to her grave.  She could have been aware she was being buried alive and unable to fight off this evil man!'"

• "Added an insider: 'It's horrifying to think Natalee might have been aware of what was happening to her – but was unable to stop it.'"

• "Dutch experts leaped into the investigation in mid-November shortly after the jawbone's discovery.  They began comparing the bone, which still had a single molar intact, with Natalee's DNA and asked her father Dave Holloway to send them her dental records by overnight courier."

• "It [the jawbone] was discovered on a beach next to a wetland wilderness area – which Joran had pinpointed on a hand-drawn map as Natalee's final resting place."

• "Joran prepared the map for Dutch journalist Jaap Amesz, who befriended him when he was in Holland two years ago and did a series of taped interviews with him.  As the Enquirer revealed in an earlier blockbuster story, the journalist turned over the map to the Holloway family.  The wetland area adjoining the ocean, called the Bubali Bird Sanctuary, is usually flooded with treated water from Aruba's sewage processing area.  But experts say heavy storms in recent months raised the water level of the sanctuary and could have washed bones from a skeleton buried there in the sea – and the jawbone could have washed back ashore, where the tourists discovered it."

• "'There's no question where the jawbone came from – it was found very close to where the bird sanctuary waters empty into the ocean when they're high enough,' private investigator Art Wood told The Enquirer.

• "Wood…confirmed:  'On the map, Joran marked an area where he said he and a friend left Natalee's body after she died.'"

• "Said a source close to the investigation:   'Joran's claim of

knowing about five more bodies has investigators puzzled and wondering if he is responsible for the deaths of other women who might be buried near Natalee.'"

- A cover photograph of four uniformed workers digging dirt out of a "graveyard" in a swampy area juxtaposed with photographs of Natalee and van der Sloot.

- An inside photograph of four uniformed workers digging dirt out of a "graveyard" in a swampy area and police officers on the side of the road supposedly viewing the "graveyard" juxtaposed with photographs of Natalee and van der Sloot.

68.    Article 2 is false because whether Natalee is dead or alive is unknown.

69.    Article 2 is false because if Natalee is dead, the cause of her death is unknown.

70.    Article 2 is false because if Natalee is dead, the method of her body's disposal is unknown.

71.    Article 2 is false because if Natalee is dead, the location of her disposed body is unknown.

72.    Article 2 is false because there was no jawbone found that was believed to be Natalee's.

73.    Article 2 is false because if a map was made of the location of Natalee's "grave," no grave was ever found.

74.    Article 2 is false because if there was a confession tape by her murderer, it was never found.

75.    Article 2 was published with actual malice, that is, with actual

knowledge of falsity or with reckless disregard for truth or falsity.

76.     Defendants had actual knowledge prior to publication of Article 2 that Natalee's death was not confirmed.

77.     Defendants had actual knowledge prior to publication of Article 2 that Natalee's cause of death was undetermined.

78.     Defendants had actual knowledge prior to publication of Article 2 that the method of disposing of Natalee's body was undetermined.

79.     Defendants had actual knowledge prior to publication of Article 2 that the location of Natalee's body was undetermined.

80.     Defendants had actual knowledge prior to publication of Article 2 that Natalee's jawbone was not found.

81.     Defendants had actual knowledge prior to publication of Article 2 that no map of Natalee's "grave," was found.

82.     Defendants had actual knowledge prior to publication of Article 2 that no confession tape by her murderer was found.

83.     Defendants originated, manufactured, or otherwise created the photograph of four uniformed workers digging dirt out of a "graveyard" in a swampy area depicted on the cover of *The National Enquirer* containing Article 2.

84.     Defendants originated, manufactured, or otherwise created the photograph of four uniformed workers digging dirt out of a "graveyard" in a

swampy area and police officers on the side of the road supposedly viewing the "graveyard" depicted in Article 2.

85.    In support of Article 2, Defendants cite to statements allegedly made by Patrick van der Eem.

86.    Defendants had clear and compelling reasons to doubt the veracity of van der Eem and the truth or accuracy of van der Eem's uncorroborated false factual statements in Article 2.

87.    Upon information and belief, van der Eem received financial remuneration in consideration for concocting the sensationalized statements cited in Article 2.

