FILED
2012 Aug-17  PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ELIZABETH ANN HOLLOWAY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **Case No.: 2:12-CV-2216-TMP** |
| | } | |
| **AMERICAN MEDIA INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT

Lee Levine
*llevine@lskslaw.com*
LEVINE SULLIVAN KOCH &
    SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, D.C. 20036
Telephone:   (202) 508-1110
Facsimile:    (202) 861-9888

Harlan I. Prater, IV
*hprater@lightfootlaw.com*
John G. Thompson
*jthompson@lightfootlaw.com*
Jeffrey P. Doss
*jdoss@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone:   (205) 581-0700
Facsimile:    (205) 581-0799

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................2

THE ARTICLES.......................................................................................................10

ARGUMENT ...........................................................................................................17

I.      PLAINTIFF'S CLAIMS ARE
        BARRED BY THE FIRST AMENDMENT...................................................17

        A.      The Articles Report on Matters of Public Concern
                and Are Therefore Protected by the First Amendment ......................17

        B.      Plaintiff's Claims Fail Because The Articles
                At Issue Are Not "Of And Concerning" Her. ....................................22

II.     PLAINTIFF'S CLAIMS ALSO FAIL
        AS A MATTER OF COMMON LAW .........................................................28

        A.      Plaintiff Cannot State a Claim for "Outrage" ...................................28

                1.      The Outrageous Conduct Requirement....................................29

                2.      The Severe Emotional Distress Requirement ...........................32

                3.      The "Of and Concerning" Requirement ...................................33

        B.      Plaintiff Cannot Establish a Cause
                of Action for Invasion of Privacy......................................................35

III.    PLAINTIFF'S CLAIMS ARISING FROM
        THE JUNE 2010 ARTICLE ARE BARRED
        BY THE STATUTE OF LIMITATIONS ....................................................38

CONCLUSION ........................................................................................................42

i

Defendants American Media, Inc. and The National Enquirer, Inc. (collectively, "AMI") respectfully submit this memorandum of law in support of their motion to dismiss plaintiff's complaint and for partial summary judgment pursuant to Rules 12(b)(6) and 56(c) of the Federal Rules of Civil Procedure.

## INTRODUCTION

This case arises from the widely publicized disappearance and presumed death of Natalee Holloway, an 18 year-old high school student who went missing while on vacation in Aruba in 2005. Speculation about what happened to her dominated the national and international media for many months in 2005 and 2006, and then again in 2010 when Joran Van der Sloot, the young man widely believed to be responsible for her disappearance, was arrested and confessed to murdering another young woman in Peru.

Plaintiff is Natalee Holloway's mother. In this case, she brings claims for "outrage" and invasion of privacy based on reporting by the *National Enquirer* (which is published by AMI) that is substantially the same as hundreds of other stories about her daughter, and indistinguishable from plaintiff's own public pronouncements and conjecture about what might have happened. The articles that plaintiff has placed at issue have precious little to say about her at all. Indeed, it appears the sole basis for plaintiff's Complaint is that she is unhappy with the venue in which the reporting about her daughter appeared – a national "tabloid" –

even though the substance of that very same reporting was widely disseminated by all manner of media throughout the world, much of it instigated by plaintiff herself.

As a result, plaintiff's claims cannot be reconciled with the "breathing room" the First Amendment affords to reporting about newsworthy matters such as the mysterious disappearance of a young American woman while on a school vacation in a foreign country.  And, all apart from the First Amendment, such claims cannot be prosecuted at common law in any event, precisely because the "act" of reporting to the public about such a newsworthy matter cannot be deemed "outrageous" within the meaning of that disfavored tort as a matter of law. Moreover, plaintiff cannot maintain any cause of action based on the publication of information that is not "of and concerning" her, nor can she claim a privacy interest in the kind of information that she, herself, has widely disseminated. Finally, plaintiff's claims based on the article published by AMI in June 2010 are time-barred because they were brought more than two years after they accrued.

## FACTUAL BACKGROUND

Natalee Holloway disappeared on May 30, 2005, while on a school vacation with classmates in Aruba.  Her disappearance was the subject of intense media scrutiny and speculation, fueled in significant part by the understandable efforts of her parents and law enforcement authorities to call attention to her plight and thereby secure useful leads as to her whereabouts.  *See* Compl. ¶ 26 ("Natalee's

2

disappearance was the subject of an unprecedented international media frenzy with literally round-the-clock coverage of the investigation into her disappearance by members of the print and broadcast media."); Declaration of Cameron Stracher ("Stracher Decl.") Ex. 1 (Beth Holloway, *Loving Natalee: A Mother's Testament of Hope and Faith*(HarperCollins 2007) ("Natalee has an army of hope behind her with the prayers and support from her hometown, the news media, and the islanders.")). She was declared legally dead in January 2012. Compl. ¶ 22. To date, no one has been charged with any crime arising from her disappearance or death.

A host of media outlets – including CBS, NBC, ABC, CNN, Fox, *The New York Times, USA Today, The Daily News, New York Post, Newsweek, Los Angeles Times,* and *People* magazine – covered the story of the young woman's unexplained disappearance from the outset. As with other highly publicized "missing child" cases throughout American history,[1] there was a great deal of

---

[1]*See, e.g.,* Stracher Decl. Ex. 2 (N.Y. Tribune (1874): reporting story of death of apparent kidnapper of Charley Ross, 4 year-old boy who was abducted from his front yard and never returned: "From his abdomen his entrails protruded, and his right side presented a hideous appearance."), Ex. 3 (N.Y. Tribune (1914): reporting how father of Dorothy Arnold, young heiress who disappeared mysteriously, opened doors of his home to reporters "to prove that the oft-repeated rumor that Dorothy Arnold is dying or restrained in her own home is groundless."), Ex. 4 (N.Y. Times: *Lindbergh Baby Found Dead in Wood; Half Covered by Leaves; Skull Fractures Caused Death*), Ex. 5 (Huffington Post: *Madeleine McCann's Grave Found, Claims South African Land Baron Stephen Birch*), Ex. 6

{00541653;v1}

speculation in the press about what happened.  Some reported that Natalee may

have overdosed on drugs or alcohol, been knocked unconscious with GHB (a so-

called "date rape" drug), or used cocaine before falling to her death.  *See, e.g.,*

Stracher Decl. Ex. 7 (ABC News:*Natalee Holloway Snorted Coke, Fell to Death,*

*Suspect Says*), Ex. 8 (MSNBC: *Did drugs and alcohol kill Natalee Holloway?*),

Ex. 9 (Fox News:  *Source: Natalee Holloway Died of Drug Overdose*), Ex. 10

(USA Today: Natalee could have "collapsed due to her body's reaction to effects

from alcohol or drugs . . ."), Ex. 11 (ABC News: "If you gave me a choice [about

how Natalee died], alcohol would be lowest on the list and GHB the highest").

Others reported that Van der Sloot, the person last seen with the young woman,

killed her after they had sex on a beach and "then allegedly asked one of his

friends to assist him in discarding her body using his boat and pushing her out to

sea." *Id.* Ex. 12 (Fox News).  Still others speculated that she was sold into sex

slavery.  *See, e.g., id.* Ex. 13 (Newsweek: "During a recent trip to Thailand [Van

der Sloot] hinted that he wouldn't mind getting into the business of sex trafficking

and even joked that he'd sold Holloway as a sex slave."), Ex. 14 (Fox News:

"[P]erhaps Natalee has been kidnapped into some sort of slave trade.").  *See also*

---

(N.Y. Times*: Boy Who Vanished in 1979 is Dead, Ex-Prosecutor Claims* (Former
Assistant U.S. Attorney is "fairly certain Etan [Patz, 6-year-old SoHo boy who
disappeared in 1979] is no longer with us" and "that the person responsible is
behind bars.")).

