FILED

2013 May-22  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ELIZABETH ANN HOLLOWAY,           )
                                  )
          Plaintiff,              )
                                  )
v.                                )          Case No. 2:12-cv-2216-TMP
                                  )
AMERICAN MEDIA, INC., and         )
THE NATIONAL ENQUIRER, INC.,      )
                                  )
          Defendants.             )

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the motion to dismiss and for partial summary judgment filed by the defendants on August 17, 2012.  (Doc. 16).  The plaintiff has filed a response, along with a motion to stay consideration of the motion for partial summary judgment.  (Doc. 24).   Also pending is a motion to reconsider the court's order granting plaintiff leave to file an affidavit under seal (doc. 28) and a motion to strike the affidavit (doc. 38), also filed under seal.   The motions have been fully briefed.  The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  PROCEDURAL HISTORY

The plaintiff, Elizabeth Ann Holloway, filed her complaint on June 20, 2012, alleging that the defendants, American Media, Inc., and its subsidiary, The National Enquirer, Inc., through its

publication, the *National Enquirer*,[1] are liable to her under Alabama law for the torts of intentional infliction of emotional distress and invasion of privacy.  The plaintiff's state-law tort claims arise from the defendants' publication of headlines, articles, and photographs in the weekly tabloid publication, the *National Enquirer*.  The three articles at issue, published in June and December 2010 and April 2011,[2] purport to describe details of the death and/or burial of Natalee Holloway, plaintiff's daughter, who disappeared during a senior trip to Aruba in 2005.  Despite extensive searches, criminal investigations, and intense media coverage, Natalee, who was then 18, was never found.[3]  The plaintiff has not yet been able to obtain conclusive proof whether her daughter is alive or dead.

The plaintiff filed the complaint commencing this action on June 20, 2012.  She complains that the *Enquirer* published at least three articles that were knowingly false and which were intended by defendants to cause her to suffer severe emotional distress.  The articles described a map that purported to show where Natalee's body was located, a "secret graveyard" where Natalee had been "buried alive," and other details about her "murder" and the treatment of her "corpse," including that

---

[1]     To avoid confusion, the court will refer herein to both American Media, Inc., and its subsidiary, The National Enquirer, Inc., collectively, as "the *Enquirer*" or "defendants."

[2]     The "cover dates" of publication were, respectively, June 28, 2010, December 6, 2010, and April 25, 2011.  The "cover date" of publication is the date that appears on the cover of the publication, even though the *actual* date of publication (i.e., the date the publication is available for purchase by the public) was an earlier, different date.  The difference between the actual date of publication and the "cover date" of publication is at the heart of the defendant's motion for partial summary judgment on statute of limitation grounds.

[3]     Natalee Holloway, plaintiff's daughter, is referred to by her first name to avoid any confusion with references to plaintiff, Elizabeth Holloway.  Plaintiff will be referred to as "Ms. Holloway."

2

it had been secreted temporarily in a coffin with another corpse before being moved to a final location.  Plaintiff alleges that the stories, headlines, and photographs published in those three articles caused her to suffer severe emotional stress and invaded her privacy through an invasion of her emotional sanctum.

After filing an unopposed motion for extension of time in which to answer or respond to the complaint, and after the motion was granted, the *Enquirer* filed a motion to dismiss and for partial summary judgment asserting that plaintiff's claims are due to be dismissed on the following grounds: (1) that the defendants are not liable to plaintiff on her tort claims because the published materials are "of public concern" and thus are protected by the First Amendment; (2) that the plaintiff cannot recover because the statements at issue are not "of and concerning" her and thus are protected by the First Amendment; (3) that the conduct at issue is not sufficiently "outrageous" to support a claim for intentional infliction of emotional distress under Alabama law; (4) that plaintiff's extreme emotional distress was not caused by the defendants or the published materials, but by the events arising from Natalee's disappearance; and (5) that the claims relating to the June 28, 2010, publication are barred by the applicable Alabama two-year statute of limitation.[4]   In response to the *Enquirer's* motion, Ms. Holloway filed a response in opposition, an affidavit, and a motion to stay consideration of the motion for partial summary judgment in order to conduct discovery.  The defendants have filed a motion for reconsideration of the order granting leave to file, and have filed a motion to file a

---

[4]        Although the motion itself is not clear, defendants have clarified that they seek summary judgment, and rely upon matters outside the pleadings, only on the ground that the tort claims are barred by the applicable statute of limitations; all other grounds are asserted in support of a motion for dismissal pursuant to Rule 12(b)(6).  (Doc. 36, p. 3).

response to the affidavit, also under seal, which was granted.[5]   In addition, the defendants filed a

reply to the plaintiff's opposition to the motion to dismiss and for partial summary judgment, which

included an opposition to the plaintiff's motion to stay.  Because the motion for partial summary

judgment is based solely upon the statute of limitations defense, for which adequate evidence already

has been submitted, the motion to stay (doc. 24) is DENIED.


## II.  STANDARDS OF REVIEW

The motion presents a complex procedural posture for the case.  Defendants make clear that

the motion for partial summary judgment is intended to reach only plaintiff's claims arising from the

June 28, 2010, publication, contending that such claims are outside the two-year limitation period.[6]

In considering all of the claims except the claim based upon the statute of limitations, the court

employs the standards governing a Rule 12(b)(6) motion to dismiss.  The court examines the

evidence offered with respect to the motion seeking dismissal of the tort claims on the basis that they

are barred by the statute of limitations in accordance with the standards governing a Rule 56 motion

for summary judgment.

---

[5]     Because defendants have clarified that they seek dismissal of the claims under Rule 12(b)(6), and not under Rule 56, with the exception of their assertion that the tort claims related to the June 2010 publication are time-barred, the plaintiff's affidavit filed under seal (doc. 23) is  not relevant to the claims being considered under Rule 12 and has not been considered by the court in resolving the instant motion to dismiss challenging claims related to the December 2010 and April 2011 publications.  Accordingly, the defendants' motion to reconsider the court's order allowing the motion to be filed (doc. 28) and the motion to strike the affidavit (doc. 38) are MOOT.

[6]     Defendants do not contend that plaintiff's similar claims of outrage and invasion of privacy arising from the December 2010 and April 2011 publication are untimely.