88.    Defendants knew prior to publication that van der Eem was not a reliable source.

89.    In support of Article 2, Defendants cite to statements allegedly made by Art Wood.

90.    Defendants had clear and compelling reasons to doubt the veracity of Wood and the truth or accuracy of Wood's uncorroborated false factual statements in Article 2.

91.    Upon information and belief, Wood received financial remuneration in consideration for concocting the sensationalized statements cited in Article 2.

92.    Defendants knew prior to publication that Wood was not a reliable

source.

93.    In support of Article 2, Defendants cite to statements allegedly made by unidentified "insiders," "investigators," and "sources."

94.    Defendants had clear and compelling reasons to doubt the veracity of the unidentified insiders, investigators, and sources and the truth or accuracy of the unidentified insiders', investigators', and sources' uncorroborated false factual statements in Article 2.

95.    Upon information and belief, if the unidentified insiders, investigators, and sources even exist, the unidentified insiders, investigators, and sources received financial remuneration in connection with their statements to Defendants.

96.    If the unidentified investigators even exist, Defendants knew prior to publication of Article 2 that the unidentified insiders, investigators, and sources were not reliable sources.

97.    Defendants intentionally or recklessly published Article 2 and the false statements and photographs contained therein.

98.    Article 2 and the false statements and photographs contained therein constituted extreme and outrageous conduct that caused Holloway emotional stress so severe that no reasonable person could be expected to endure it.

99.    Holloway's emotional stress was compounded because she continues

to work tirelessly to learn of her daughter's fate.

### *Article 3*

100.   In the April 25, 2011 issue of *The National Enquirer*, American Media and The National Enquirer published or caused to be published a false and outrageous cover article entitled:

> **New investigation reveals:**
> **JORAN AND HIS DAD HID**
> **NATALEE'S BODY IN A TOMB!**
> **THEY TOSSED HER IN A**
> **CORPSE FILLED CASKET**
> **PLUS FBI finds murder details on his computer**

101.   A true and correct copy of the April 25, 2011 article in *The National Enquirer* is attached hereto as Exhibit "3" and incorporated by reference herein ("Article 3").

102.   Publication of Article 3 and the following false statements and photographs, among others, published therein, constituted extreme and outrageous conduct:

- The headline entitled "New investigation reveals:  JORAN AND HIS DAD HID NATALEE'S BODY IN A TOMB!  THEY TOSSED HER IN A CORPSE FILLED CASKET; PLUS FBI finds murder details on his computer."

- An inside headline entitled "NEW INVESTIGATION:  Joran hid NATALEE'S BODY IN A TOMB!  COPS SEARCH FOR MURDER DETAILS ON HIS COMPUTER."

- "Natalee Holloway's body is hidden in a forgotten above-ground tomb on the island of Aruba – with another corpse!"

- "…He [van der Sloot] claims that he used his laptop computer to e-mail a pal all the details of what really happened to Natalee."

- Peruvian authorities have examined Joran's computer and recovered bombshell information he thought he had erased.

- "In his sensational jailhouse confession, Joran told his fellow inmate he had murdered Natalee in a rage because she refused to have sex with him.  He hurriedly buried her body in a shallow, sandy grave – and then later hid it in an above-ground crypt with a deceased Aruban!"

- "A source close to the case also says that Joran claimed his late father Paulus, an attorney who was about to become a judge in Aruba, used his influence to help dispose of Natalee's body."

- "'Joran told a fellow prisoner that was because Natalee's body was hidden in the coffin of a deceased Aruban – thanks to a payoff to a funeral home worker,' revealed an insider.  'Her body was interred in an above-ground tomb on the island.  Joran bragged she ended up in a coffin with a dead guy with no one, including the funeral home, suspecting it.'"

- "Initially Natalee's remains were concealed in a shallow grave on the beach where she died until arrangements could be made to slip her body into the coffin before the legitimate funeral."

- "'Joran revealed to the prison snitch that in e-mails he told a buddy that he became enraged when Natalee refused to have sex with him, and when he ignored her protests and started groping her, she slapped him,' an insider told The Enquirer.  'He lost control and beat and strangled her, and came to his senses only when he discovered that she was almost dead.  At that point, he panicked and buried her body in a shallow grave in the sand where she eventually died from her injuries.'"

- A cover photograph of a "tomb" in which Natalee's body was allegedly buried with other corpses juxtaposed with pictures of Natalee and van der Sloot.