4

*id.* Ex. 15 (CNN: *Prosecutor: 'No doubt' Natalee Holloway is dead*), Ex. 16 (CBS

News: *Natalee Holloway's Body Found? Picture Leads Divers to Renew Search*),

Ex. 17 (9News:  *Natalee Holloway's mother believes she's dead*).[2]

   In 2010, after Van Der Sloot was arrested in Peru and confessed to the

murder of Stephany Flores, there was renewed speculation about what had

happened to Natalee Holloway.  The news media reported that, after being taken

into custody, Van Der Sloot had drawn a map pinpointing  her remains.  *See, e.g.,*

*id.*Ex.18 (CNN: Tim Miller, private investigator retained by Natalee Holloway's

father, stated that "I've actually got a map that Joran wrote and drew another map

down here where Natalee's body is supposedly at.").  Additional questions arose as

to whether she may have been buried alive.  *Id.*  Ex. 19 (ABC: Van der Sloot

_____

   [2] This Court can take judicial notice of the fact that these articles were
published.  *See Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th
Cir. 2007) ("the Court takes judicial notice, on the basis of several newspaper
articles discussing the film, that Who's the Man? received wide commercial
distribution"); *Dunn v. Martin*, 178 F. App'x 876, 877 (11th Cir. 2006) ("We
discern no error in the district court's taking notice of the online article at the
dismissal stage of this case."); *Von Saher v. Norton Simon Museum of Artat
Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of
publications introduced to 'indicate what was in the public realm at the time, not
whether the contents of those articles were in fact true.'") (citing *Premier Growth
Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006)); *City of
Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 662 n.10 (6th Cir.
2005) ("We take judicial notice of the fact that the media articles cited above were
published, without reaching any conclusions about their truth.").

5

"seemingly admits to not knowing if Natalee Holloway was even dead when he decided to dispose of her body").

Other widely circulated media reports speculated that a jawbone found near where Natalee disappeared might be hers.  *See, e.g., id.* Ex. 20 (MSNBC: "Dutch forensic experts are testing a piece of [jaw]bone found on the Caribbean island of Aruba to see if it comes from missing American teenager Natalee Holloway . . . . The bone was found on a beach near the Caribbean resort island's Phoenix Hotel, close to the Bubali swamp . . . . Van der Sloot . . . previously claimed that he dumped her body in the swamp."), Ex. 21 (LA Times: *Piece of Bone Found in Aruba, Could Be From Holloway*),Ex. 22 (USA Today: *Dutch experts examining bone for any link to missing teen Natalee Holloway*), Ex. 23 (People: *Did Jaw Bone Found in Aruba Come from Natalee Holloway?*).

Still others surmised that a laptop owned by Van der Sloot might contain information about Natalee's disappearance.  *See, e.g., id.* Ex. 24 (CBS News: "FBI agents will travel to Peru to inspect the hard drive of a laptop belonging to Joran Van der Sloot . . . . They hope to find clues on Van der Sloot's computer to help solve the 2005 disappearance of Holloway, who was on a school trip to Aruba."), Ex. 25 (CNN: "FBI agents are traveling to Peru to study a laptop belonging to Joran Van der Sloot"), Ex. 26 (LA Times: "Investigators have said they believe

6

van der Sloot killed Flores after she found something related to the Holloway case on his computer"), Ex. 19 (ABC: "Police now have Joran's laptop").

Plaintiff played a crucial role in instigating such media speculation about her daughter's whereabouts.  Immediately upon her daughter's disappearance, plaintiff took to the airwaves in an understandable effort to generate interest in and information about her plight.  Indeed, she made at least sixty appearances on the Fox News Channel's *On the Record with Greta Van Susteren* alone as well as numerous appearances on NBC's *Today Show*, ABC's *Good Morning America*, MSNBC CNN the *O'Reilly Factor* and *Hannity & Colmes. Id.* Ex. 14, 27 (Partial listing of Beth Holloway's appearances on various television shows).  In these multiple venues, she discussed openly and without reservation the investigation into her daughter's disappearance and speculated about what might have happened to her, including her fear that Natalee might have been buried alive, *see id.* Ex. 28 (NY Daily News*: "'Natalee never even had the chance for a medical doctor or a coroner, anyone, to determine (if she was alive),'") (quoting plaintiff), and her belief that Van der Sloot sexually assaulted her daughter as she was coming in and out of consciousness, telling Greta Van Susteren:

> Oh, Greta, oh absolutely, Greta. I mean our best case scenario is that they've kidnapped her.  They've got her held captive in one of these crack houses or one of the brothels that are on the island or the island of Curacao. I mean that would be – that would be our best outcome,

{00541653;v1}

> Greta, and oh absolutely we would just be thrilled to
> death with that.

*Id.* Ex. 14.

In 2007, plaintiff published the best-selling autobiography, *Loving Natalee: A Mother's Testament of Hope and Faith* (HarperCollins), which itself contains plaintiff's own – oftentimes graphic – account of her investigation into her daughter's disappearance. For example, she writes about a statement Van der Sloot made to investigators:

> Joran describes Natalee's underwear with the dark blue
> embroidery and the flowers. He describes her pubic area.
> I know what he is referring to. She is shaven higher than
> usual for her bathing suit. Dear God. He *has* been with
> her. Joran continues and tells the men that he inserted a
> finger in her. Then another one. I am sickened by his
> sexually explicit and graphically detailed account.

*Id.* Ex. 1. In the book, plaintiff offers her own speculation that Van der Sloot was responsible for her daughter's disappearance. She also acknowledges that "[e]veryone seems to have a theory about what happened to Natalee. But as horrific as some of these mystic tips are, they don't even affect me anymore one way or the other." *Id.*

Plaintiff's book also explains how she purposefully reached out to the media to publicize the story of her daughter's disappearance. Before her first interview with a local television news station, she writes, a friend cautioned: "'You know, once you open this gate, Beth, you can't close it, so be sure you're ready.'" *Id.* In

8

response plaintiff stated:  "Let's do it"  and thereafter worked with a "media coordinator" who helped "field interview requests."  In the book, she gratefully acknowledges that "[t]he national and international media [began] to pick up on Natalee's story as reporters and producers migrate from Birmingham to the island. FOX, CNN, NBC, ABC, BBC, AP. Everybody.  Natalee has an army of hope behind her with the prayers and support from her hometown, the news media, and the islanders."  *Id.*

The book was adapted into a television movie that, according to *Variety*, "bagged record ratings."  *Id.* Ex. 29 (Variety: *Lifetime Movie Scores with Holloway*).  *See also id.* Ex.30 (www.lifetimetv.com:  *Natalee Holloway – Official Movie Site*).  Plaintiff now has her own regularly scheduled television show, *Vanished with Beth Holloway*, that, according to its website, "examines America's unsolved cases as told to Holloway by the families who've been victimized by mysterious abductions or disappearances of loved ones and unspeakable crimes. . . . Each episode will profile real-life mysteries, giving detailed accounts of the events described by those closest to the victims as Beth Holloway goes on location to conduct key interviews, introduce important facts and give the audience a clear

9

understanding of pivotal moments in each harrowing case." *Id.* Ex. 31

(www.lifetime.com: *About Vanished with Beth Holloway*).[3]

## THE ARTICLES

AMI was one of many media outlets that reported on Natalee Holloway's

disappearance.  Compl. ¶ 27.  Specifically, plaintiff complains about articles

published in the *National Enquirer* with the cover dates of June 28, 2010 (the

"June 2010 Article"), December 6, 2010 (the "December 2010 Article"), and April

25, 2011 (the "April 2011 Article").  *See* Compl. Exs. 1, 2, 3.