**A.  Motion to Dismiss**

Because this case is before the court on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must assume as true all of the "well-pleaded" facts set in the plaintiff's complaint.  In <u>Conley v Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), the Supreme Court stated that a complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  "[T]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low."  <u>Quality Foods de Centro Am. S.A. v. Latin Am. Agribusiness Develop. Corp.</u>, 711 F.2d 989, 995 (11th Cir. 1983).  Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Liberal notice pleading standards embodied in Rule 8(a) "do not require that a plaintiff specifically plead every element of a cause of action," <u>Roe v. Aware Woman Ctr. for Choice, Inc.</u>, 253 F.3d 678, 683 (11th Cir. 2001), or set out in precise detail the specific facts upon which she bases her claim.  The complaint must only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  <u>Id.</u> (quoting <u>In re Plywood Antitrust Litigation</u>, 655 F.2d 627, 641 (5th Cir. Unit A Sept.8, 1981)).

Although the court must accept the factual allegations of the complaint as true, it is not required to accept legal conclusions masquerading as facts.  As one district court recently reiterated:

> Federal Rule of Civil Procedure 12(b)(6) empowers the Court to grant a defendant's motion to dismiss when a complaint fails to state a claim upon which relief can be granted.  The pleadings are construed broadly so that all well-pleaded facts are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff.  <u>Cooper v. Pate</u>, 378 U.S. 546, 546, 84 S. Ct. 1733, 12 L. Ed. 2d 1030

(1964); <u>Conner v. Tate</u>, 130 F. Supp. 2d 1370, 1373 (N.D. Ga. 2001).  However, the court need not "accept as true a legal conclusion couched as a factual allegation." <u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).

<u>Smith v. Delta Air Lines, Inc.</u>, 422 F. Supp. 2d 1310, 1324 (N.D. Ga. 2006).  The Supreme Court

commented in 2007 on Rule 12(b)(6) dismissals, saying:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," <u>Conley v. Gibson</u>, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, <u>ibid.</u>; <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level, <u>see</u> 5 C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1216, pp. 235-236 (3d ed.2004) (hereinafter <u>Wright & Miller</u>) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), <u>see, e.g</u>., <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); <u>Neitzke v. Williams</u>, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).

The Supreme Court in <u>Twombly</u> clearly raised the threshold for factual allegations in a complaint

from "conceivable" to "plausible".  <u>Anderson v. Nichols</u>, No. 3:07cv45/RV/EMT, 2007 WL

2020165 (N.D. Fla. July 9, 2007).  <u>Twombly</u> instructs that "<u>Conley's</u> 'no set of facts' language has been questioned, criticized, and explained away long enough" and "this famous observation has earned its retirement."  127 S. Ct. at 1269.

The court of appeals has taken the Supreme Court's admonition to heart.  "The Supreme Court's most recent formulation of the pleading specificity standard is that 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." <u>Watts v. Florida Int'l Univ.</u>, 495 F.3d 1289, 1295 (11th Cir. 2007), quoting <u>Twombly</u>, 127 S. Ct. at 1965.  The rule does not "impose a probability requirement at the pleading stage;" instead the standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the elements of the claims.  <u>Twombly</u>, 127 S.Ct. at 1965.   "It is sufficient if the complaint succeeds in 'identifying facts that are suggestive enough to render [the element] plausible.' " <u>Watts</u>, 495 F.3d at 1296, quoting <u>Twombly</u>, 127 S.Ct. at 1965.  Accordingly, the court must evaluate the plaintiff's claims in light of the <u>Twombly</u> standard, taking as true the well-pleaded *factual* allegations of her complaint.

### B.  Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  FACTS

For purposes of the motion to dismiss, the allegations of the complaint are accepted as true. In addition to describing and attaching copies of the articles at issue, plaintiff alleges a number of other legally significant facts.  At paragraph 27 and elsewhere in the complaint, plaintiff has alleged that "[b]eginning in July 2005 and continuing until at least through April 25, 2011, American Media and the National Enquirer have published numerous false headlines, articles, and statements with accompanying photographs about Natalee's disappearance...," including the three at issue here.  The complaint alleges that each of the three articles was "published with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity" in that the sources of information in the articles were known to be unreliable and that the information was itself false and known by the defendants to be false.[7]  Although the complaint alleges that defendants intentionally published false information "in  a calculated effort to gain financially" and "in a calculated effort to increase sales and increase profits by falsely sensationalizing their continued tabloid coverage of Natalee's disappearance," (see ¶¶ 132, 133 of the complaint), plaintiff also alleges that "[d]efendants published the false and outrageous headlines, articles, statements and photographs *with the intent to cause, or with reckless disregard of a substantial probability of causing, Plaintiff to suffer severe emotional distress*."  (See ¶ 134 of the complaint) (italics added).  Thus, the complaint alleges that

---

[7]       The plaintiff also seems to allege that the defendants "negligently" published the false information.  See ¶ 125 of the complaint.  Negligently publishing false information is insufficient to state a cause of action under the circumstances of this case.  See n. 17, *infra*.

at least part of the motivation of the defendants was the intent to inflict on plaintiff severe emotional distress.

For purposes of the motion for partial summary judgment, the only relevant facts are those relating to the statute of limitations.  The relevant evidence offered by the defendants indicates that the *Enquirer* that carried a publication date of June 28, 2010, was available to the public as early as June 16, 2010.  Plaintiff has responded both that the defendants' evidence regarding the date of distribution is inadequate, and that, regardless of when the June 28 edition was available to the public, she did not see the publication or suffer any distress over the publication until September or October 2010.