- 20 -

- An inside photograph of a "tomb" in which Natalee's body was allegedly buried with other corpses juxtaposed with pictures of Natalee and van der Sloot.

103.  Article 3 is false because whether Natalee is dead or alive is unknown.

104.  Article 3 is false because if Natalee is dead, the cause of her death is unknown.

105.  Article 3 is false because if Natalee is dead, the method of her body's disposal is unknown.

106.  Article 3 is false because if Natalee is dead, the location of her disposed body is unknown.

107.  Article 3 is false because if there are computer files detailing Natalee's murder, they were never found.

108.  Article 3 was published with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

109.  Defendants had actual knowledge prior to publication of Article 3 that Natalee's death was not confirmed.

110.  Defendants had actual knowledge prior to publication of Article 3 that Natalee's cause of death was undetermined.

111.  Defendants had actual knowledge prior to publication of Article 3 that the location of Natalee's body was undetermined.

112.  Defendants had actual knowledge prior to publication of Article 3 that

no computer files detailing Natalee's murder were found.

113.   Defendants originated, manufactured, or otherwise created the photograph of a "tomb" in which Natalee's body was allegedly buried with other corpses depicted on the cover of *The National Enquirer* containing Article 3.

114.   Defendants originated, manufactured, or otherwise created the photograph of a "tomb" in which Natalee's body was allegedly buried with other corpses depicted in Article 3.

115.   In support of Article 3, Defendants cite to statements allegedly made by unidentified "sources" and "insiders."

116.   Defendants had clear and compelling reasons to doubt the veracity of the unidentified sources and insiders and the truth or accuracy of the unidentified sources' and insiders' uncorroborated false factual statements in Article 3.

117.   Upon information and belief, if the unidentified sources and insiders even exist, the unidentified sources and insiders received financial remuneration in connection with their statements to Defendants.

118.   If the unidentified sources and insiders even exist, Defendants knew prior to publication of Article 3 that the unidentified sources and insiders were not reliable sources.

119.   Defendants intentionally or recklessly published Article 3 and the false statements and photographs contained therein.

120.   Article 3 and the false statements and photographs contained therein constituted extreme and outrageous conduct that caused Holloway emotional stress so severe that no reasonable person could be expected to endure it.

121.   Holloway's emotional stress was compounded because she continues to work tirelessly to learn of her daughter's fate.

## Publication With Actual Malice

122.   Defendants published the false and outrageous headlines, articles, statements, and photographs with actual malice in that they published the false and outrageous headlines, articles, statements, and photographs with knowledge of falsity or with a reckless disregard for truth or falsity.

123.   Defendants possessed actual knowledge of the falsity of the outrageous headlines, articles, statements, and photographs or acted with a reckless disregard for the truth or falsity in publishing the false and outrageous headlines, articles, statements, and photographs.

124.   The outrageous headlines, articles, statements, and photographs are similar to those published in 2005 and 2006.

125.   Defendants negligently published the false and outrageous headlines, articles, statements, and photographs by failing prior to publication to conduct a reasonable investigation of the publication of headlines, articles, statements, and photographs that transcended all bounds of decency and which are to be regarded

as atrocious and utterly intolerable in a civilized community.

126.   Defendants had no sources for certain of their false and outrageous headlines, articles, statements, and photographs.

127.   Defendants knowingly published the false and outrageous headlines, articles, statements, and photographs without any reliable, trustworthy, or credible sources for said headlines, articles, statements, and photographs and with no corroboration for said headlines, articles, statements, and photographs.

128.   Defendants knowingly published the false and outrageous headlines, articles, statements, and photographs relying on sources known to them to be unreliable, lacking credibility, biased, and untrustworthy with no independent corroboration for statements allegedly made by these sources.

129.   In publishing the false and outrageous headlines, articles, statements, and photographs, Defendants purposely avoided learning the truth by, among other things, failing to attempt to interview many individuals who could confirm or deny the things stated in the headlines, articles, and statements and captured in the photographs.

130.   Defendants published the false and outrageous headlines, articles, statements, and photographs with actual malice in that they published said false and outrageous headlines, articles, statements, and photographs with actual knowledge that, of among other things, Natalee's corpse had not been found.