<u>The June 2010 Article</u>

Despite its cover date of "June 28, 2010," the magazine was actually

published and made available on newsstands and to subscribers two weeks earlier,

by June 18.  *Id,* Ex. 1*; see also id.* ¶ 36.The article carried the headline "Natalee's

Grave Found!" with a cover photo depicting the island of Aruba with inset photos

of Natalee Holloway and Van der Sloot.  The article recounted that "suspected

killer Joran van der Sloot drew a secret map showing the location where he says he

buried her body."  The map, the article speculated, could lead authorities to

Natalee Holloway's remains, which "could be the key piece in the evidence chain

---

[3]For example, in an episode that aired recently, Beth Holloway explores – through a video recreation (that never discloses that it is, in fact, a recreation) – one theory that a missing child was part of a voodoo ritual.  Vanished with Beth Holloway, Ep. 10 "Baum/Hill," *available at* http://www.amazon.com/gp/product/B005EN33G6.

needed to convict van der Sloot" who had recently been arrested in Peru and had confessed to murdering Stephany Flores.

According to the article (and other contemporaneously published press reports[4]), the map was given to the missing woman's father, Dave Holloway, by Dutch journalist Jaap Amesz, "who befriended Joran when he was in Holland two years ago and did a series of taped interviews with him."  Amesz, the article reported, was frustrated by the failure of Aruban authorities to "renew their investigation based on the information he got from Van der Sloot," so he sent the map to Mr. Holloway.  Tim Miller, the director of a well-regarded investigative firm engaged by Mr. Holloway, told the *Enquirer* that the map "gives a precise location in the Bubali area of Aruba where Joran says Natalee's body was buried." The Bubali area, a bird sanctuary, is a "tough area to search," Miller said, because it is "large and marshy and overgrown with high weeds."  The bird sanctuary had only been partially searched by Aruban authorities in 2005, according to Aruba's attorney general Taco Stein, because it "such a large area."  Given the "new evidence" provided by the map, however, the article reported that Miller expressed hope that Aruban authorities would "agree to work together with us to search the area."  If Natalee Holloway's remains were found, the article noted, the "Aruba

_____

[4]*See* Stracher Decl. Ex. 18 (examples of such an article).

11

government may ask that Joran be shipped to the island to finally stand trial for her death."

In addition, the article reported that Van der Sloot "has repeatedly changed his story about what happened to the 18 year-old" and recounted how he recently tried to extort $250,000 from Beth Holloway "in exchange for revealing the location of her daughter's burial site."[5]  But, Miller told the *Enquirer*, "I'm hoping Natalee's body is where Joran's map says it is, and that we find a grave and dig it up."

In its entirety, the June 2010 Article contained only three references to plaintiff:

(1)     "Natalee's parents Beth and Dave are hoping to find closure in their daughter's death."

(2)     "[Van der Sloot] allegedly tried recently to extort $250,000 from [Natalee's] distraught mother in exchange for revealing the location of her daughter's burial site."

---

[5] This information was widely reported by other media entities as well. *See* Stracher Decl. Ex. 32 (Christian Science Monitor: *Joran van der Sloot admits to extorting Holloways*), Ex. 33 (CNN: *Interpol: Van der Sloot tried to extort Holloway's mother*).  In fact, it forms the basis for a criminal prosecution currently before this Court.  *See United States v. Van der Sloot*, Case No. 2:10-CR-237-KOB-TMP (N.D. Ala.) (indictment filed on June 30, 2010); *see also United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

{00541653;v1}

(3)    "The Holloway family has gone through hell for five years – they

        deserve final closure in what happened to Natalee."

The December 2010 Article

The second article, which bears a cover date of "December 6, 2010,"

reported that a jawbone recently discovered near the Bubali area in Aruba "was

identified as being from a young white woman." Compl. Ex. 2; *see also id.* ¶ 66.[6]

The cover included a photo re-creation, specifically identified as such, showing

four uniformed men digging in the sand, along with inset photos of Natalee

Holloway and Van der Sloot.  It bore the headline "Natalee Was Buried Alive,"

and reported that, because heavy storms in recent months may have washed the

jawbone into the sea where it then came ashore, investigators were considering

whether it may have come from a skeleton in the marshy area.  Art Wood, a private

investigator and retired FBI agent engaged by Dave Holloway, told the *Enquirer,*

"There's no question where the jawbone came from – it was found very close to

where the bird sanctuary waters empty into the ocean when they're high enough."

To determine whether the bone was Natalee's, Wood said, Dutch experts asked

Dave Holloway "to send them [her] dental records by overnight courier" in order

to compare them to the single molar reportedly found intact on the jawbone.

---

[6]*See* Stracher Decl. Exs. 20-23 (collecting other media reports of the same
information).

Based on this recent discovery, the article recounted, authorities were also taking a closer look at tapes made by a Dutch investigator, Patrick van der Eem, who had secretly taped Van der Sloot talking openly about "Natalee's final moments," including his claim that she went into convulsions after a night of drinking – *e.g.,* "Instead of calling for medical help, Joran said he and a friend disposed of Natalee."[7]  According to the article, the tapes revealed that, when van der Eem asked Van der Sloot how he knew Natalee was dead, he replied "'I wasn't [expletive deleted] sure about that . . . but it really scared me to death."  It was possible, Van der Sloot acknowledged on the tapes, that "Natalee was alive and simply in a coma when they buried her."

Moreover, when Van der Sloot was informed of the discovery of the jawbone by his attorney, the article reported, "'he just sneered and tried to laugh it off as if it was nothing.'"  He reportedly told a prison guard that "[i]t's no secret on the streets that the bad guys dump bodies in that swamp" and indicated that "[t]here are at least FIVE more bodies out there."  The article concluded by noting that Aruba has been a "sometimes-fatal magnet for the young and beautiful," including Amy Lynn Bradley who was twenty-three when she disappeared from a

---

[7] This information as well was widely reported by other media. *See, e.g.,* Stracher Decl.Ex. 34 (ABC: *Meet the Man Who Got Van Der Sloot to Talk About Holloway's Disappearance*), Ex. 35 (CNN: *Van der Sloot on video: No sleep lost over Holloway's dumped body*).

{00541653;v1}

cruise ship, and Nevina Labouovic who was sailing with her family when they and their boat all disappeared.  Given Van der Sloot's claims, the article explained, investigators were wondering if he might be "responsible for the deaths of other women who might be buried near Natalee."

The December 2010 Article contained only one reference to plaintiff, a photo caption identifying: "Natalee's mom Beth Twitty with Dutch journalist Peter De Vries, who has been involved in the case from the beginning."