## IV.  DISCUSSION

### A.  Application of the First Amendment as a Bar to Tort Claims

The case at bar requires the court to draw a line between the state's right to protect a citizen from outrageous conduct and invasions of privacy, and the Constitutional protection of free speech guaranteed by the First Amendment.  The conflict between an individual's tort claim and a free press most often has been confronted in the realm of libel law.  Modern legal standards regarding the collision of defamation claims and First Amendment rights were defined by the Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

In Sullivan, the *New York Times* published an editorial advertisement in support of the civil rights movement and against the treatment of protesters by describing a "wave of terror" perpetrated by police in Montgomery, Alabama. The police commissioner sued for libel, alleging that the

11

references to police were directed toward him, were false, and had damaged his reputation.  The

Alabama courts granted him relief, but the Supreme Court reversed, holding that "the rule of law

applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for

freedom of speech and of the press that are required by the First and Fourteenth Amendments in a

libel action brought by a public official against critics of his official conduct."  367 U.S. at 264.  The

Court noted that constitutional protections had been offered historically to speech that was erroneous,

and that such protection is afforded even in spite of the falsity of the speech.  The Court explained:

> Thus we consider this case against the background of a profound national
> commitment to the principle that debate on public issues should be uninhibited,
> robust, and wide-open, and that it may well include vehement, caustic, and
> sometimes unpleasantly sharp attacks on government and public officials.  See
> Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 93 L. Ed. 1131; De Jonge v.
> Oregon, 299 U.S. 353, 365, 57 S. Ct. 255, 81 L. Ed. 278.  The present advertisement,
> as an expression of grievance and protest on one of the major public issues of our
> time, would seem clearly to qualify for the constitutional protection.  The question
> is whether it forfeits that protection by the falsity of some of its factual statements
> and by its alleged defamation of respondent.
>
> Authoritative interpretations of the First Amendment guarantees have consistently
> refused to recognize an exception for any test of truth – whether administered by
> judges, juries, or administrative officials – and especially one that puts the burden of
> proving truth on the speaker.  Cf. Speiser v. Randall, 357 U.S. 513, 525-526, 78
> S. Ct. 1332, 2 L. Ed. 2d 1460.  The constitutional protection does not turn upon 'the
> truth, popularity, or social utility of the ideas and beliefs which are offered.'
> N.A.A.C.P. v. Button, 371 U.S. 415, 445, 83 S. Ct. 328, 344, 9 L. Ed. 2d 405.  As
> Madison said, 'Some degree of abuse is inseparable from the proper use of every
> thing; and in no instance is this more true than in that of the press.'  4 Elliot's
> Debates on the Federal Constitution (1876), p. 571.  In Cantwell v. Connecticut, 310
> U.S. 296, 310, 60 S. Ct. 900, 906, 84 L. Ed. 1213, the Court declared:
>
> > 'In the realm of religious faith, and in that of political belief, sharp
> > differences arise.  In both fields the tenets of one man may seem the
> > rankest error to his neighbor.  To persuade others to his own point of
> > view, the pleader, as we know, at times, resorts to exaggeration, to

12

> vilification of men who have been, or are, prominent in church or state, and even to false statement.  But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.'

That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive,' N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S. Ct. 328, 338, 9 L. Ed. 2d 405, was also recognized by the Court of Appeals for the District of Columbia Circuit in Sweeney v. Patterson, 76 U.S. App. D.C. 23, 24, 128 F.2d 457, 458 (1942), cert. denied, 317 U.S. 678, 63 S. Ct. 160, 87 L. Ed. 544.  Judge Edgerton spoke for a unanimous court which affirmed the dismissal of a Congressman's libel suit based upon a newspaper article charging him with anti-Semitism in opposing a judicial appointment.  He said:

> 'Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. * * *  The interest of the public here outweighs the interest of appellant or any other individual.  The protection of the public requires not merely discussion, but information.  Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen.  Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. * * *  Whatever is added to the field of libel is taken from the field of free debate.'

New York Times Co. v. Sullivan, 376 U.S. at 271-72.  In the end, however, the court's protection of the speech at issue went only so far as those "erroneous statements honestly made."  376 U.S. at 278.  The ultimate test of such speech requires a finding that the First Amendment shields from liability to a public official for *libel* all but those false statements "of and concerning the plaintiff" that are made with knowledge of falsity, actual malice, or reckless disregard for the truth.  367 U.S. 287-88.  Because there is no allegation of libel or slander at issue here, the issue becomes whether

the standards enunciated in New York Times v. Sullivan apply where the claims alleged are intentional infliction of emotional distress or an invasion of privacy.

### 1.  Intentional Infliction of Emotional Distress

The tension between the tort of intentional infliction of emotional distress and the First Amendment's protections of the press was brought into focus in Hustler Magazine v. Falwell, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).  In Hustler, the Supreme Court held that the First and Fourteenth Amendment may prohibit a public figure from recovering damages for the tort of intentional infliction of emotional distress.  The speech at issue in Hustler was an "ad parody" that depicted, in cartoon fashion, a nationally known evangelical minister having sexual relations with his mother in an outhouse.  The subject matter of the speech at issue was admittedly false, and the plaintiff, Jerry Falwell, was not a public official, but a public figure.[8]

The Court in Hustler grappled with the application of the contours of libel law drawn from Sullivan to the quite different tort of intentional infliction of emotional distress.  The Court recognized that speech does not lose its First Amendment protection simply because it is outrageous, shocking, embarrassing, or offensive.  485 U.S. at 55-56.  At the same time, the Court viewed the speech at issue in Hustler as opinion, and as "the public expression of ideas," which did not contain any assertions of fact.  Nevertheless, the Court concluded that a public figure "may not recover for

---

[8]      In Hustler, the parties did not dispute the classification of the religious leader/television host as a public figure.  Similarly, the parties in this case do not dispute that Elizabeth Holloway, who sought publicity about the disappearance of her daughter and appeared frequently on television after Natalee disappeared, also is a public figure.

the tort of intentional infliction of emotional distress ... [w]ithout showing in addition that the publication contains a false statement of fact which was made with 'actual malice'." 455 U.S. at 56. Accordingly, a claim alleging intentional infliction of emotional distress, like a libel claim, can survive a First Amendment challenge when the publication was factual,[9] false, and made with actual malice.