131.   Defendants published the false and outrageous headlines, articles, statements, and photographs with actual malice in that they published said false and outrageous headlines, articles, statements, and photographs with actual knowledge that, of among other things, Natalee's cause of death – if she was even dead – was undetermined.

132.   Defendants intentionally published the false and outrageous headlines, articles, statements, and photographs related to Natalee's disappearance in a calculated effort to gain financially.

133.   Defendants intentionally published the false and outrageous headlines, articles, statements, and photographs related to Natalee's disappearance in a calculated effort to increase sales and increase profits by falsely sensationalizing their continued tabloid coverage of Natalee's disappearance – even over 5 years later.

## **Damages**

134.   Defendants published the false and outrageous headlines, articles, statements and photographs with the intent to cause, or with reckless disregard of a substantial probability of causing, Plaintiff to suffer severe emotional distress.

135.   As a direct and proximate result of Defendants' publication of the false and outrageous headlines, articles, statements, and photographs, Plaintiff suffered severe emotional distress of such intensity that no person could be

expected to endure it.

136.   The conduct of Defendants demonstrates willful misconduct and an entire want of care that raises a presumption of conscious indifference to consequences.

WHEREFORE, Plaintiff, Elizabeth Ann Holloway, demands:

(a)   That judgment be entered against Defendants, American Media, Inc. and The National Enquirer, Inc., d/b/a *The National Enquirer*, for compensatory damages in an amount to be determined at trial;

(b)   That judgment be entered against Defendants, American Media, Inc. and The National Enquirer, Inc., d/b/a *The National Enquirer*, jointly and severally, for punitive damages in an amount to be determined at trial to punish and penalize Defendants and deter Defendants from repeating their unlawful conduct;

(c)   That judgment be entered against Defendants for attorneys' fees, costs, and interest; and

(d)   Such other relief as this Court deems equitable, just, and proper.

## TRIAL BY JURY DEMANDED ON COUNT ONE

## COUNT TWO: INVASION OF PRIVACY

137.   Holloway hereby incorporates, adopts, and re-alleges Paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138. By publishing the false headlines, articles, statements, and photographs set forth above, Defendants invaded Holloway's privacy through an invasion of her emotional sanctum.

139. Defendants' invasion of Holloway's emotion sanctum is highly offensive to a reasonable person.

## DAMAGES

140. As a direct and proximate result of Defendants' publication of the false headlines, articles, statements, and photographs, Plaintiff has suffered adverse physical consequences from stress, emotional distress, and mental pain and suffering.

141.

The conduct of Defendants demonstrates willful misconduct and an entire want of care that raises a presumption of conscious indifference to consequences.

WHEREFORE, Plaintiff, Elizabeth Ann Holloway, demands:

(a)     That judgment be entered against Defendants, American Media, Inc. and The National Enquirer, Inc., d/b/a *The National Enquirer*, jointly and severally, for compensatory damages in an amount to be determined at trial;

(b)     That judgment be entered against Defendants, American Media, Inc. and The National Enquirer, Inc., d/b/a *The National Enquirer*, jointly and severally, for punitive damages in an amount to be determined at trial to punish

and penalize Defendants and deter Defendants from repeating their unlawful conduct;

(c)     That judgment be entered against Defendants for attorneys' fees, costs, and interest; and

(d)     Such other relief as this Court deems equitable, just, and proper.

**TRIAL BY JURY DEMANDED ON COUNT TWO**

Respectfully submitted this the 20th day of June 2012.


**LITTELL LAW FIRM**                **WOOD, HERNACKI & EVANS, LLC**

<u>**s/C. Elizabeth Littell Courson**</u>       L. Lin Wood
C. Elizabeth Littell Courson          lwood@whetriallaw.com
Attorney at Law                       Georgia Bar No. 774588
Elizabeth@littell-law.com             (*pro hac vice* admission pending)
Alabama Bar Nos.                      Stacey Godfrey Evans
ASB-5342-L75L                         sevans@whetriallaw.com
LIT 028                               Georgia Bar No. 298555
                                      (*pro hac vice* admission pending)
PO Box 242606
Montgomery, Alabama 36124            1180 West Peachtree Street
334-649-0076                         Suite 2400
                                     Atlanta, Georgia 30309
                                     404-891-1402
                                     404-506-9111 (fax)