<u>The April 2011 Article</u>

The third article, which contained no reference to plaintiff, bore a cover date of April 25, 2011, and included a cover photo of a graveyard with an above-ground tomb as well as inset photos of Natalee Holloway and Van der Sloot.  Compl. Ex. 3; *see also id.* ¶ 101. It reported that, following his arrest for the murder of Stephany Flores, Peruvian authorities seized Van der Sloot's laptop computer on which, he claimed, he found Flores searching for information about Holloway, "flew into an insane rage" and killed her.[8]  According to the article, once incarcerated, Van der Sloot revealed to a prison informant that he also used the computer to send emails to a friend explaining how "he became enraged when Natalee refused to have sex with him" and then "lost control and beat and strangled

---

[8] Other media outlets reported the same information. *See, e.g.,* Stracher Decl. Exs. 24-26.

her, and came to his senses only when he discovered that she was almost dead." Although he deleted the information on the computer, the article reported, the "FBI is sifting through every detail on the hard drive to find the information that will finally solve the mystery of the Alabama teen's mysterious disappearance in 2005 – and nail Joran for her murder."  Art Wood, the Holloway family investigator and retired FBI agent, told the *Enquirer*, "[i]t's the dynamite evidence that could put Joran on death row."

In addition, the article reported that Van der Sloot had told the prison informant that, after initially burying Natalee's body in a shallow grave, he subsequently placed it in a coffin in an above-ground crypt.  In this regard, the article recounted how, "early in the investigation, Joran's father [an attorney] advised him: 'No body, no case' and Joran bragged to journalists that her body would never be found."  Still, the article explained,  investigators remained hopeful that the laptop would reveal "how Natalee really died and how Joran's father helped him dispose of her body and then cover up Joran's involvement in the murder."

Finally, the article reported that law enforcement authorities had already determined that the computer was used to search for websites relating to Holloway after the Flores murder, giving the lie to Van der Sloot's claims about why he killed her.  Thus, the article concluded, if he "'ever gets out of prison for brutally

16

murdering Stephany, Joran's computer may give U.S. authorities all they need to convict him of Natalee's murder.'"

## ARGUMENT

## I.
## <u>PLAINTIFF'S CLAIMS ARE BARRED BY THE FIRST AMENDMENT</u>

Just last year, in *Snyder v. Phelps*, the Supreme Court reaffirmed that "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits," including specifically claims for intentional infliction of emotional distress and invasion of privacy.  131 S. Ct. 1207, 1213 (2011) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988)).  In this case, because the articles report on a matter of public concern and because they are not "of and concerning" plaintiff, her claims fail as a matter of constitutional law.

### A.   **The Articles Report on Matters of Public Concern
   <u>and Are Therefore Protected by the First Amendment.</u>**

In *Snyder*, the Supreme Court considered whether the First Amendment "shield[ed]" from tort liability members of the Westboro Baptist Church who picketed near a soldier's funeral service carrying clearly offensive – and allegedly false – signs that said, among other things, "God Hates Fags," "You're Going to Hell," "God Hates the USA/Thank God for 9/11," "Thank God for Dead Soldiers," and "God Hates You."  131 S. Ct. at 1213.  Plaintiff – the soldier's father – brought a number of tort claims against the Church and its members, including claims for

17

intentional infliction of emotional distress and invasion of privacy.  Because

defendants' speech addressed a matter of public concern, the Court held, the First

Amendment barred plaintiff's claims.  *Id.* at 1215.

"Speech on matters of public concern," the Court explained, "occupies the

highest rung of the hierarchy of First Amendment values, and is entitled to special

protection."  *Id.* (internal quotation marks and citations omitted).Moreover, the

Court emphasized, what constitutes a matter of  "public concern" must be

construed broadly, lest "courts themselves . . . become inadvertent censors."  *Id.* at

1216.  Thus, speech deals with a matter of public concern when, for example, "it is

a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public."  *Id.*  (internal marks and citations omitted).  "The

arguably inappropriate or controversial character of a statement is irrelevant to the

question whether it deals with a matter of public concern."  *Id.*  Rather, once a

court determines that a defendant's speech addresses a matter of public concern, it

"cannot be restricted simply because it is upsetting or arouses contempt."  *Id.* at

1219.

As it relates specifically to a claim for intentional infliction of emotional

distress, the Court noted that the potential for censoring speech is particularly real:

> The jury here was instructed that it could hold Westboro
> liable for intentional infliction of emotional distress
> based on a finding that Westboro's picketing was
> "outrageous."  "Outrageousness," however, is a highly

18

> malleable standard with an inherent subjectiveness about
> it which would allow a jury to impose liability on the
> basis of the jurors' tastes or views, or perhaps on the
> basis of their dislike of a particular expression.  In a case
> such as this, a jury is unlikely to be neutral with respect
> to the content of the speech, posing a real danger of
> becoming an instrument for the suppression of vehement,
> caustic, and sometimes unpleasant expression.  Such a
> risk is unacceptable; in public debate we must tolerate
> insulting, and even outrageous, speech in order to
> provide adequate breathing space to the freedoms
> protected by the First Amendment.

*Id.* at 1219 (internal marks and citations omitted).

Similarly, with respect to plaintiff's invasion of privacy claims, the Supreme

Court explained:

> [i]n most circumstances, the Constitution does not permit
> the government to decide which types of otherwise
> protected speech are sufficiently offensive to require
> protection for the unwilling listener or viewer.  Rather,
> the burden normally falls upon the viewer to avoid
> further bombardment of his sensibilities simply by
> averting his eyes.  As a result, the ability of government,
> consonant with the Constitution, to shut off discourse
> solely to protect others from hearing it is dependent upon
> a showing that substantial privacy interests are being
> invaded in an essentially intolerable manner.

*Id.* at 1220 (internal marks and citations omitted).

There can be no question that the articles at issue reported on a matter of

public concern.  Indeed, plaintiff has essentially pled as much.  In her Complaint,

she alleges that "Natalee's disappearance was the subject of an unprecedented

international media frenzy with literally round-the-clock coverage of the

19

investigation into her disappearance by members of the print and broadcast media."  Compl. ¶ 26 (emphasis added).  *See also Atkins v. State*, 421 Md. 434, 460-61, 26 A.3d 979, 994 (2011) (noting that "the disappearance of Natalee Holloway, a young American girl who disappeared while on vacation in Aruba" is a "real-life 'myster[y] that [has] caught the public eye").  Thus, there cannot be any legitimate doubt that, as plaintiff has acknowledged, the subjects addressed in the articles were of "general interest and of value and concern to the public."  *Snyder,* 131 S. Ct. at 1216.[9]

One case is particularly instructive in this regard.  In *Miles v. Ramsey*, 31 F. Supp. 2d 869 (D. Colo. 1998), the court held that two articles published in the *National Enquirer* about the investigation into the murder of JonBenét Ramsey and the fact that the Ramsey family speculated that their neighbor – the plaintiff Stephen Miles – killed the child was a matter "in which the public may have a legitimate public interest."  *Id.* at 875.  In so holding, the court noted that "[i]t is undeniable that JonBenet's murder investigation has drawn almost unprecedented

---

[9] Moreover, "[i]n media cases, the scope of what is arguably within the sphere of public concern has been held to be extraordinarily broad with great deference paid to what the publisher deems to be of public interest."  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 102 n.9 (2d Cir. 2000) (internal marks and citation omitted).  *See also Anderson v. Suiters*, 499 F.3d 1228, 1237-38 (10th Cir. 2007) (courts generally defer to editorial judgment on issues of newsworthiness); *Sussman v. Am. Broad. Cos*, 186 F.3d 1200, 1202 (9th Cir. 1999) (same).

media attention.  Given the media spectacle that surrounds the investigation, it is

reasonable to assume that the public at large would legitimately be interested in the

Enquirer's statements about the investigation, despite the Enquirer's tabloid

status."  *Id*.  *See also Ramsey v. Fox News Network, L.L.C*., 351 F. Supp. 2d 1145,

1147, 1150 (D. Colo. 2005) (finding that Fox News report on the sixth anniversary

of the murder of JonBenét Ramsey related to a matter of public concern).