The defendants further argue that the Supreme Court has concluded that the Free Speech Clause of the First Amendment provides a bar to state-law tort claims that arise from speech on matters "of public concern." They contend that, regardless of the falsity or outrageousness of speech, it is protected by the First Amendment if it involves a matter "of public concern." They cite Snyder v. Phelps, ___ U.S. ___, 131 S. Ct. 1207 (2011), which shielded from liability members of the Westboro Baptist Church who picketed a soldier's funeral, holding signs that were offensive, outrageous, and allegedly false. The soldier's father, Albert Snyder, brought claims of intentional infliction of emotional distress and invasion of privacy under Maryland state law after church members lined up along the funeral route holding signs that read, *inter alia*: "God Hates Fags," "You're Going to Hell," and "Thank God for IEDs". Snyder, 131 S. Ct. at 1216-17. The Supreme Court found that the First Amendment protected the speech of the church members where the speech was "relating to any matter of political, social, or other concern to the community." The signs were found to be "of public concern" because they addressed matters involving "homosexuality in the

---

[9]   It also is undisputed that the articles at issue purported to describe facts concerning Natalee Holloway's disappearance, and were not set forth as opinion, parody, or caricature as was the article at issue in Hustler.

military" and the "fate of our Nation."  Snyder, 131 S. Ct. at 1217.[10]  The Court in Snyder noted, however, that there was no allegation that the church members were not representing their "honestly believed" views on public issues.[11]  131 S. Ct. at 1217.  The Court further explained that the picketing did not involve any "pre-existing relationship or conflict between [the church] and [the soldier's father] that might suggest [the church's] speech on public matters was intended to make an attack on Snyder over a private matter."  131 S. Ct. at 1217.

While Snyder clearly expressed a broad view of "special protection" for speech on matters of public concern, even where it is false and "insulting" or "outrageous," it can be asserted fairly that the First Amendment protection described in Snyder does not extend to speech that is not "honestly" believed, or that is used as a weapon simply to mount a personal attack against someone over a private matter.  The plaintiff in this case, unlike Snyder, has alleged that she had a pre-existing relationship with the defendants and that the newspaper articles at issue were "intended" to cause her distress.[12]  Defendants have definitively stated that, for purposes of their motion, they accept the

---

[10]      There is little question that the disappearance of Natalee Holloway, which dominated news coverage for many weeks, if not years, and which involved the safety of travel abroad and called up the worst fears of parents, was a matter of "concern to the community."

[11]      It is also worth noting that, like the "ad parody" in Falwell, the speech at issue in Snyder did not involve asserted "facts," at least in the sense that a reasonable person could understand the offending speech to assert ascertainably "false" statements.  The expressions "God Hates Fags" and "You're Going to Hell" and "Thank God for IEDS" are, at best, opinions, not factual statements.

[12]      Facts in support of this claim are set forth in her affidavit, filed under seal.  (Doc. 37).  Because the motion at issue is one offered pursuant to Rule 12(b)(6), however, the court need not consider the affidavit, and looks to the complaint alone, in which it is alleged that the publication was known to be false, and that the defendants acted intentionally and maliciously to cause her harm.  See ¶¶ 132-134 of the complaint.

plaintiff's allegations that the articles were false.  <u>Snyder</u> does not definitively extend First

Amendment protection to the speech at issue, because plaintiff has alleged that the statements made

were not "honestly believed," and were motivated by some desire to attack her or cause her pain.

The requirement that the statements at issue in a defamation case be either true or believed

by the speaker to be true was discussed further by the Supreme Court in <u>Milkovich v. Lorain Journal</u>

<u>Co.</u>, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990):

> However, due to concerns that unduly burdensome defamation laws could stifle
> valuable public debate, the privilege of "fair comment" was incorporated into the
> common law as an affirmative defense to an action for defamation. "The principle of
> 'fair comment' afford[ed] legal immunity for the honest expression of opinion on
> matters of legitimate public interest when based upon a true or privileged statement
> of fact." 1 F. Harper & F. James, LAW OF TORTS § 5.28, p. 456 (1956) (footnote
> omitted).  As this statement implies, comment was generally privileged when it
> concerned a matter of public concern, was upon true or privileged facts, represented
> the actual opinion of the speaker, and was not made solely for the purpose of causing
> harm.  See RESTATEMENT OF TORTS, supra, § 606.  "According to the majority rule,
> the privilege of fair comment applied only to an expression of opinion and not to a
> false statement of fact, whether it was expressly stated or implied from an expression
> of opinion."  RESTATEMENT (SECOND) OF TORTS, supra, § 566, Comment a.  Thus
> under the common law, the privilege of "fair comment" was the device employed to
> strike the appropriate balance between the need for vigorous public discourse and the
> need to redress injury to citizens wrought by invidious or irresponsible speech.

<u>Milkovich</u>, 497 U.S. at 13-14.  While <u>Milkovich</u> deals with libel allegations and not with claims of

intentional infliction of emotional distress or invasion of privacy, there is no reason to believe that

the "need to redress injury ... wrought by invidious or irresponsible speech" is any less compelling

in the realm of torts other than libel or slander.[13]   The Supreme Court's "actual malice" requirement for defamation actions by public officials and figures demonstrates that there remains a narrow area in which speech may exceed the First Amendment shield.  Likewise, <u>Snyder</u> implies that knowingly false speech motivated by a specific intent to cause emotional harm to a particular person may also fall outside First Amendment protection.

More recent pronouncements of the Supreme Court make an examination of any protection for *false* speech even more difficult.  In <u>United States v. Alvarez</u>, ___ U.S. ___, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012), the court determined that the Stolen Valor Act, a federal statute that criminalized knowingly false statements in which the speaker claims to have been a recipient of the Medal of Honor, violated the First Amendment.   Defendants argue that <u>Alvarez</u> provides First Amendment protection to false speech,[14] but such a broad reading of <u>Alvarez</u> is not justified.   The statute at issue in <u>Alvarez</u> constituted a content-based prior restraint for which the Government had failed to provide a sufficient rationale for its chilling effect on legitimate speech.  The Stolen Valor Act was vulnerable to First Amendment challenge not because false speech is never protected, but because the Act "targets falsity and nothing more."  <u>Alvarez</u>, 132 S. Ct. at 2545.  The Court recognized that "our law and tradition show ... there are instances in which the falsity of speech bears upon whether it is protected," as in cases involving defamation, fraud or other torts.  132 S. Ct. at 246.  <u>Alvarez</u> recognizes that blanket prohibitions on entire categories of speech are different than

---

[13]     The burden of proving the falsity of the statements ultimately lies with the plaintiff. <u>Milkovich</u>, 297 U.S. at 16.