Moreover, as the Supreme Court has itself held:  "[t]he commission of

crime, prosecutions resulting from it, and judicial proceedings arising from the

prosecutions . . . are without question events of legitimate concern to the public."

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975).  *See also Time, Inc. v. Hill*,

385 U.S. 374, 388 (1967) ("We have no doubt that . . . the opening of a new play

linked to an actual incident [of a family held prisoner in their home by three

escaped convicts], is a matter of public interest.  [Drawing a] line between the

informing and the entertaining is too elusive for the protection of freedom of the

press") (internal marks and citations omitted); *Lowe v. Hearst Commc'ns, Inc*.,414

F. Supp. 2d 669, 674 (W.D. Tex. 2006) ("Reports of the investigation of crimes or

matters pertaining to criminal activity have almost without exception been held to

be newsworthy or matters of legitimate public interest as a matter of law"), *aff'd*,

487 F.3d 246, 250 (5th Cir. 2007) ("there is a legitimate public interest in facts

tending to support an allegation of criminal activity, even if the prosecutor does not

21

intend to pursue a conviction") (citation omitted); *Mistrot v. True Detective Publ'g Corp.*, 467 F.2d 122, 124 (5th Cir. 1972) (article about double murder addressed issue of public concern, even though murder was no longer "hot news" because "[t]he freedom to publish, whatever its qualifications, is not subject to a stopwatch brake").

In this case, reporting about the disappearance of a teenage girl while on a school vacation in a foreign country, the investigation into that disappearance, and criminal charges filed against the man widely suspected of murdering her are all matters of legitimate public concern. *See Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) ("concerns about the safety of children" is an issue of public concern). Thus, at the very least, plaintiff cannot bring tort claims for "outrage" or invasion of privacy without overcoming the barriers to such claims erected by the First Amendment.

**B.   Plaintiff's Claims Fail Because The Articles At Issue Are Not "Of And Concerning" Her.**

Following *Snyder*, it would appear that a claim for "outrage" based solely on the content of a news report about a matter of public concern cannot be squared with the First Amendment for that reason alone. *See* 131 S. Ct. at 1219 ("in public debate we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment") (internal marks and citations omitted). Thus, because it cannot be disputed the

22

articles at issue address such matters, plaintiff has failed to state a claim on which relief can be granted.

Even assuming *arguendo* that an outrage claim is not entirely precluded by *Snyder* in such circumstances, however, plaintiff's claims in this case cannot survive First Amendment scrutiny in any event because they are not "of and concerning" her as a matter of constitutional law.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288-92 (1964).  In *Sullivan*, the Court held that the First Amendment protected a newspaper advertisement that accused Montgomery, Alabama police "of answering Dr. [Martin Luther] King's protests with 'intimidation and violence'" because, *inter alia*, the advertisement was not, as a matter of *constitutional* law, "of and concerning" plaintiff, the supervisor of the city's police department (who was not otherwise named in the publication).  376 U.S. at 258, 291.  The Court so held despite the fact that, at Alabama common law, testimony by witnesses who understood the advertisement to refer to plaintiff was sufficient to sustain a jury verdict in his favor.  *Id.  See also Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966) (First Amendment precluded plaintiff from pursuing claim if he could not satisfy *constitutional* "of and concerning" requirement by showing that column at issue made "specific reference" to him); *Diaz v. NBC Universal, Inc.*, 337 F. App'x 94, 96 (2d Cir. 2009) ("As a threshold, and constitutional, matter, a plaintiff alleging defamation must demonstrate that the allegedly defamatory statement was

23

'of and concerning' him or her"); *Yow v. Nat'l Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1183 (E.D. Cal. 2008) ("the First Amendment requires that the statement on which the claim is based must specifically refer to, or be of and concerning, the plaintiff in some way") (internal marks and citation omitted); *Two Jinn, Inc. v. Green*, 2007 WL 1381804, 2007 WL1381804, at *3 (D. Idaho Mar. 7, 2007) (same); *Auvil v. CBS 60 Minutes*, 800 F. Supp. 928, 933 (E.D. Wash.1992) ("Among the prophylactic rules designed to serve First Amendment values is the threshold requirement that the injured party demonstrate that the defamatory (or as here disparaging) communication was personally directed to him or (as here) to the product."); RESTATEMENT (SECOND) OF TORTS § 564 cmt. f (1977) ("The common law position was that if the recipient reasonably understood the communication to be made concerning the plaintiff, the defamer was subject to liability . . . . This position is now held to be in violation of the First Amendment[.]").

Following *Sullivan,* in *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-56 (1988), the Court held that a plaintiff cannot maintain a cause of action to recover emotional or reputational damages arising from speech without satisfying the strict constitutional requirements that govern a defamation claim.  Specifically, the Court rejected the argument that it should apply a different standard in a case asserting a claim for intentional infliction of emotional distress than it would in a defamation actions simply because "here the State seeks to prevent not reputational damage,

24

but the severe emotional distress suffered by the person who is the subject of an offensive publication. " *Id.* at 52.  It did so because "in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. . . . [E]ven when a speaker or writer is motivated by hatred or ill will his expression was protected by the First Amendment." *Id*. At 53. *See also Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1104-06 (D.D.C. 1991) (The lesson of *Falwell* is that courts may not permit plaintiffs, through creative pleading, to invoke other torts as a vehicle for "end-running other requirements of defamation law."); *Time, Inc.*, 385 U.S. at 387 (same with respect to claims for invasion of privacy).

The teaching of *Sullivan* and *Falwell* and their progeny is that the "of and concerning" requirement is not limited to libel claims, but extends to any tort action seeking reputational, emotional or other pecuniary damages based on speech.  *See, e.g., Kirch v. Liberty Media Corp*., 449 F.3d 388, 398 (2d. Cir. 2006) ("The district court properly dismissed ITTC's defamation, tortious interference, and civil conspiracy claims on the grounds that Breuer's statements were not 'of and concerning' ITTC"); *Blatty v. N.Y. Times Co*.**,** 728 P.2d 1177, 1184 (Cal. 1986) (imposing First Amendment and state law "of and concerning" requirement to bar claim for intentional interference with prospective economic advantage because "it is plain that [plaintiff's] intentional interference claims have as their

{00541653;v1}

gravamen the alleged injurious falsehood of a statement.").  As a result, plaintiff

cannot proceed to litigate her outrage and privacy claims without establishing, at

the very least, that the articles she challenges were "of and concerning" her.

In her Complaint, plaintiff asserts that the articles are outrageous and

invaded her "emotional sanctum" because, among other statements, the June 2010

Article states:  "Investigator: Killer's map to NATALEE'S GRAVE FOUND" and

"It's believed that Natalee's body is buried at the Bubali Bird Sanctuary."  Compl.

¶ 37.  Similarly, she complains that the December 2010 Article reports that a

jawbone was found "near a swamp in Aruba, where Alabama teen Natalee

Holloway disappeared" and that the April 2011 Article contains the headline "New

investigation reveals:  JORAN AND HIS DAD HID NATALEE'S BODY IN A

TOMB! THEY TOSSED HER IN A CORPSE FILLED CASKET; PLUS FBI

finds murder details on his computer."  Compl. ¶¶ 67, 102.  These statements are

not about plaintiff.  Indeed, *none* of the allegedly actionable statements are about

her – they do not mention or refer to her in any way.  To the extent that plaintiff is

even referenced in the articles, the references are in passing and simply note that

she is Natalee Holloway's concerned mother.  Thus, because the statements at

issue are not "of and concerning" plaintiff, her claims must be dismissed as a

matter of constitutional law.