[14]     There is no question that the statute criminalized only intentional and knowingly false statements – blatant lies about being a Medal of Honor recipient.  The statute did not, however, require that the false claim be made with any culpable intent, such as to defraud or injure another.

protections under the law for those who suffer actual injury. "Torts involving the intentional infliction of emotional distress (like torts involving placing a victim in a false light) concern falsehoods that tend to cause harm to a specific victim of an emotional-, dignitary-, or privacy-related kind." 132 .S. Ct. at 2554 (Breyer and Kagan, JJ, concurring).[15]

The cases discussed above instruct that while false speech often must be tolerated in order to foster the free exchange of ideas so integral to our constitutional values, there remain limits upon the right to publish false statements that injure an individual. Those limits appear to be drawn with respect to whether the statements published purport to convey facts (as distinct from opinions), whether the speaker had knowledge that the facts conveyed in the statements were false, and – in the case of a claim of intentional infliction of emotional distress – whether the publication of the statements was intended to, and did, inflict severe emotional distress on a particular victim.[16] At the same time, it is clear that the torts of defamation and of intentional infliction are separate and distinct.

---

[15]     Alvarez is a plurality opinion, with four justices joining in the main opinion and Justices Breyer and Kagan concurring in the judgment, but on different grounds. The narrowest reading of Alvarez is that the statute at issue was unconstitutionally overbroad because it penalized statements falsely claiming an award of the Medal of Honor entirely on the basis of the falsity of the statement "and nothing else." While the falsity of a statement remains relevant to some forms of proscription of speech (i.e., fraud, defamation), it is not alone sufficient to meet First Amendment muster. Under Sullivan and its progeny, falsity must be coupled with some other element of culpability, such as an intent to injure or defraud another person.

[16]     The defendants seek dismissal of the invasion of privacy claim on the same basis as the outrage claims, asserting that "all the constitutional standards that govern defamations actions" apply to any tort claim. Because the court disagrees with the foundation of the argument, the privacy claim need not be addressed separately.

While the First Amendment protections relating to falsity and recklessness apply to expression that may be deemed both defamatory and outrageous, the cases cited by defendants do not support their contention that the "of and concerning" element of a defamation claim also applies as a First Amendment limitation to a claim of intentional infliction of emotional distress.   This is because of the different essential natures of the two torts.  A cause of action for defamation is rooted in the injury to one's reputation.  It arises from the fact that others are led to believe something false about the victim, thereby injuring the victim in the eyes of others.  A cause of action for outrage, however, is rooted in the injury to one's own mental or emotional well-being.  See, e.g., Mitchell v. Random House, Inc., 703 F. Supp. 1250 (S.D. Miss. 1988).  Publication of false facts that are not "of and concerning" the plaintiff cannot damage the plaintiff's reputation, which is an essential element of libel; publication of false facts may, however, serve to inflict severe emotional distress where the defendant "acted for the specific purpose of inflicting emotional distress on [plaintiff] or knew or should have known that emotional distress to [her] would likely result."   Foretich v. Advance Magazine Publishers, Inc., 767 F. Supp. 1099, 1105 (D.D.C. 1991).[17]   This concept is

---

[17]      Although Foretich uses in part the traditional language of negligence – "should have known" – the court does not believe that a claim for intentional infliction of emotional distress can be grounded on a mere negligent statement of a falsehood and avoid First Amendment  limitations on such state tort actions.  Rather, to go beyond First Amendment protection and become actionable, a knowingly false statement must be made with something akin to "actual malice," such as the intent to injure a particular victim, or, perhaps, reckless disregard of whether the knowingly false statement will injure a particular victim.  Indeed, under Alabama law, just such an intent to injure, or such recklessness as to be similar to intent, is required as an element of the tort.  "[T]his tort does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' ....  The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress."   American Rd. Serv. Co. v. Inmon, 394 So. 2d 361, 364-65 (Ala. 1980).

evident in the very roots of the tort of outrage, which recognized the existence of the claim in situations that often involved the mistreatment of a corpse or conduct relating to a funeral or burial. Obviously, such conduct does not become actionable because it is "of and concerning" the plaintiff. Such conduct gives rise to the tort of intentional infliction of emotional distress because it was "outrageous," intentional, and inflicted severe emotional distress on the plaintiff – not on the deceased. The limiting principles that the "of and concerning" requirement provide in a libel case are similarly served in an outrage case by the intent element, and by general tort principles concerning foreseeability.[18]

Accordingly, for all the reasons set forth herein, the First Amendment does not bar the plaintiff's claim that publication of knowingly false information about her daughter's disappearance constituted outrageous conduct where it was published with the intent and expectation that it would cause severe emotional distress to her. The motion to dismiss pursuant to Rule 12(b)(6) based upon this ground is due to be denied.

### 2. Invasion of Privacy

Defendants seek dismissal of the invasion of privacy claim, arguing that such a claim is barred by the First Amendment if the published matter is of public interest. As grounds for the

---

[18] The lack of an "of and concerning" requirement does not open the floodgates of litigation to every reader of a publication who may become upset over the contents of a story. To the contrary, the conduct at issue here is actionable because the defendants allegedly knew that the plaintiff would suffer great distress, and allegedly *intended* to inflict that harm upon her. The same would not be true about other readers who may have empathized with the plight of Ms. Holloway, or who may have been worried or distressed over the disappearance of a teenager.

motion, defendants rely upon Grimsley v. Guccione, 703 F. Supp. 903, 910 (M.D. Ala. 1988) for the proposition that no matter "of public concern" can also be private.   In Grimsley, a woman complained that her privacy was invaded by the publication of a story in *Penthouse* magazine that described the unexpected birth of her son after a doctor had told her she simply had hemorrhoids. The court granted a motion for summary judgment in favor of the defendants.   The material published in Grimsley, however, was protected by the First Amendment not only because it was of public concern, but also because it was true, and was based upon a similar story published with plaintiff's consent and assistance in her local newspaper.   Her complaint was based not upon the content of the story, but upon the "ironic" headline.[19]   703 F. Supp. at 906-07.