Plaintiff attempts to circumvent the First Amendment by contending that at least some of the statements about which she complains are false.  *See, e.g.,* Compl. ¶ 28 ("Defendants published numerous false headlines, articles, and statements with accompanying photographs").  But, for purposes of the First Amendment, it simply does not matter that plaintiff so alleges.  Indeed, as the Supreme Court reaffirmed in June in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), the First Amendment prohibits the promulgation of laws that empower either government or its citizens to punish speech simply because it is alleged to be false.  *See, e.g., id.* at 2545 ("The Court has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection.").  Put differently, in a case such as this one, unless the allegedly false speech at issue is "of and concerning" the plaintiff, neither state nor federal law can constitutionally purport to authorize any of its citizens to police its courts to ensure the purity of public discourse.  *See id.* at 2547 ("Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth. See G. Orwell, Nineteen Eighty–Four (1949) . . . .  Were this law to be sustained, there could be an endless list of subjects the National Government or the States could single out.").  Otherwise, anyone allegedly offended by false speech could invoke the judicial process and seek to recover damages for the emotional distress the publication of such falsehoods allegedly caused them.  As the Supreme Court

27

explained in *Alvarez*, however, the "mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id.* at 2548.

## II.
## PLAINTIFF'S CLAIMS ALSO FAIL AS A MATTER OF COMMON LAW

Even if plaintiff's claims were not constitutionally infirm, which they are, they fail for the independent reasons that she cannot establish their elements as a matter of common law.

### A.  Plaintiff Cannot State a Claim for "Outrage"

Plaintiff cannot state a viable claim for the tort of "outrage" at common law for three independent reasons.  First, the conduct at issue – *i.e.,* the publication of articles in a newspaper, even a so-called "tabloid" newspaper – is not sufficiently "outrageous" to sustain such a cause of action as a matter of law.  Second, given the massive publicity and media speculation surrounding the disappearance of her daughter, much of it generated by plaintiff herself, she cannot conceivably carry her burden of proving that she sustained the kind of extreme emotional distress the tort requires as a result of the three articles she seeks to place at issue.  Finally, the common law requirement that an allegedly tortious publication be "of and concerning" the plaintiff to be actionable rightly applies to all publication-based torts and therefore precludes plaintiff's "outrage" claim just as it would any defamation claim brought by her.

28

1.        **The Outrageous Conduct Requirement**

In Alabama, the tort of "outrage" – also known as intentional infliction of emotional distress – is an extremely limited cause of action.  *Little v. Robinson,* 72 So. 3d 1168, 1172-73 (Ala. 2011).  *See also Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala.1993) (noting that Alabama Supreme Court "has held in a large majority of the outrage cases reviewed that no jury question was presented").  To give rise to a cause of action for outrage, the conduct at issue must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Horne v. TGM Assocs., L.P.,* 56 So. 3d 615, 631 (Ala. 2010) (internal marks and citation omitted).  This is a question of law for the court. *Logan v. Sears, Roebuck & Co.,* 466 So.2d 121, 123 (Ala. 1985).

To date, Alabama courts have recognized the tort in only four circumstances: (1) wrongful conduct in the burial context, (2) barbaric methods employed to coerce an insurance settlement, (3) egregious sexual harassment, and (4) "against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction."  *Little,* 72 So. 3d at 1172-73.  *See also e.g., Estate of Reed v. Ponder Enters., Inc.*, 2012 WL 1031487, at * 7-8 (M.D. Ala.

Mar. 27, 2012) (noting limited reach of outrage tort under Alabama law); *Jackson v. Countrywide Home Loans, Inc.,* , 2012 WL 777180, at * 8 (M.D. Ala. Mar. 7, 2012) (same).  None of these circumstances are applicable here.

In cases involving the death of loved ones – the only remotely analogous circumstance recognized by the Alabama courts – the tort has been applied solely to outrageous conduct related directly to the contemporaneous disposal of the body.  *See, e.g., Gray Brown-Service Mortuary, Inc. v. Lloyd*, 729 So. 2d 280 (Ala. 1999) (cemetery's secretive disinterment and gross abuse of corpse by opening a casket, throwing acid into it, removing some remains and tossing them in the woods to solve an "odor problem" in mausoleum supported outrage claim); *Levite Undertakers Co. v. Griggs*, 495 So.2d 63 (Ala.1986) (defendant's wrongful retention of remains of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question on outrage claim); *Cates v. Taylor*, 428 So. 2d 637 (Ala. 1983) (defendant's withdrawal of permission to use a burial plot thirty minutes before planned funeral sufficient to present a jury question on outrage claim); *Southern Life & Health Ins. Co. v. Morgan,* 105 So. 161, 165 (1925) (wrongful refusal to issue death certificate which delayed child's burial and caused body to decay and decompose supported plaintiff's claim).  AMI's news reporting plainly does not fit any of these fact patterns.

Indeed, in the few reported Alabama cases in which plaintiffs have even attempted to assert outrage claims against the media, the courts have rejected those efforts out of hand. *See, e.g., Finebaum v. Coulter,* 854 So. 2d 1120 (Ala. 2003) (dismissing outrage claim where plaintiff alleged radio host had accused him of performing oral sex on another man); *Fitch v. Voit*, 624 So. 2d 542 *(*Ala. 1993) (affirming dismissal of outrage claim where newspaper printed photograph of plaintiffs' decedent as she lay in bed dying of cancer); *Little v. Consolidated Publ'g Co.,* 83 So. 3d 517 (Ala. Civ. App. 2011) (affirming dismissal of outrage claim where plaintiff alleged newspaper falsely criticized him because of his race). Simply put, there is nothing in Alabama law to support plaintiff's novel theory that the act of publishing a news report, in a so-called "tabloid" or otherwise, can be sufficiently "outrageous" to "be regarded as atrocious and utterly intolerable in a civilized society." *Horne*, 56 So. 3d at 631 (internal marks and citations omitted).

This is especially so where, as here, news reports about the same subjects, containing indistinguishable speculation about the fate of Natalee Holloway, were disseminated contemporaneously both by a legion of other media outlets and, indeed, by plaintiff herself. *See* discussion *supra* at 2-10.  Under such circumstances, plaintiff cannot carry her burden with respect to this element of the tort as a matter of law.

{00541653;v1}

### 2.    The Severe Emotional Distress Requirement

To state a claim for outrage, Alabama law requires that the emotional distress suffered by plaintiff be so severe that "no reasonable person could be expected to endure it." *Stabler v. City of Mobile*, 844 So.2d 555, 560 (Ala.2002). *See also Diefenderfer v. Ford Motor Co.,* 916 F. Supp. 1155, 1162 (M.D. Ala. 1995),*aff'd*, 91 F.3d 163 (11th Cir. 1996); *State Farm Auto Ins. Co. v. Morris*, 612 So.2d 440, 445 (Ala.1993); *Johnston v. Bhd. of Ry., Airline & Steamship Clerks*, 1984 WL 2815, at * 2 (N.D. Ala. Feb. 15, 1984). In this case, given the massive publicity attendant to Natalee Holloway's disappearance – including publicity generated by plaintiff herself – she cannot conceivably carry her burden of proving that she sustained the kind of severe emotional distress necessary to establish the tort. *See, e.g., Grimsely v. Guccione,* 703 F. Supp. 903 (M.D. Ala. 1988).