Similarly, defendants' reliance upon J.C. v. WALA-TV, Inc., 675 So. 2d 360, 362 (Ala. 1996), is misplaced.   The matter "of public concern" at issue was specifically held to be "truthful and [] of legitimate concern to the public."   Defendants further rely upon Doe v. Roe, 638 So. 2d 826, 828 (Ala. 1994), for the proposition that matters of public concern are excepted from liability for invasion of privacy.   In Doe, the children of a murder victim sought an injunction to prevent the publication of a novel that was based upon their father's killing and dismembering of their mother. 639 So. 2d at 926.   That case involved a prior restraint, which is subject to a higher level of scrutiny under a First Amendment analysis.   And while the issue of falsity is not directly addressed, the Alabama Supreme Court found that events were "of public concern" where they had been "a matter of public record" as part of the trial transcript – a fact which further suggests that there is no "legitimate public concern" regarding statements that are false.

---

[19]      In *Penthouse*, the story was entitled "The Birth of a Hemorrhoid."

The court assumes and the *Enquirer* has conceded that, for purposes of this motion, the stories at issue are false.  For that reason, the court is not willing to hold that the First Amendment shields from an invasion-of-privacy claim every false and malicious statement that involves a matter "of public concern."  However, the defendants' argument that the privacy claim must fail under Alabama state law is more compelling, and will be discussed *infra*.

### B.  State Law as a Bar to Tort Claims

#### 1.  Outrageousness of Conduct

The *Enquirer* asserts that, as a matter of law, the conduct complained of is not sufficiently "outrageous" to be actionable under Alabama law.  In addition, defendants assert that the publications did not cause the emotional distress suffered by Ms. Holloway because she was distressed by the facts of her daughter's disappearance and by other media coverage.  First, defendants argue that the outrage claim is not actionable because similar information was reported on television or in other publications,[20] and because Ms. Holloway contributed to the widespread media coverage by appearing on television, granting interviews to the media, and writing about the

---

[20]    Defendants contend that the court may consider evidence of reporting in other media sources without converting their Rule 12(b)(6) motion to dismiss into a motion for summary judgment because the court may take judicial notice of the other media reports.  Even assuming the court may take such judicial notice as a matter of evidentiary admissibility, this does not change the fact that such evidence is outside the pleadings, triggering the conversion requirement of Rule 12(d), unless excluded by the court.  The question is not whether the other media reports are admissible as evidence, but whether they are evidence outside the pleadings.  Because the court views the other media reports as such, they are excluded and not considered by the court in support of defendants' Rule 12(b)(6) motion.

events.[21]  This argument, which relies primarily upon evidence submitted outside of the pleadings, does not provide a basis for a Rule 12(b)(6) motion.[22]  The only question before the court on the Rule 12 motion is whether the facts alleged in the complaint can be construed as conduct that is outrageous under governing Alabama law.

The tort of outrage[23] first was recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980).  Since that time, the Alabama Supreme Court repeatedly has made clear that a remedy under this theory is reserved for conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSC Indus. Contractors, Inc., 624 So. 2d 1042, 1044 (Ala. 1993).  Not only must the conduct that constitutes an outrage claim be deemed egregious, the emotional distress that results also must be so extreme that "no reasonable person could be expected to endure it." Potts v. Hayes, 771 So. 2d 462, 465 (Ala. 2000).  In Alabama, the tort of outrage has been held to be a very limited cause of action, available only under the most egregious circumstances. Mills v. Wex-Tex Indus., 991 F. Supp. 1370, 1385 (M.D. Ala. 1997).  It is a remedy

---

[21]    Defendants argue that plaintiff "played a crucial role in instigating such media speculation" and that she "took to the airwaves" to generate interest in Natalee's disappearance. (Doc. 17, p. 9).

[22]    The argument may well be asserted in a motion for summary judgment, but defendantshere has explained that the statute-of-limitations defense is the only ground offered pursuant to Rule 56.  Furthermore, any arguments relating to causation and the extent of the emotional distress would be more appropriate for a motion for summary judgment, and would be premature before plaintiff is allowed to conduct any discovery.  (See Motion for Stay, Doc. 24.)

[23]    The terms "outrage" and "intentional infliction of emotion distress" are used interchangeably, and apply to the same tort, which was defined in Inmon.

available only in the "most reprehensible situations." Moore v. Beneficial Nat'l Bank, 876 F. Supp.

1247, 1261 (M.D. Ala. 1995).  Applying Alabama law on this subject, the Eleventh Circuit Court

of Appeals has stated:

> The Alabama Supreme Court has not yet addressed the question of
> whether a tort of outrage would lie given such facts as these, but has
> generally acknowledged only three types of cases that constitute
> successful outrage claims: (1) cases involving "wrongful conduct in
> the context of family burials"; (2) cases in which "insurance agents
> employ [] heavy-handed, barbaric means. . . to coerce. . . insured[s]
> into settling. . . insurance claim[s]," and (3) cases "involving
> particularly egregious sexual harassment."

Tinker v. Beasley, 429 F. 3d 1324, 1330 (11th Cir. 2005), citing Thomas, 624 So. 2d at 1044; Stabler

v. City of Mobile, 844 So. 2d 555, 560 (Ala. 2002).  There are no reported Alabama cases where the

underlying conduct allegedly causing the extreme emotional distress was a mere publication of

information.

In this case, the plaintiff's outrage claim arises from graphic descriptions of the treatment of

her daughter's corpse.  Because "family burials" is one of the limited types of cases in which this tort

has been applied,  this court is unwilling to state as a matter of law that falsely reporting gruesome

details of a daughter's death, coupled with the intent to cause emotional distress, could never support

a claim for outrage.  Defendants argue that the tort has been recognized only in cases where the

remains have been "physically abused," (doc. 36, p. 17), but the Alabama Court of Civil Appeals'

recent opinion in Martin v. Hodges Chapel, LLC, 89 So. 3d 756 (2011), suggests otherwise.  In

Martin, the motion to dismiss was based upon the time limitation, but the court was examining the

25

conduct of a funeral home in relation to providing the deceased's family accurate information about the location of loved-ones' graves.   While the records kept were inadequate to identify the whereabouts of the graves of deceased family members, the case did not include any allegations that the corpses of the deceased family members had been mistreated or abused.  89 So. 3d at 759.  Also, the seminal case in Alabama, Inmon, at least implies that mere words can be the basis for an outrage claim.  In explaining the underlying rationale for recognizing the tort of intentional infliction of emotional distress, the Inmon court quoted from a law review article, as follows:

> No social utility is advanced by permitting unrestrained name-calling and use of insulting language.  Just as clearly, there is a mental injury to the victim of the abusive words.  In the United States today intensifying emphasis is being placed upon the individual, the integrity of his personality and its legal preservation and protection....  The law cannot undertake to guarantee peace of mind or complete mental equanimity, but it can and should be ready to grant damages for emotional distress intentionally caused by unjustifiable name-calling.