In *Grimsley,* plaintiff claimed she suffered the requisite severe emotional distress when *Penthouse* magazine published an article entitled "Birth of a Hemorrhoid" about the surprising birth of plaintiff's son after she was told she was suffering, instead, from a case of hemorrhoids.  The court rejected plaintiff's claim for outrage, finding that her voluntary appearance in and assistance with the publication of other articles and photos about the same event precluded her claim. 703 F. Supp. at 907-08 (rejecting outrage claims because "by the time *Penthouse* published the story, the article with text and headlines substantially similar to that

32

found in *Penthouse,* had already appeared in newspapers in [plaintiff's] hometown and neighboring cities, in out-of-state newspapers, and in two national publications.").

As in *Grimsley,* Beth Holloway cannot claim to have suffered severe emotional distress arising from the publication of speculation about her daughter's disappearance and death when she, herself, has engaged in such speculation on the same subjects in multiple media outlets. *See* Stracher Decl. Exs. 1, 14, 17, 27. On this separate ground, therefore, plaintiff's cause of action for outrage should be dismissed.

### 3.     The "Of and Concerning" Requirement

All apart from the First Amendment, the common law of Alabama has long provided that a plaintiff seeking damages for harm caused by the content of a publication cannot sustain such a claim unless she can prove that an allegedly actionable statement was "of and concerning" her. *See, e.g., Fitch*, 624 So.2d at 543-44; *Chandler v. Birmingham News Co*., 209 Ala. 208, 95 So. 886, 888-89 (Ala. 1923) (burden on plaintiff to establish allegedly defamatory publication "was 'of and concerning him'"); *Larrimore v. Dubose*, 827 So.2d 60 (Ala. 2001) (wife could not maintain libel claim based on statements about her husband).

This "of and concerning" requirement is not limited to defamation claims. Rather, to prevail on *any* tort claim arising from a publication, a plaintiff must

{00541653;v1}

prove that the publication was about her.  *See, e.g., Fitch,* 624 So.2d at 543 (family members could not sustain libel or invasion of privacy claims based on newspaper's publication about their relative); *Santiesteban v. Goodyear Tire & Rubber Co.*, 306 F.2d 9, 12 (5th Cir. 1962) (affirming order striking damage claim arising from alleged suffering of plaintiff's wife because "the weight of authority is that the reflex suffering of appellant based on his knowledge of the mortification of or other effect on his family may not be considered as an element of damage").[10]

Thus, as discussed in section IB *supra*, because plaintiff has not based her claims on any published statement about her, but rather on statements "about *Natalee's* disappearance" and "the alleged treatment of *Natalee's* corpse," Compl. ¶¶ 27, 34 (emphasis added), she may not bring a tort claim – regardless of its denomination – based on publication of the articles she has placed at issue.

---

[10]*See also Justice v. Belo Broad. Corp.*, 472 F. Supp. 145 (N.D. Tex. 1979) (parents could not maintain claim based on statements about their son); *Young v. That Was The Week That Was*, 312 F. Supp. 1337, 1340 (N.D. Ohio 1969) ("Virtually all the cases which have passed upon this question (cited above) have held that an individual has no cause of action for invasion of his privacy, where the defendant published information concerning the individual's deceased relative"), *aff'd*, 423 F.2d 265 (6th Cir. 1970); *Miller v. Nat'l Broad. Co.*, 232 Cal. Rptr. 668 (Cal. App. 2d Dist. 1986) (daughter could not maintain invasion of privacy or intentional infliction of emotional distress claim based on publication about her father and trespass into her parents' home); Robert D. Sack, *Sack on Defamation: Libel, Slander & Related Probs.* § 12:3.3 ("As in defamation, there is ordinarily no vicarious right of privacy. Only the person actually referred to may maintain an action.") .

{00541653;v1}

**B.**   **Plaintiff Cannot Establish a Cause**
        **of Action for Invasion of Privacy**

At common law, the tort of invasion of privacy consists of four separately actionable wrongs: 1) intrusion into a person's solitude or seclusion; 2) publication of private facts; 3) placing a person in a "false light;" and 4) appropriating a person's name or image for a commercial purpose.  *See Norris v. Moskin Stores, Inc.,* 132 So.2d 321 (Ala. 1961).  While it is not clear whether plaintiff is attempting to assert a claim for intrusion upon seclusion, publication of private facts or false light,[11] her privacy-based cause of action, which concededly arises solely from AMI's publication of the three articles at issue, fails as a matter of common law both because (1) there is no "relational right of privacy" in Alabama, and (2) the articles address a matter of public interest.

First, in Alabama, there is no "relational right of privacy."  Simply put, in Alabama, one family member may not maintain a cause of action based on the publication of allegedly "private" information about another family member.  *See, e.g., Fitch,* 624 So. 2d at 543 (dismissing family's claims for invasion of privacy based on allegedly emotionally distressing publication of photograph of dead relative); *Woods v. SunTrust Bank,* 81 So. 3d 357, 365-66 (Ala. Civ. App. 2011)

---

[11] Plaintiff does not attempt to and in any event could not set forth any of the elements of a claim for appropriation of name or likeness.

(dismissing privacy claim brought by daughter based on allegedly emotionally distressing phone calls made to parents).  That is precisely what plaintiff has attempted to accomplish by asserting a claim for invasion of privacy in this case based on statements about her daughter.  As a result, her invasion of privacy claim fails to state a cause of action for this independent reason as well.[12]

Second, because the articles at issue address newsworthy matters of public interest – *i.e.*, the disappearance of a teenage girl while on a school vacation in a foreign country, the investigation into that disappearance, and criminal charges filed against the man widely suspected of  murdering her – plaintiff's claim for invasion of privacy is barred  as a matter of common law and by Article I, section 4 of the Alabama Constitution.  *See J.C. v. WALA-TV, Inc.,* 675 So. 2d 360, 362 (Ala. 1996) (holding that Alabama Constitution barred plaintiff's intrusion claim because publication of teenager's status as a runaway concerned a "'legitimate public interest.'") (citing and quoting *Campbell v. Seabury Press,* 614 F.2d 395, 396 (5th Cir. 1980) (holding that public interest defense to privacy claim "extends to information concerning interesting phases of human activity and embraces all issues about which information is needed or appropriate so that individuals may

---

[12]Moreover, to the extent plaintiff asserts a claim for false light invasion of privacy, that claim would be barred for the reasons set forth in sections IB and IIA3, *supra*.

cope with the exigencies of their period.")); *Doe v. Roe,* 638 So.2d 826, 828 (Ala.

1994) (dismissing plaintiff's intrusion claim because book about murder of

children's mother addressed matter of public interest); *McCaig v. Talladega Publ'g

Co.,* 544 So. 2d 875, 879-880 (Ala. 1989) (holding that plaintiffs' claim for

publication of private facts was barred because article about  plaintiffs' business

affairs was of legitimate public concern); *Smith v. Doss,* 37 So. 2d 118, 120 (Ala.

1948) ("the right of privacy does not prohibit the broadcast of matter which is of

legitimate public or general interest.").