American Road Service Co. v. Inmon, 394 So. 2d 361, 364 (Ala. 1980) (quoting Wade, Tort Liability for Abusive and Insulting Language, 4 VAND.L.REV. 63, 100 (1950-51)).  Although this is far from a ringing statement of liability principals, it does suggest that there is nothing in Inmon categorically excluding liability for an intentional infliction of emotional distress by the use of knowingly false and abusive words.  At least at this stage, the court is unwilling to find that published words alone can never be the basis for an outrage claim.

While the tort of outrage is a very limited cause of action under Alabama law, Ms. Holloway's allegations are sufficiently similar to those previously considered "outrageous" by

Alabama courts;[24] accordingly, defendant's motion to dismiss the claim for the tort of intentional infliction of emotional distress as insufficiently pleaded under Alabama law is due to be denied.

### 2. Invasion of Privacy

The defendants assert that Ms. Holloway's invasion-of-privacy claim must fail because, under Alabama law, there is no "relational right of privacy." (Doc. 17, p. 37). Defendants argue that the stories in the *Enquirer* about which Ms. Holloway complains were about Natalee's death and/or burial and not about Ms. Holloway. Because these stories did not implicate any privacy interest personal to Ms. Holloway, the defendants argue that she cannot sue on the basis of a privacy interest related to a family member.

The Alabama Supreme Court has stated unequivocally that "the right of privacy is a personal right" and that no "relational right of privacy" exists in Alabama.[25] Fitch v. Voit, 624 So. 2d 542, 543 (Ala. 1993)(members of family have no invasion-of-privacy claim based upon the publication

---

[24]    Defendants further assert that the outrage claim is due to be dismissed because the plaintiff cannot prove causation. The *Enquirer* argues that, because she was distressed over her interactions with Joran Van der Sloot – the man linked to Natalee's disappearance and later convicted of the murder of another young woman – she cannot prove that any severe distress she may have suffered is attributable to the publication and not to other events. Such an argument may be asserted in support of a motion for summary judgment, but is not appropriate in what defendants have now clarified is a motion brought pursuant to Rule 12.

[25]    Other jurisdictions have recognized that close relatives may have a privacy interest in the autopsy records of a decedent. See, *e.g.*, Reid v. Pierce County, 961 P.2d 333, 342 (Wash. 1998)(holding that "immediate relatives of a decedent have a protectable privacy interest in the autopsy records" of a decedent, "grounded in maintaining the dignity of the deceased"); Katz v. National Archives & Records Admin., 862 F. Supp. 476, 485 (D.D.C. 1994)(holding that the Kennedy family had a "clear privacy interest" in preventing disclosure of x-rays and autopsy photographs of President John F. Kennedy that had been sought under the Freedom of Information Act).

of photographs of a relative in her hospital bed, published two years after her death, which described

her as "dying of cancer."). Under state law, a plaintiff cannot recover for the invasion of another's

privacy, even if the person whose privacy has been invaded is a close relative. See, e.g., Woods v.

SunTrust Bank, 81 So. 3d 357 (Ala. Civ. App. 2011)(daughter's privacy was not intruded into by

 invasive calls from a creditor that were made to parents' phone regarding parents' debt).[26]   These

cases, defendants urge, compel the conclusion that Ms. Holloway cannot maintain an action for an

invasion of privacy into events relating to her daughter's death or burial.

Whether Alabama law recognizes an exception to the bar for "relational rights" where a

minor child's privacy is at issue is debatable. Ordinarily, the interest protected by the cause of action

is the right of each person to his or her own personal privacy. It may be arguable, however, that a

parent's personal privacy interest is invaded also when private, personal information about his or her

minor child[27] is involved. In Hogin v. Cottingham, 533 So. 2d 525 (Ala. 1988), the state supreme

court found that parents have a viable claim for an invasion of privacy into their child's private

---

[26]     The defendants further argue that the publication of the articles cannot be made the subject of an invasion of privacy claim; that only the "manner in which the information ... was gathered" can be actionable. The court does not agree. See, e.g., Bryars v Kirby's Spectrum Collision, Inc., 2009 WL 1286006 * 15 (S.D. Ala. May 7, 2009)(indicating that statements made about plaintiff could invade her privacy if "severe enough"). Similarly, the court is unwilling to determine as a matter of law on a Rule 12(b)(6) motion that such details cannot be deemed "private" for purposes of an invasion of privacy claim because they may have been published by other media outlets. Certainly, evidence that may be adduced through discovery could lend credence to defendants' position, but any evidence that the same gruesome facts were reported by other media outlets (where that evidence is not attached to the complaint or answer) is not properly considered on a Rule 12(b)(6) motion.

[27]     In Alabama, the age of majority is nineteen. See Ala.Code § 26-1-1 (1975).

information.  In <u>Hogin</u>, an attorney's inquiry to school officials into the identity of a child whose photograph appeared in a newspaper provided a right of action for the parents of that child. Although the court in <u>Hogin</u> never addressed whether the parents had standing or whether any "relational right" exists (and that issue apparently was not raised by the defendant), a parent's right to seek redress for an invasion into the child's privacy was acknowledged.

Even assuming, however, that Ms. Holloway can maintain an action for invasion of privacy based upon the publication of descriptions of Natalee's alleged burial, the action is viable only if the subject of the intrusion "must be, or is entitled to be, private."   533 So. 2d at 531.  Under the unusual facts of this case, the court finds that descriptions of the investigation into Natalee's alleged death and gravesite do not constitute a private matter.  First, such accounts are plainly newsworthy as reporting on possible criminal, public-safety, or law enforcement activities. Whether and how Natalee may have died, where and how her body may have been disposed of, and the progress of the investigation into these questions was simply not a private matter.  Second, Ms. Holloway admits that she actively sought media interest, inquiry, and attention to the plight of Natalee.  In her undeniably determined efforts to find her daughter, Ms. Holloway chose publicity and attention, forgoing any right to claim the matters private.  The court is not critical of this decision, but is simply pointing out that once she made the matters public, they could no longer be private.