In *Smith,* a case remarkably similar to this one, the two daughters of a man

who was long presumed murdered but then found to have died of cancer in

California twenty-five years later, while another man was tried and convicted for

his murder, brought an invasion of privacy claim against a radio station that

broadcast the details of the saga.  Plaintiffs claimed that the broadcast wrongly

disclosed the "description and practical history of the private and family life of

plaintiffs, plaintiffs' father and plaintiffs' family, in which the name, actions and

intimate details of the past and forgotten life of plaintiffs' father and of plaintiffs'

family are reproduced, resurrected and detailed by graphic descriptions."  37 So.

2d at 118.  In dismissing their privacy claims, the court noted its sympathy for "the

feelings of the plaintiffs," but nevertheless held that, given the notoriety of the

story and the public nature of the events at issue, plaintiffs could not state a claim for invasion of privacy under Alabama law.  *Id.* at 120-21.

As established at pp. 2-10 and 17-22, *supra,* the story of Natalee Holloway's disappearance, presumed death, and the subsequent investigation of her whereabouts has been international news for the last seven years.  Even if  plaintiff could credibly assert a desire to keep that story private, therefore, her claim for invasion of privacy fails to state a viable claim under Alabama law in the face of the palpable and legitimate public interest that has long surrounded it.

### III.
### PLAINTIFF'S CLAIMS ARISING FROM THE JUNE 2010 ARTICLE ARE BARRED BY THE STATUTE OF LIMITATIONS

Plaintiff's claims based on the June 2010 Article are time barred and should be dismissed for the independent reason that they were brought more than two years after they accrued.  *See* Ala. Code § 6-2-38(*l*) (two year statute of limitations for invasion of privacy and intentional infliction of emotional distress claims).  In Alabama, for any tort based on damages allegedly caused by a publication, the "statute of limitations 'begins to run at the time [the cause of action] accrues, that is, when the [. . . ] matter is published.'"  *Walton-Horton v. Hyundai Motor Mfg. Ala., LLC*, 2009 WL 3764229, at *8 (M.D. Ala. Nov. 10, 2009) (quoting *Tonsmeire v. Tonsmeire,* 233 So. 2d 465, 467 (Ala. 1970)), *aff'd on other grounds*, 402 F. App'x 405 (11th Cir. 2010) .   Under Alabama law, as in most states, a

38

statement is "published" when it is disseminated to a third party.  *See, e.g., Hollander v. Nichols*, 19 So.3d 184, 195 (Ala. 2009) (allegedly defamatory records published when they were first distributed to third parties).  *See also Age-Herald Publ'g Co. v. Huddleston*, 207 Ala. 40, 92 So. 193, 197 (1921) ("To 'publish' a newspaper at any place is, according to common understanding, to compose, print, issue, and distribute it to the public, and especially to its subscribers . . . .").

In this case, the June 2010 Article was in fact published on June 16, 2010, more than two years before plaintiff filed her complaint on June 20, 2012.  *See* Affidavit of Robert O'Neill ("O'Neill Aff.") ¶ 4 (June 16 was date on which June 2010 Article was actually made available for sale to public).  It is of no consequence that the issue in which the June 2010 article appeared bears a cover date of "June 28, 2010," because that date is not the date the magazine was disseminated to the public.  *Id.* ¶¶ 4, 5.  This proposition is well settled law across the country.  *See, e.g., Printron, Inc. v. McGraw-Hill, Inc.*, 35 F. Supp. 2d 1325, 1326-27 (D.N.M. 1998) ("[w]hile the offending article appeared in an issue of *Business Week* that bore a September 12, 1994 cover date  . . . [s]ubstantially all subscribers received the September 12, 1994 issue by September 6, 1994. . . . There is no question that the disputed article was substantially and effectively communicated to a meaningful mass of readers by at least September 6, 1994.");  *Glanville v. Glanville*, 1993 WL 256605, at *4-5 (N.D. Ga. Mar. 5, 1993) (libel

39

claim based on October 1990 issue of *Esquire* magazine accrued by "on sale" date of September 18, 1990, "that is, the date that the October issue of the magazine would be made available for sale to the general public").[13]

---

[13]*See also Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984) ("it is common knowledge that publications are often in the hands of the public before the date appearing thereon. This is particularly true of magazines. The May issue of a monthly magazine usually arrives on the newsstands and at the homes of subscribers by mid-April. Courts have recognized this as common practice."); *Bradford v. Am. Media Operations, Inc.*, 882 F. Supp. 1508, 1512, 1517-19 (E.D. Pa. 1995) (because "the September 7, 1993 edition of Star was made generally available to the Pennsylvania public on August 31, 1993, or, at the latest, September 1, 1993," plaintiff's complaint, which was filed September 6, 1994, was time-barred); *Ratliff v. Farm Progress Cos.*, 1992 WL 240661, at *2-4 (E.D. Ky. May 4, 1992) ("Although the article in question was published in three of the Defendant's magazines bearing the cover date of December 5, 1989, the date on the cover of the magazines is not determinative of the actual date of publication" and finding that cause of action accrued when "the Defendant mailed over 100,000 copies of Prairie Farmer on November 30, 1989."); *Wildmon v. Hustler Magazine, Inc.*, 508 F. Supp. 87, 91 (N. D. Miss. 1980) (defamation and invasion of privacy claims time-barred because "on or before October 5, 1978, substantially all of the November, 1978, issues of Hustler Magazine were distributed to the public"); *Khaury v. Playboy Publ'ns, Inc.,* 430 F. Supp. 1342, 1344-45 (S.D.N.Y.1977) (claim accrued when magazine issue went on sale to the public, not the date on the cover); *Suss v. N.Y. Media, Inc.*, 69 A.D.3d 411, 411-12, 891 N.Y.S.2d 409, 410-11 (1st Dep't 2010) (barring commercial misappropriation claim because based on article in *New York* magazine, although magazine issue was dated May 7, 2010, the magazine was "distributed to newsstands in Manhattan on April 28 and April 29, 2007; the action was commenced on April 30, 2008; and it is undisputed that both of plaintiff's claims are governed by the one-year statute of limitations").

Accordingly, because plaintiff filed her complaint on June 20, 2012,  more than two years after her alleged causes of action accrued, her claims based on the June 2010 Article are time-barred and must be dismissed.

41

## CONCLUSION

For the foregoing reasons, AMI respectfully requests that this Court dismiss plaintiff's complaint in its entirety and with prejudice pursuant to Rules 12(b)(6) and 56(c) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated: <u>Friday, August 17, 2012</u>          <u>/s/ Harlan I. Prater, IV</u>
One of the Attorneys for Defendants

OF COUNSEL:

Lee Levine
*llevine@lskslaw.com*
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, D.C. 20036
Telephone:   (202) 508-1110
Facsimile:   (202) 861-9888

Harlan I. Prater, IV
*hprater@lightfootlaw.com*
John G. Thompson
*jthompson@lightfootlaw.com*
Jeffrey P. Doss
*jdoss@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone:   (205) 581-0700
Facsimile:   (205) 581-0799

42

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon the following counsel of record through the Court's electronic filing system this <u>17th</u> day of <u>August</u>, 2012:

L. Lin Wood
*lwood@whetriallaw.com*
Stacey Godfrey Evans
*sevans@whetriallaw.com*
WOOD HERNACKI & EVANS LLC
1180 West Peachtree Street, Suite 2400
Atlanta, Georgia 30309

Carolyn Littell Courson
*elizabeth@littell-law.com*
P.O. Box 242606
Montgomery, Alabama 36124


                                        */s/ Harlan I. Prater, IV*
                                        Of Counsel

43