The court recognizes some dissonance in a finding that the publication of gruesome, false descriptions of a daughter's death can be "outrageous" while the subject matter itself is not "private." That result, however, is a logical result of the public policy behind the common law torts asserted in this case.  The tort of outrage seeks to prevent intentional conduct that causes severe emotional

harm.  The tort of invasion of privacy evolved as a protection of those places or emotions that a plaintiff has guarded as private and has shielded from public view.  Although Ms. Holloway may have chosen to surrender any existing privacy (of which there was precious little, in any event) in order to gain support for the search for her daughter, she did not chose to be subjected to the emotional pain allegedly caused by outrageous and knowingly false stories on such an emotional topic as the fate of her daughter.  She no longer has a claim for invasion of privacy, but she has sufficiently pleaded a claim for intentional infliction of emotional distress.  Accordingly, the motion to dismiss the invasion-of-privacy claim is due to be granted because, under state law, Ms. Holloway did not have a privacy interest in the subject matter and, even if she did, the published information was not treated as private by her.

### C.  Statute of Limitations

Defendants also assert that plaintiff's claim of outrage arising from the *Enquirer* publication dated June 28, 2010, is time-barred by Alabama's two-year statute of limitations, and that defendants are thus entitled to summary adjudication on this narrow part of the plaintiff's claims.   The defendants have provided evidence that the publication was available to readers and was distributed more than two years before the instant complaint was filed.  (Affi. of O'Neill, doc. 18-1).  In making the argument that the outrage claim is time-barred, the defendants again rely on law relating to the tort of libel, for which the statute of limitations begins to run when the false statements are published to a third party.

30

The court finds that this accrual date for libel does not apply to the tort of outrage.  In the nature of defamation, the reputational injury to the plaintiff occurs at the moment the defamatory information is published to a third person, and it is at that moment that the cause of action is fully accrued and can be sued upon, even if the *extent* of the injury is not yet fully realized.  As Alabama courts have noted, however, "a cause of action alleging the intentional infliction of emotional distress does not accrue until the defendant's actions have caused the plaintiff severe distress, two of the four necessary elements of such a cause of action." Martin v. Hodges Chapel, LLC, 89 So. 3d 756, 763 (Ala. Civ. App. 2011); Chaney v. Ala West-AL, LLC, 22 So. 3d 488, 498 (Ala. Civ. App. 2008).  Defendants argue that the accrual of a cause of action for intentional infliction of emotional distress does not depend upon "discovery" by the plaintiff, but, rather, accrues at the moment of publication of the distress-inducing information.  But to state the argument makes clear its error.  The nature of the injury suffered in an outrage claim is not dependent on other persons knowing about the false information, but upon the *plaintiff* knowing about it.[28]  It cannot be said logically that a plaintiff has suffered emotional distress unless and until she actually becomes aware of the distress-inducing information or conduct.  If the plaintiff never becomes aware of it, she could never have suffered extreme emotional distress because of it, and, accordingly, a claim for intentional infliction of that distress never accrues.  For this reason, the accrual of a cause of action for intentional

---

[28]     In many ways, defamation and intentional infliction of emotional distress are reverse mirror images of each other.  Defamation is injury to a person in the eyes of others due to publication of outrageously false information about the plaintiff, regardless of whether the person is aware of the publication or the reputational injury he has suffered.  Intentional infliction of emotional distress is injury to a person in that person's own mind and emotional state, regardless of whether any other person becomes aware of the conduct or information causing the emotional pain.

infliction of emotional distress occurs at the moment the plaintiff actually suffers the distress by becoming aware of the distress-inducing information or conduct.

Plaintiff has provided evidence that she did not see the June 28, 2010, story until, at the earliest, September 2010.  (Aff. of Holloway, Doc. 22-1, ¶15).   She could not have suffered any emotional distress proximately caused be the story until that time.  No cause of action could have accrued before then because the action accrues only once the plaintiff suffers an injury proximately caused by the wrongful conduct.  Accordingly, the motion for partial summary judgment as to the outrage claim is due to be denied.[29]

---

[29]   Although it is not an argument advanced by the plaintiff, the court also notes that, even if her cause of action for intentional infliction of emotion distress accrued on June 16, 2010, when the story first was published, it can be argued that the statute of limitation was tolled until June 28, 2010, based on the date defendants put on the cover of the *Enquirer* edition in which the story appeared.  While they offer evidence that, notwithstanding the conceded fact that the *Enquirer* bore the date of June 28, 2010, it actually was available to the public as early as June 16, 2010. There is no evidence, however, that the average plaintiff would know that the "cover date" did not accurately reflect the date of publication.  Indeed, except for the "cover date," a plaintiff could not know when the allegedly offending publication occurred or when the statute of limitation on his claim began to run.   In Alabama, a statute of limitation can be tolled either under equitable circumstances that prevent the plaintiff from timely commencing his action or because of fraud by the defendant that conceals the existence of the plaintiff's claim.  See Weaver v. Firestone, No. 1101403, 2013 WL 135750 (Ala. Jan. 11, 2013); DGB, LLC v. Hinds, 55 So. 3d 218, 225 (Ala. 2010); Ala. Code § 6-2-3 (1975).  Here, it may be argued that the June 28 "cover date" actively misled the plaintiff about when the publication occurred and her cause of action accrued, leading her to believe it accrued on June 28 when, in fact, it accrued on June 16, 2010.  As a result she may be entitled to tolling of the limitation period until June 28 to remedy that misrepresentation.

## **V.  CONCLUSION**

Based on the foregoing considerations, the motion to dismiss and for partial summary judgment filed by the defendants (doc. 16) is due to be GRANTED IN PART and DENIED IN PART.  The motion to dismiss and for partial summary judgment is due to be DENIED as to the plaintiff's claim of intentional infliction of emotional distress.  The motion to dismiss is due to be GRANTED as to plaintiff's invasion-of-privacy claim, and that claim is due to be DISMISSED WITH PREJUDICE.

A separate order will be entered herewith granting in part and denying in part the defendants' motion.

DONE the 22nd day of May, 2013.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE