FILED
2013 Jul-08  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**ELIZABETH ANN HOLLOWAY,**     }
                                }
    **Plaintiff,**             }
                                }
**vs.**                         }     **Case No.: 2:12-CV-2216-TMP**
                                }
**AMERICAN MEDIA INC., et al.,** }
                                }
    **Defendants.**            }

## MOTION FOR SUMMARY JUDGMENT

Of Counsel:
Lee Levine
*llevine@lskslaw.com*
Jay Ward Brown (*pro hac vice*
   motion forthcoming)
*jbrown@lskslaw.com*
LEVINE SULLIVAN KOCH
  & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, D.C. 20036
Telephone:  (202) 508-1110
Facsimile:   (202) 861-9888

Rachel F. Strom
*rstrom@lskslaw.com*
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, New York 10036
Telephone:  (212) 850-6102
Facsimile:   (212) 850-6299

Harlan I. Prater, IV
*hprater@lightfootlaw.com*
John G. Thompson
*jthompson@lightfootlaw.com*
Jeffrey P. Doss
*jdoss@lightfootlaw.com*
LIGHTFOOT, FRANKLIN &
  WHITE LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone:  (205) 581-0700
Facsimile:   (205) 581-0799

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................. 3

A.    Natalee's Disappearance ............................................................... 3

B.    Van der Sloot's 2008 "Confession" .............................................. 9

C.    Van der Sloot Is Charged With Extortion And Arrested for a
      Murder in Peru .............................................................................. 12

      1.    June 2010 ............................................................................ 12

      2.    November/December 2010 ................................................. 17

      3.    March/April 2011 ............................................................... 21

D.    The Complaint And The Prior Motion To Dismiss ....................... 24

ARGUMENT .............................................................................................. 27

A.    While Plaintiff Is Entitled To Have Facts Construed In Her Favor,
      She Is Not Entitled To A Favorable Construction Of State Law ....... 28

B.    The Alabama Supreme Court Has Consistently Limited The Tort
      Of Outrage To Specified Categories of *Conduct* ......................... 32

C.    Disseminating The Articles About A Matter of Public Concern To
      A General Audience Is Not Outrageous As A Matter Of Law ........... 35

D.    The Facts Of This Case Are Not Analogous To The "Burial
      Misconduct" Cases Recognized By Alabama As Actionable ............ 43

{00638220;v1}

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Rd. Serv. Co. v. Inmon*,
    394 So. 2d 361 (Ala. 1980)...........................................................................32, 47

*Angle v. Dow*,
    822 F. Supp. 1530 (S.D. Ala. 1993) ..................................................................30

*Burden v. Int'l Longshoremen's Ass'n*,
    510 F. Supp. 2d 618 (S.D. Ala. 2007) ..............................................................30

*Cabaniss v. Coosa Valley Med. Ctr.*,
    No. CV 93-PT-2710-E, 1995 WL 241937 (N.D. Ala. Mar. 20, 1995),
    *aff'd*, 116 F.3d 491 (11th Cir. 1997)...............................................................34

*Callens v. Jefferson County Nursing Home*,
    769 So. 2d 273 (Ala. 2000)..............................................................................34

*Cates v. Taylor*,
    428 So. 2d 637 (Ala. 1983)..............................................................................45

*Dotson v. Wal-Mart Stores, Inc.*,
    No. 96-6690, 1998 WL 669940 (6th Cir. Sept. 17, 1998)................................36

*Driver v. W.E. Pegues, Inc.*,
    No., 2012 WL 3042939 (N.D. Ala. July 19, 2012) ...........................................45

*Ex Parte Crawford & Co.*,
    693 So.2d 458 (Ala. 1997)...............................................................................32

*Finebaum v. Coulter*,
    854 So. 2d 1120 (Ala. 2003)............................................................................36

*Fitch v. Voit*,
    624 So. 2d 542 (Ala. 1993)....................................................................36, 46, 48

*Fitch v. Voit*,
    No. Civ. A. No. CV 92-063, 1993 WL 141588 (Ala. Cir. Ct. Jan. 6,
    1993), *aff'd*, 624 So. 2d 542 (1993)................................................................46

ii

*Fudge v. Penthouse Int'l, Ltd.*,
   840 F.2d 1012 (1st Cir. 1988)............................................................42

*Gallups v. Cotter*,
   534 So.2d 585 (Ala. 1988).................................................................34

*Grantham v. Vanderzyl*,
   802 So.2d 1077 (Ala. 2001).............................................................34

*Gray Brown-Serv. Mortuary Inc. v. Lloyd*,
   729 So. 2d 280 (Ala. 1999)..............................................................45

*Green Tree Acceptance, Inc. v. Standridge*,
   565 So.2d 38 (Ala. 1990)..................................................................36

*Grimsley v. Guccione*,
   703 F. Supp. 903 (M.D. Ala. 1988)...............................28, 36, 41, 42

*Hazewood v. Found. Fin. Grp., LLC*,
   No. 07-0171-WS-B, 2007 WL 1975446 (S.D. Ala. July 2, 2007),
   *aff'd*, 551 F.3d 1223 (11th Cir. 2008)..............................................31

*Horne v. TGM Assocs., L.P.*,
   56 So. 3d 615 (Ala. 2010)................................................................27

*House v. Corporate Servs., Inc.*,
   882 F. Supp. 161 (M.D. Ala. 1995).................................................33

*Hurst v. Cook*,
   981 So. 2d 1143 (Ala. Civ. App. 2007)...........................................36

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988)...........................................................................47

*In re Schlein*,
   8 F.3d 745 (11th Cir. 1993) ............................................................29

*Jenkins v. U.S. Fid. & Guar. Co.*,
   698 So. 2d 765 (Ala. 1997)..............................................................33

*Johnson v. McDonald*,
   3 P.3d 1075 (Ariz. Ct. App. 1999)..................................................37

iii

*Levite Undertakers Co. v. Griggs*,
    495 So. 2d 63 (Ala. 1986)................................................................45

*Little v. Consol. Publ'g Co.*,
    83 So. 3d 517 (Ala. Civ. App. 2011) .........................................36, 47

*Logan v. Sears, Roebuck & Co.*,
    466 So. 2d 121 (Ala. 1985)............................................................28

*Martin v. Hodges Chapel, LLC*,
    89 So. 3d 756 (Ala. Civ. App. 2011)..............................................47

*Morgan v. North Mississippi Medical Ctr., Inc.*,
    458 F. Supp. 2d 1341 (S.D. Ala. 2006),
    *aff'd*, 225 F. App'x 828 (11th Cir. 2007) ......................................34

*Mosley v. Wyeth, Inc.*,
    719 F. Supp. 2d 1340 (S.D. Ala. 2010) ..........................................31

*Nelson v. Chattahoochee Valley Hosp. Soc'y*,
    731 F. Supp. 2d 1217 (M.D. Ala. 2010) .........................................30

*O'Rear v. B.H.*,
    69 So. 3d 106 (Ala. 2011)..............................................................33

*Riley v. Kennedy*,
    553 U.S. 406 (2008)......................................................................29

*Rollins v. Phillips*,
    554 So.2d 1006 (Ala. 1989)...........................................................44

*Snyder v. Phelps*,
    __ U.S. __, 131 S. Ct. 1207 (2011)......................................43, 47, 48

*Stabler v. City of Mobile*,
    844 So.2d 555 (Ala. 2002).............................................................36

*Thomas v BSE Indus. Contractors, Inc.*,
    624 So. 2d 1041 (Ala. 1993)..........................................................32

*Time, Inc. v. McLaney*,
    406 F.2d 565 (5th Cir. 1969) .........................................................27

iv

*Tinker v. Beasley*,
    429 F.3d 1324 (11th Cir. 2005) .............................................................33, 34, 35

*United States v. Bailey*,
    419 F.3d 1208 (11th Cir. 2005) .................................................................30, 31

*West v. American Tel. & Tel. Co.*,
    311 U.S. 223 (1940).............................................................................................29

*Whitt v. Hulsey*,
    519 So. 2d 901 (Ala. 1987).................................................................44, 45, 47

## STATUTES

Fed. R. Civ. P. 12 ..................................................................................*passim*

Fed. R. Civ. P. 56.......................................................................................1, 27, 28

## OTHER AUTHORITIES

Alabama Tort Law § 23.01 ....................................................................................32

{00638220;v1}

Pursuant to Federal Rule of Civil Procedure 56, Defendants American Media, Inc. and The National Enquirer, Inc. (together, "AMI") respectfully request that the Court enter summary judgment on Count One of the Complaint, the only remaining Count, and dismiss the entire action with prejudice.

## **INTRODUCTION**

When her daughter Natalee Holloway disappeared in Aruba in 2005, plaintiff Elizabeth Ann Holloway made a choice that any parent would readily understand:  She worked tirelessly to focus media attention on Natalee's plight, and actively engaged directly with the public through the media, personally advocating for her daughter in an effort to keep authorities focused on the investigation.[1]  As the undisputed evidence described below makes plain, Ms. Holloway spoke frequently, and in detail, through scores of media outlets about the circumstances of Natalee's likely death at the hands of Joran Van der Sloot, the multiple, widely circulated theories about the whereabouts of her body, and developments in the investigation.  Indeed, Ms. Holloway ultimately became something of an authority on the fate of other missing children, starring in an internationally distributed cable television series, *Vanished with Beth Holloway*, in

---

[1] AMI refers to plaintiff as "Ms. Holloway" and to her daughter as "Natalee" to avoid confusion.

which she reported in detail, often through re-enactments, on the disappearance and possible death of other children.

It is against this backdrop that the Court is now called upon to evaluate Ms. Holloway's cause of action against AMI for the tort of "outrage" based on reports that AMI published about Natalee's disappearance.  Ms. Holloway alleges that, among *all* the public discussion of Natalee's fate, including her own candid descriptions of what might have happened to her daughter, AMI's publications alone were so outrageous in character and extreme in degree as to be sanctionable at law.  The Court, in adjudicating AMI's prior motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), ruled that the *allegations* of Ms. Holloway's Complaint were sufficient to state a claim for outrage under Alabama common law.  The Court itself noted, however, that once the parties moved beyond the pleadings, the issue might well be ripe for adjudication by motion for summary judgment.  *See* 05/22/13 Mem. Op. at 24 n.22.  In fact, given the undisputed context in which AMI's publications actually occurred, no reasonable jury could find that they constitute the kind of extreme conduct encompassed by the sharply limited tort of outrage recognized under Alabama law.  Accordingly, AMI now moves for summary judgment on this ground.

2

## STATEMENT OF UNDISPUTED FACTS

**A.    Natalee's Disappearance**

Natalee Holloway disappeared on May 30, 2005, while on a school vacation with classmates in Aruba.  Compl. ¶¶ 16-17.  Her disappearance was the subject of intense media scrutiny and speculation, fueled in significant part by the understandable efforts of her parents and law enforcement authorities to call attention to her case and secure useful leads.  *See* Compl. ¶ 26 ("Natalee's disappearance was the subject of an unprecedented international media frenzy").  Indeed, as Ms. Holloway's efforts were later described on her own television series, *Vanished with Beth Holloway*,

> Beth finds a way to bring the search for Natalee forward.  She is a tigress of a mother.  She got down there [to Aruba] and found the perfect answer in terms of  enlisting people – she got the media involved . . . Although shy by nature, Beth forces herself to give countless interviews and press conferences and the whole world starts to listen.

Ex. 70 (episode 1).  *See* Ex. 19 at 107-08 (Ms. Holloway explains "national and international media [began] to pick up on Natalee's story as reporters and producers migrate[d] from Birmingham to the island.  FOX, CNN, NBC, ABC, BBC, AP.  Everybody. . . . Maybe all this media attention will bring out the answer.").

Ms. Holloway has acknowledged that, in adopting this strategy, she knew what she was opening herself up to:  as she later explained in her *New York Times*

{00638220;v1}

best-selling autobiography, *Loving Natalee: A Mother's Testament of Hope and Faith*, before her first television interview about Natalee's disappearance, a friend cautioned her:  "'You know, once you open this gate, Beth, you can't close it, so be sure you're ready.'"  Ex. 19 at 65.  Ms. Holloway recounted that she told her friend, "Let's do it."  *Id.*  She thereafter engaged a "media coordinator" who helped "field interview requests."  *Id.* at 107.

As Ms. Holloway hoped, the media focused on what happened to Natalee. Media outlets from around the world reported on the progress of the official investigation, the several unofficial investigations, and speculation from purportedly "informed sources."  Ms. Holloway herself made over sixty appearances on just the Fox News Channel's *On the Record with Greta Van Susteren* to talk about the case.  *See* Ex. 59.  She also made numerous appearances on NBC's *Today Show*, ABC's *Good Morning America*, HLN, MSNBC, CNN, *The O'Reilly Factor* and *Hannity & Colmes*, among many others.  *Id.*  In so doing, Ms. Holloway repeatedly and openly discussed in detail the investigation into her daughter's disappearance and speculated about what might have happened to her.

For example, in one television appearance, Ms. Holloway discussed her fear that Natalee might have been drugged.  *See, e.g.,* Ex. 16 (Fox, *Hannity & Colmes*, Apr. 11, 2006) (speculating that, given "how Joran describes Natalee, how she's saying some very unusual things is totally out of character for her, it sounds as if

4

she's been drugged").  And, in several contexts, she discussed the fact that her daughter's body likely had been discarded.  *See, e.g.*, Ex. 12 (Fox, *On The Record*, Feb. 6, 2006) (discussing her fear that Natalee's "body may be unrecoverable"); Ex. 19 at 223 (in her book, noting "Aruban police believe that . . . [Natalee] met her fate at the van der Sloot home, and that Joran called his father – or someone – and that they disposed of her body. That's what we think may have happened").

Ms. Holloway also engaged in frank discussion of, and speculation about, physical evidence that periodically turned up and which might have been relevant to Natalee's disappearance, including clothing and human remains, as well as the possible whereabouts of her body.  *See, e.g.*, Exs. 8, 62 (Fox, *On The Record,* Nov. 14, 2005) (discussing bone that some speculated might have been Natalee's); Ex. 4 (Fox, *On The Record*, Aug. 15, 2005) (discussing belt that some speculated might have been Natalee's); Ex. 19 at 128 (recounting that, "At the dump it's rumored that a body has been found, and that Dave and I are arguing over whether or not it's Natalee"); Ex. 11 (Fox, *On The Record*, Jan. 26, 2006) (discussing arrangements for cadaver dogs to search sand dunes for Natalee's body); Ex. 20 (CNN, *Prosecutor: 'No Doubt' Natalee Holloway is dead*, Nov. 23, 2007) ("Beth Holloway, said her ex-husband Dave Holloway has hired divers who will use sonar equipment to search for the girl's remains in deep water").

5

Similarly, Ms. Holloway discussed publicly her "best case scenario," telling Fox's Greta Van Susteren:

> Oh, Greta, oh absolutely, Greta. I mean our best case scenario is that they've kidnapped her. They've got her held captive in one of these crack houses or one of the brothels that are on the island or the island of Curacao. I mean that would be – that would be our best outcome, Greta, and oh absolutely we would just be thrilled to death with that.

Ex. 2 (Fox, *On the Record*, July 21, 2005).

Given the gruesome nature of the apparent crime, it is not surprising that Ms. Holloway's own descriptions of it often became graphic. For example, in her book, she writes about a statement Van der Sloot made to investigators:

> Joran describes Natalee's underwear with the dark blue embroidery and the flowers. He describes her pubic area. I know what he is referring to. She is shaven higher than usual for her bathing suit. Dear God. He *has* been with her. Joran continues and tells the men that he inserted a finger in her. Then another one. I am sickened by his sexually explicit and graphically detailed account.

*Id.* Ex. 19 at 49-50. *See* Ex. 6 (Fox, *On The Record*, Oct. 13, 2005) (Ms. Holloway says that "we had known that from Joran's statement that Joran had had sex with Natalee at his home. But I had never, never [before] had knowledge that Deepak and Satish Kalpoe had also participated in a gang rape against her."); Ex. 17 (MSNBC, *The Abrams Report*, Apr. 19, 2006) (Ms. Holloway told interviewer, "we know for a fact, we know that Deepak and Satish and Joran took Natalee, we know the sexual assaults they committed against her by both of the suspects'

6

admissions by Joran Van der Sloot and Deepak Kalpoe, what we don't know is what they did with Natalee when they were finished with her").[2]

Ms. Holloway's multiple media appearances successfully kept the media's attention riveted on the investigation for at least two years.  As she put it in her book, the media was "running here and running there.  Following every crazy lead as we have done."  Ex. 19 at 128.  Multiple media outlets reported, for example, that Natalee may have overdosed on drugs or alcohol or used cocaine before falling to her death.  *See, e.g.*, Ex. 15 (Birmingham News, *Aruban investigator breaks silence on teen*, Mar. 26, 2006) (quoting Aruban police as saying Natalee "may have 'just collapsed' from heavy drinking combined with drugs, perhaps given to her by others."); Ex. 14 (MSNBC, *Did drugs and alcohol kill Natalee Holloway?*, Mar. 24, 2006) ("it's almost like she [Natalee] was out doing a line of cocaine or something" and noting that "we're talking obviously about a badly decomposed body.  I don't know what remains there would be at this stage"); Ex. 13 (USA

---

[2] *See also, e.g.*, Ex. 5 (Fox, *On The Record*, Sept. 16, 2005) (Ms. Holloway recounted that "Deepak admitted on international media how they all three raped her."); Ex. 6 (Fox, *On The Record*, Oct. 13, 2005) (Ms. Holloway said, "And you know, as he is describing my daughter, Greta, he is very sexually – he's very sexually explicit on what he's doing to her. And you know, he's describing Natalee as falling asleep and waking up.  So you know, Greta, that is definitely having her in an altered state of mind. She -- Natalee was not able to choose her will as to what was happening to her with these three suspects."); Ex. 10, 64 (Fox, *On The Record,* Nov. 29, 2005) (Ms. Holloway recounts that Van der Sloot had said that "Deepak raped, murdered and buried my daughter on the island of Aruba").

Today, *Aruban police eye drugs in Holloway case,* Mar. 23, 2006) (Natalee may have "collapsed due to her body's reaction to effects from alcohol or drugs").

Still others speculated about the details of Natalee's burial – including the possibility that her body had been moved.  *See, e.g.*, Ex. 1 (Fox, *The O'Reilly Factor*, July 19, 2005) (Holloway family investigator speculated, "I truly feel as though that site we found that we believe is a grave site, I believe that Natalee was buried in that for a day or two. Somebody hired somebody else to go ahead and dig her up and then dispose of her"); Ex. 13 (USA Today, *Aruban police eye drugs in Holloway case*, Mar. 23, 2006) ("investigators believe that someone took steps to carefully hide Holloway's body – perhaps burying her twice"); Ex. 15 (Birmingham News, *Aruban investigator breaks silence on teen*, Mar. 26, 2006) (Aruban police official "told CBS that a new witness has surfaced with information about a specific burial location 'too specific to just be a story that was just made up by someone'").  Others reported the possibility that, as Ms. Holloway herself had suggested was the "best case scenario," *see supra* at 6, Natalee had been sold into sex slavery.  *See, e.g.,* Ex. 2 ( Fox, *On the Record*, Jul. 21, 2005) ("perhaps Natalee has been kidnapped into some sort of slave trade"); Ex. 29 (Fox, *On the Record*, Nov. 24, 2008) (Van der Sloot said "he sold Natalee Holloway to a mysterious stranger").

**B.**  **Van der Sloot's 2008 "Confession"**

As the investigation dragged into 2007, news coverage abated somewhat.
But, in 2008, some three years after Natalee disappeared, public attention spiked
again when Van der Sloot "confessed" to a Dutch investigator, Patrick van der
Eem, that, after he had a sexual encounter with Natalee, she started to have
convulsions and eventually passed out.  Unsure if Natalee was actually dead, Van
der Sloot claimed he "asked one of his friends to assist him in discarding her body
using his boat and pushing her out to sea."  Ex. 25 (Fox News, *Holloway's
Anguished Mother: Tape Confession Means Natalee Could Have Been Saved*, Feb.
5, 2008).  *See also* Ex. 26 (Press-Register, *Official: Tape of Suspect Admissible*,
Feb. 5, 2008) (Van der Sloot claimed that Natalee "was drunk and that she began
shaking and slumped down on the beach as they were kissing in May 2005" and
"[h]e said that Holloway looked dead but that he could not be sure she was not still
alive when a friend took her away"); Ex. 28 (ABC, *Was Natalee Holloway
Drugged?*, Feb. 15, 2008) ("On the tape, he said Holloway went into convulsions
and then became limp.  Fearing she was dead, he claimed on the tapes that he
called an unknown accomplice who came and took the body out to sea, where it
was dumped overboard.").[3]

---

[3] *See also, e.g.,* Ex. 24 (CNN, *Van der Sloot on video: No sleep lost over Holloway's
dumped body*, Feb 4, 2008) ("In the video that aired Sunday on Dutch television, van der

Ms. Holloway energetically joined the renewed media frenzy, actively

engaging in speculation about the veracity of the purported confession and its

implications for Natalee's last moments.  During one appearance, for example,

Ms. Holloway outlined in detail a possible scenario:

> She could have very well been in a coma and he disposed of her
> body alive.  But there is no way, there is no way we can go back and
> find out if she was alive or not, Greta. Absolutely we can never
> recapture that, never…
>
> And we know that Joran purchased her drinks and paid for her
> drinks. We know that Joran served her drinks.  So absolutely they
> had the ability to place a GHB, ecstasy, I do not even know what
> these drugs are that these males use, these perpetrators in bars slip
> these females.  But, yes, she was drugged.

Ex. 27 (Fox, *On The Record*, Feb. 6, 2008).  Similarly, during an appearance on

ABC's *20/20*, Ms. Holloway observed of Van der Sloot that "he chose to be that

person himself, to decide, you know, whether he's going to seek medical help for

Natalee with her laying there in his presence -- or is he gonna make the decision to

dispose of her body?  I mean, dear God! He did! And even though he didn't know

---

Sloot . . . told a man he was with the Alabama teen on an Aruban beach when she apparently died and that a friend of his with a boat disposed of Holloway's body. 'He went out to sea and then he threw her out, like an old rag,' van der Sloot told Aruban businessman Patrick van der Eem January 16."); Ex. 22 (ABC, *Meet the Man Who Got Van Der Sloot to Talk About Holloway's Disappearance*, Feb. 4, 2008) ("Van der Sloot said that the seizure occurred during a romantic encounter between the pair" and then called a friend to help him "dispose of the body."); Ex. 27 (Fox, *On The Record*, Feb. 6, 2008) (at end of interview with Ms. Holloway, van Susteren states, "Coming up, did a man named Daury toss Natalee Holloway's body off of a boat?" and reporting that "Joran says after Natalee was unresponsive, he had his friend, Daury, toss Natalee's body off a boat, though Joran says he was not even sure Natalee was even dead").

if she was alive or not."  Ex. 65 (ABC *20/20, Special Editions* "The Final Hours of

Natalee Holloway", Feb. 4, 2008).[4]  As Ms. Holloway explained on NBC's

*Dateline* a few weeks later, ultimately, she became "numb" to all of the discussion

of her daughter's fate and the possible whereabouts of her body:

> CHRIS HANSEN:  While her parents were grateful for the [media]
> attention, hoping that it might prompt people with information to
> come forward, it became increasingly difficult to separate good leads
> from bad.
>
> MS. HOLLOWAY:  I mean I have had calls that Natalee is in a
> freezer in the Van der Sloot house to Natalee is in a boat in
> Columbia or Venezuela.  So, you know . . . .
>
> HANSEN:  How do you cope with that?
>
> MS. HOLLOWAY: You just become numb to it.

Ex. 67 (NBC, *Dateline*, "*The Search for Natalee Holloway*", Feb. 22, 2008).

---

[4] *See also, e.g.*, Ex. 65 (Ms. Holloway speculated Van der Sloot "disposed of my daughter's body while she was alive"); Ex. 66 (CNN, *Larry King Live*, Feb. 7, 2008) (Ms. Holloway speculated that Van der Sloot "does not know if she was alive or not when he decided to dispose of her body.  She could have been in a coma easily"); Ex. 23 (New York Daily News, *Natalee Holloway's mother: Secret footage 'put an end to my nightmare,'* Feb. 4, 2008) (Ms. Holloway is quoted as saying that "'Natalee never even had the chance for a medical doctor or a coroner, anyone, to determine [if she was alive]'" ); Ex. 21 (NBC 9 News:  *Natalee Holloway's mother believes she's dead*, Feb. 2, 2008) (Ms. Holloway "was responding to hidden camera footage of a Dutch student allegedly acknowledging involvement in her daughter's disappearance").

{00638220;v1}

C.  **Van der Sloot Is Charged With**
    **Extortion And Arrested For A Murder In Peru**

1.  **June 2010**

In June 2010, some five years after Natalee's disappearance, criminal

charges were filed against Van der Sloot in this very Court. The charges arose

from his alleged extortion of money from Ms. Holloway – money that he used to

travel to Peru, where he subsequently beat and murdered a young woman named

Stephany Flores. *See* Ex. 39 (New York Post*, Tomato-Pasted – Peruvians Pelt*

*Evil Sloot with Rotten Fruit*, June 12, 2010) (reporting on Flores murder and noting

that "[a]dding to[Ms. Holloway's] pain is the fact that van der Sloot financed his

trip to Peru after receiving $25,000 of [her] money on May 10."). These events, in

turn, caused media coverage of Natalee's still-unsolved disappearance to surge.

On June 7, 2010, for example, Tim Miller, director of the well-regarded

investigative firm engaged by Natalee's family, appeared on national television to

discuss the still on-going search for Natalee:

> VELEZ-MITCHELL:   Joran has also been charged in the U.S. with
> extortion.  He's accused of trying to extort a quarter of a million
> dollars from an unnamed person in Alabama.  In exchange... he
> would tell them where Natalee Holloway's body was and the details
> of her death.  Now, HLN affiliate, NBC-13 in Birmingham, says law
> enforcement sources confirmed to them the target of Joran's alleged
> extortion plot was Natalee's mother, Beth.  HLN has not been able to
> independently confirm this, but I want to go to Tim Miller, director
> of Texas EquuSearch. . . .
>
> TIM MILLER, TEXAS EQUUSEARCH:  Well, you know, I'm in
> Aruba right now, and I've actually got a map that Joran wrote and

12

drew another map down here where Natalee's body is supposedly at.
. . .

VELEZ-MITCHELL:  Right.  Is it your understanding that Beth was the victim of the extortion and that Beth sent the money?  We have not been able to get a comment from her attorneys.  This is just what other people are reporting.

MILLER: Well, and yes.

Ex. 36 (HLN, Issues with Jane-Velez Mitchell, June 7, 2010).  See also Ex. 38

(CNN, Interpol: Van der Sloot tried to extort Holloway's mother, June 8, 2010).

The next morning, *Good Morning America* reported that "Van der Sloot has confessed" to the murder of Stephany Flores.  The program quoted Flores' father as stating that "Police now have Joran's laptop. . . . It contains valuable information that may lead to more of Joran's victims."  Ex. 37.  ABC also reported that Van der Sloot "allegedly attempt[ed] to extort money from the Holloway family.  According to a federal criminal complaint, Van Der Sloot allegedly sought $250,000 in exchange for information about where Holloway's body could be found . . . And we learned for the first time this morning . . . that the FBI was working with . . . Natalee's mom."  *Id.*

On June 12, 2010, Van der Sloot was formally charged with murdering Flores.  Ex. 39.  At the same time, the media reported that Van der Sloot "has told cops in Peru that he will confess to Aruban officials where he dumped Holloway's corpse if the Arubans visit him in jail."  *Id.*  One such report noted that Ms. Holloway was "devastated" about Flores' death:

Adding to her pain is the fact that van der Sloot financed his trip to Peru after receiving $25,000 of [Ms. Holloway's] money on May 10. As part of an FBI sting that day, the Dutchman met with [her attorney] in Aruba and agreed to disclose how he killed Natalee and disposed of her remains.

Van der Sloot told [the lawyer] that Natalee died when he shoved her to the ground and she hit her head on a rock. He also said his father later buried her body under the foundation of a house.

But the FBI said that house had not yet been built when Natalee disappeared.

*Id.* Another published a comprehensive update about the case:

Strapped for cash, [Van der Sloot] obtains $25,000 from Holloway's mother in exchange for a promise to lead her to her daughter's body. The FBI secretly records the alleged extortion but Van der Sloot is not arrested.

He heads off to Lima to play poker. He kills Flores, Peru's police say, after a night of poker with her at a casino in which he had about 10 drinks of whiskey and pisco while she drank wine. The evidence against him is so overwhelming, they say, that he has no choice but to confess.

. . . In a November 2008 confession, he tells Fox News' Greta Van Susteren he sold Natalee into sexual slavery. Before she airs the interview, he calls to say it was all a lie.

Jaap Amesz, a Dutch reality TV star, extracted yet another confession from him in the Holloway disappearance. In this one, she falls off a balcony drunk and is disposed of in a lake.

Ex. 40 (Newsday, Cousin: 'Something is bad in his head', June 14, 2010).

It is undisputed that, with the sole exception of her own television series, *all* of Ms. Holloway's media appearances, her best-selling book and her other statements described above (not to mention *all* of the above-cited media reports)

14

occurred *before* AMI published the first of the three articles sued upon here, in the issue of *The National Enquirer* dated June 28, 2010, under a headline that read, in part, "Joran's Secret Hand-Drawn Map to Natalee's Grave Found! – Investigator's File." ("June 2010 article").  Ex. 41.

The June 2010 article includes a cover photo depicting the island of Aruba with inset photos of Natalee and Van der Sloot.  *Id.*  Precisely as a national television network had reported two weeks earlier, Ex. 36, the article recounts that "suspected killer Joran Van der Sloot drew a secret map showing the location where he says he buried her body."  The map, the June 2010 article explained, could lead authorities to Natalee's remains, which "could be the key piece in the evidence chain needed to convict Van der Sloot."  Ex. 41.  As reported in the June 2010 article, the map was given to the missing woman's father, Dave Holloway, by Dutch journalist Jaap Amesz, "who befriended Joran when he was in Holland two years ago and did a series of taped interviews with him."  Amesz, the article reported, was frustrated by the failure of Aruban authorities to "renew their investigation based on the information he got from Van der Sloot," so he sent the map to Mr. Holloway.  Tim Miller (who had already been interviewed on national television on this subject) is described as having told the *Enquirer* that the map "gives a precise location in the Bubali area of Aruba where Joran says Natalee's

body was buried." The Bubali area, a bird sanctuary, is a "tough area to search," Miller said, because it is "large and marshy and overgrown with high weeds."

In addition, the June 2010 article goes on to note that the bird sanctuary had only been partially searched by Aruban authorities in 2005, according to Aruba's attorney general Taco Stein, because it is "such a large area." Given the "new evidence" provided by the map, however, AMI reported that Miller had expressed hope that Aruban authorities would "agree to work together with [his firm] to search the area." Making it clear that no grave had *yet* been found, Miller is also quoted as saying, "'I'm hoping Natalee's body is where Joran's map says it is, and that we find a grave and dig her up.'" If Natalee's remains could be found, the June 2010 article noted, the "Aruba government may ask that Joran be shipped to the island to finally stand trial for her death." *Id.*

Moreover, as multiple national media had reported earlier that month, the June 2010 article recounted that Van der Sloot "has repeatedly changed his story about what happened to the 18 year-old," and described how he recently had tried to extort $250,000 from Beth Holloway "in exchange for revealing the location of her daughter's burial site." *Compare* Ex. 41 (June 2010 article) *with* Exs. 36, 37 & 40 (national media reports). And, the June 2010 article included a side bar that reported (as others already had) on the connection between the Flores murder and Natalee's disappearance. *Compare* Ex. 41 (June 2010 article) *with* Ex. 40

16

(Newsday, *Cousin: 'Something is bad in his head'*, June 14, 2010) (reporting that

Van der Sloot killed Flores after she saw a message on his laptop about Natalee).[5]

## 2.     November/December 2010

As the media followed the Flores case, new leads about Natalee also

received wide-spread attention.  In November 2010, a jawbone was found washed

ashore near the Bubali Bird Sanctuary, prompting Ms. Holloway to speak out on

the subject, and scores of media outlets to report what she said.  *See, e.g.*, Ex. 48

(Mobile Register, *Mother awaits news on bone found in Aruba*, Nov. 21, 2010)

("Natalee Holloway's mother said she's anxiously awaiting the news on whether a

jawbone found on an Aruban beach could have been her daughter's"); Ex. 44

---

[5] Also in June 2010, the *Daily Beast* published an extensive review of the new map evidence that contains virtually every point raised by AMI in the June 2010 article:

> The Bubali Bird Sanctuary is a tranquil oasis on the northwestern edge of the tiny Caribbean island of Aruba. . . . [¶] Natalee Holloway's father Dave believes that his daughter's remains are somewhere in these thick wetlands.  Joran van der Sloot, the primary suspect in Holloway's disappearance, now in jail in Lima, Peru after confessing to the murder of 21-year-old Stephany Flores, drew a map last February, showing exactly where he and the Kalpoe brothers left her body in the early morning hours of May 30, 2005. Van der Sloot drew the map for Jaap Amersz, Holland's most famous reality television star, who spent months cultivating a close friendship with Van der Sloot, who loved the idea of befriending someone so famous and readily fell for the trap.  Amersz then sold the story and the map to the Dutch tabloid Der Telegraaf which refused to run the piece and instead turned the damning information over to Aruban authorities, who chose to ignore it as "fantasy."  [¶] Now Holloway's father has the map. He is in Aruba with Tim Miller, the head of Equusearch, a private firm based in Texas that specializes in finding missing persons—dead or alive.

Ex. 42 (Daily Beast, *Will Natalee's Father Find Her?*, June 28, 2010).

(MSNBC, *Cops test jawbone for Natalee Holloway link*, Nov. 16, 2010) (reporting that "Dutch forensic experts are testing a piece of bone found on the Caribbean island of Aruba to see if it comes from Natalee Holloway" and that "[e]xperts will first establish whether the bone is human before comparing its DNA to that of Holloway"); Ex. 47 (Los Angeles Times, *Piece of Bone Found in Aruba, Could Be From Holloway*, Nov. 16, 2010), Ex. 46 (USA Today, *Dutch experts examining bone for any link to missing teen Natalee Holloway*, Nov. 16, 2010), Ex. 45 (People, *Did Jaw Bone Found in Aruba Come from Natalee Holloway?*, Nov. 16, 2010).  The reports all noted that, as one put it, "[t]he bone was found on a beach near the Caribbean resort island's Phoenix Hotel, close to the Bubali swamp" into which Van der Sloot "previously claimed that he dumped her body."  Ex. 44 (MSNBC, *Cops test jawbone for Natalee Holloway link*, Nov. 16, 2010), *see also, e.g.*, Ex. 46 (USA Today, *Dutch experts examining bone for any link to missing teen Natalee Holloway*, Nov. 16, 2010).[6]

The second AMI article challenged by Ms. Holloway, published under a headline that read, in part, "New Bone Evidence:  Natalee Was Buried Alive,"

---

[6] On November 22, 2010, on one national television program discussing the new jawbone evidence, an interviewer asked Ron Shindel, a former NYPD deputy inspector:  "If it is [Natalee's bone that was found in Aruba], are we curious about where the rest of the body parts may be?"  Shindel responded, "[i]f you can identify it as Natalee Holloway, you're going to move forward and you're going to start looking all over the beach and trying to uncover places. There may be a shallow grave on that beach, and they're going to start looking at that beach pretty heavy, at this point."  Ex. 49 (CNN, *Nancy Grace Show*, Nov. 22, 2010).

appeared in the issue of the *Enquirer* dated December 6, 2010 (the "December 2010 article").  Ex. 50.  In it, AMI reported that a jawbone recently discovered near the Bubali area in Aruba "was identified as being from a young white woman."  The cover included a photo re-creation, specifically identified as such, showing four uniformed men digging in the sand, along with inset photos of Natalee Holloway and Van der Sloot.  In the December 2010 article, AMI reported (as others already had) that, because heavy storms may have washed the jawbone into the sea where it then came ashore, investigators were considering whether it may have come from a skeleton in the marshy area.  *Compare* Ex. 50 (December 2010 article) *with* Exs. 44, 45, 46, 48, 49.  Art Wood, a retired FBI agent engaged by Natalee's father, is described in the December 2010 article as having told the *Enquirer*, "There's no question where the jawbone came from – it was found very close to where the bird sanctuary waters empty into the ocean when they're high enough."  Ex. 50.  In addition, Wood said, Dutch experts had asked Dave Holloway "to send them [her] dental records by overnight courier" in order to compare them to the single molar reportedly found intact on the jawbone.  *Id.*

Based on this recent discovery, the December 2010 article recounted, authorities were also taking a closer look at the audio tapes made by the Dutch investigator Patrick van der Eem, who had secretly taped Van der Sloot talking about "Natalee's final moments," including his claim that she went into

19

convulsions after a night of drinking.  *Id.*  (As noted, the van der Eem tapes had been the subject of widespread media reports in 2008, and Ms. Holloway herself talked about their contents in detail at that time.  *Supra* at 9-11.)  According to the December 2010 article, the tapes revealed that, when van der Eem asked Van der Sloot how he knew Natalee was dead, he replied "'I wasn't [expletive deleted] sure about that . . . but it really scared me to death."  It was possible, Van der Sloot acknowledged on the tapes, that "Natalee was alive and simply in a coma when they buried her."  Based on these confessions, AMI reported, investigators had concluded that Natalee could have been buried alive.  Ex. 50.

Moreover, when Van der Sloot was informed of the discovery of the jawbone by his attorney, the December 2010 article reported, "'he just sneered and tried to laugh it off as if it was nothing.'"  Van der Sloot reportedly told a prison guard that "[i]t's no secret on the streets that the bad guys dump bodies in that swamp" and indicated that "[t]here are at least FIVE more bodies out there."  The article concluded by noting that Aruba has been a "sometimes-fatal magnet for the young and beautiful," including Amy Lynn Bradley who disappeared from a cruise ship, and Nevina Labouovic who was sailing with her family when they and their boat all disappeared.  Given Van der Sloot's claims, the December 2010 article

20

explained, investigators were wondering if he might be "responsible for the deaths of other women who might be buried near Natalee."[7]

### 3.    March/April 2011

In March 2011, the FBI sent agents to Peru to determine whether Van der Sloot's laptop computer contained any evidence relevant to Natalee's disappearance.  Once again, this news prompted renewed coverage of the story. *See, e.g.*, Ex. 52 (CNN, *FBI traveling to Peru for clues in Natalee Holloway case*, Mar. 10, 2011) (reporting that "FBI agents are travelling to Peru to study a laptop belonging to Joran Van der Sloot . . . A source close to the case told InSession the FBI will be searching for any clues that can help solve the Holloway case."); Ex. 54 (CBS, *Joran van der Sloot's computer to get FBI going-over in Natalee Holloway case*,  Mar. 11, 2011) (reporting that "FBI agents will travel to Peru to inspect the hard drive of a laptop belonging to Joran Van der Sloot . . . . They hope to find clues on Van der Sloot's computer to help solve the 2005 disappearance of Holloway").  The *Los Angeles Times* expanded on these reports, noting that "[i]nvestigators have said they believe Van der Sloot killed Flores after she found

---

[7] Once it was determined that the jawbone found in Aruba did not belong to Natalee, the media speculated whether it belonged to Bradley.  *See, e.g.* Ex. 51 (CNN, *Jawbone rekindles cruise ship mystery*, Jan. 3, 2011).  Producing her cable television series at approximately this same time (the first episodes aired in May 2011), Ms. Holloway devoted an entire episode to Bradley's disappearance – questioning whether she was sold into sexual slavery and speculating that she is currently a prostitute in the Caribbean.  *See* Ex. 69 (Episode 3).

something related to the Holloway case on his computer."  Ex. 58 (Los Angeles Times, *Peru Approves 1st Step Toward Extradition of Joran van der Sloot*, Apr. 24, 2012).[8]

It was at this juncture that AMI published the third article Ms. Holloway challenges in this suit, in the issue of the *Enquirer* dated April 25, 2011, under a headline that read, in part, "Joran and His Dad Hid Natalee's Body in a Tomb!" (the "April 2011 article").  Ex. 57.  This article includes a cover photo of a graveyard with an above-ground tomb as well as photos of Natalee and Van der Sloot.  *Id.*  In the April 2011 article, AMI reported (as did many others before it) that, following his arrest for the Flores murder, Peruvian authorities seized Van der Sloot's laptop computer on which, Van der Sloot claimed, he found Flores searching for information about Holloway, "flew into an insane rage" and killed her.  *Id.*  According to the article, once incarcerated, Van der Sloot revealed to a

---

[8] *See also, e.g.*, Ex. 56 (Birmingham News, *Joran Van der Sloot*, Mar. 16, 2011) ("A copy of Joran van der Sloot's laptop hard drive is in the possession of the FBI, provided by Peruvian authorities, AOL News reported Tuesday . . . [Van der Sloot] is the primary suspect in the May 2005 disappearance of Mountain Brook teen Natalee Holloway during a post-high school graduation trip to Aruba. Van der Sloot was charged last year with attempting to extort money from Natalee Holloway's mother for information in the teen's disappearance."); Ex. 53 (HLN, *Issues with Jane Velez-Mitchell*, Mar. 10, 2011) ("Breaking news tonight. FBI agents headed to Peru as we speak. There, they will finally, finally, finally get a look at the laptop computer belonging to accused killer Joran Van Der Sloot. Could Joran's laptop hold the secret of what happened to Natalee Holloway?  Will we finally learn the truth we've been waiting for, for so long? . . . A source told CNN Van Der Sloot allegedly killed Flores because she discovered information on his laptop linking him to the disappearance of Natalee Holloway.  Is the truth somewhere in Joran's hard drive?").

prison informant that he also used the computer to send emails to a friend explaining how "he became enraged when Natalee refused to have sex with him" and then "lost control and beat and strangled her, and came to his senses only when he discovered that she was almost dead." *Id.* Although he deleted the information on the computer, the April 2011 article reported, the "FBI is sifting through every detail on the hard drive to find the information that will finally solve the mystery of the Alabama teen's mysterious disappearance in 2005 – and nail Joran for her murder." *Id.* Art Wood, the Holloway family investigator, told the *Enquirer*, "[i]t's the dynamite evidence that could put Joran on death row." *Id.*

In addition, AMI reported in the April 2011 article that Van der Sloot had told the prison informant that, after initially burying Natalee's body in a shallow grave, he subsequently placed it in a coffin in an above-ground crypt. In this regard, the article recounted how, "early in the investigation, Joran's father [an attorney] advised him: 'No body, no case' and Joran bragged to journalists that her body would never be found." *Id.* Still, the article explained, investigators remained hopeful that the laptop computer would reveal "how Natalee really died

and how Joran's father helped him dispose of her body and then cover up Joran's

involvement in the murder." *Id.*[9]

## D.    The Complaint And The Prior Motion To Dismiss

On June 20, 2012, Ms. Holloway filed her Complaint in this action, asserting

claims for outrage and invasion of privacy based on the three above-referenced

articles (collectively, the "Articles").   In its ruling on AMI's Rule 12 motion, the

Court dismissed with prejudice the privacy claim.   Accordingly, AMI limits its

discussion here to the sole remaining claim for outrage.   In that regard,

Ms. Holloway alleges that the Articles contain "false and outrageous statements

---

[9] Two weeks later, Ms. Holloway's internationally distributed television series premiered in the United States, with the first episode reporting on Natalee's disappearance.   As described on the show's website:

> Lifetime's gripping true-life series 'Vanished With Beth Holloway' examines some of America's most disturbing unsolved cases, as told to Holloway by the families who've been victimized by mysterious abductions or disappearances of loved ones and unspeakable crimes.   Now left with little hope, these families turn to Holloway, who continues to live a mother's worst nightmare as she carries on her tireless quest to solve the mystery surrounding her daughter Natalee's tragic 2005 disappearance.   [¶]   Each episode will profile real-life mysteries, giving detailed accounts of the events described by those closest to the victims as Beth Holloway goes on location to conduct key interviews,  introduce important facts and give the audience a clear understanding of pivotal moments in each harrowing case.

*See* Ex. 60 (Lifetime's *Vanished With Beth Holloway* webpage).   *See also* Ex. 68 (NBC, *The Today Show*, May 9, 2011) (Plaintiff describing and promoting *Vanished With Beth Holloway*). The episodes each employ dramatic voiceovers, unmarked recreations and background music, as well as interviews by Ms. Holloway herself of those closest to the victims.   Because the series was being produced during the period in which the last of the challenged Articles was published, it forms part of the context in which publication occurred.   Copies of the episodes are attached as Exhibit 69 to this motion.

and photographs describing the alleged treatment of Natalee's corpse."

Compl. ¶ 34.  In particular, Ms. Hollow complains of:

- the statements in the June 2010 article that Van der Sloot drew a map to where he claims he buried Natalee's body, Compl. ¶ 37;

- the December 2010 article's discussion of jawbone evidence, Van der Sloot's prior confession to Patrick Van der Eem, the fact that Joran might have disposed of Natalee's body when she was still alive and that Natalee might have been slipped a date-rape drug, *id.* ¶ 67; and

- the April 2011 article's discussion of the Peruvian authorities' desire to search Van der Sloot's laptop in order to determine what happened to Natalee, Van der Sloot's latest confessions, and the photo-recreation and related headlines associated with the reports that her body might have been moved to a tomb in 2005, *id.* ¶ 102.

Generally, Ms. Holloway alleges that these portions of the articles are false because Natalee's grave was never found, no jawbone was ever determined to be Natalee's and, if Natalee is dead, "the manner of her death… is unknown," "the method of her body's disposal is unknown" and the "location of her disposed body is unknown."  Compl. ¶¶ 24, 39, 40.  Ms. Holloway alleges that AMI knew these portions of the Articles were false and that it published them with the intention of inflicting severe emotional distress on her, that she suffered such distress as a result, and that the act of publishing these statements was the type of outrageous conduct proscribed by Alabama law.  Compl. ¶¶ 34, 62-63, 97-98, 119-120.

On August 17, 2012, defendants moved to dismiss the outrage claim on the substantive grounds that (i) the First Amendment bars the cause of action in these

circumstances; (ii) Ms. Holloway cannot demonstrate that the Articles were of and concerning her; (iii) she cannot establish the required "severe emotional distress;" and (iv) publishing the Articles, which address matters of public concern, cannot be considered sufficiently outrageous to sustain the claim.

This Court dismissed Ms. Holloway's privacy claim on May 22, 2013, but it denied AMI's motion with regard to the outrage claim. Specifically, the Court rejected AMI's arguments that the First Amendment absolutely barred the claim and that she was required to show the Articles were "of and concerning" her. The Court also held that, for the purposes of a Rule 12(b)(6) motion, Ms. Holloway had met her burden of alleging "severe emotional distress." Finally, the Court held that the Complaint's allegations, standing alone, were sufficient to make out a claim that the act of publishing the Articles was the type of extreme and outrageous conduct encompassed by the tort of outrage in Alabama. 05/22/13 Mem. Op. at 21. In particular, because "Ms. Holloway's *allegations* are sufficiently similar to those previously considered 'outrageous' by the Alabama Courts," – *i.e.*, because the publications at issue consisted of information *about* the purported burial of her daughter and Alabama courts have permitted outrage claims arising from conduct involving the burial of family members – "at least at th[e pleading] stage," this Court was "unwilling to find that published words can never be the basis for an outrage claim." *Id.* at 26-27 (emphasis added).

26

In so ruling, the Court declined to consider, in the context of a Rule 12(b)(6)

motion, evidence outside the pleadings, including materials that establish the

overall context in which the Articles were published, Ms. Holloway's own role in

creating that context, and that AMI, whose participation was limited to reporting to

the public on an acknowledged matter of public concern, itself played no part in

the handling or disposition of Natalee or her body.  At the same time, the Court

expressly noted that this argument, and the evidence proffered in support of it,

"may well be asserted in a motion for summary judgment."  *Id.* at 23-24 & nn. 20,

22.  AMI now moves for summary judgment on this ground.[10]

## ARGUMENT

The basis for the present motion is straightforward:  Under Alabama law, to

prevail on a claim for outrage, a plaintiff must prove, among other elements, that

the defendant's conduct was "so outrageous in character and so extreme in degree

as to go beyond all possible bounds of decency, and to be regarded as atrocious

and utterly intolerable in a civilized society."  *Horne v. TGM Assocs., L.P.*, 56 So.

3d 615, 631 (Ala. 2010) (internal quotations and citation omitted); *see also*

---

[10] A pre-discovery motion for summary judgment is appropriate where, as here, no discovery could create any dispute with respect to the facts material to the legal question presented.  Fed. R. Civ. P. 56(a) & (b).  Indeed, where, as here, the claim itself implicates speech about a matter of public concern, a court should avail itself of all procedural options that, properly applied, would terminate the litigation at the earliest possible stage.  *Time, Inc. v. McLaney*, 406 F.2d 565, 565 (5th Cir. 1969) (permitting meritless claim to proceed would, through burden of "long and expensive trial proceedings," have "chilling effect" on speech).

27

05/22/13 Mem. Op. at 29 (same) (citing additional cases).  This is a question of law for the Court.  *E.g.*, *Grimsley v. Guccione*, 703 F. Supp. 903, 907 (M.D. Ala. 1988); *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985).  No Alabama court has ever sustained an outrage claim based purely on speech (regardless of whether the speech was true or false), and most especially not a claim based on speech to a general audience about a matter of public concern.

It is undisputed that AMI had no involvement in any of the conduct related to the apparent death, burial or possible mistreatment of Natalee's remains.  Indeed, it is undisputed that AMI did no more than disseminate to the general public information about those events.  No Alabama court has ever recognized a claim for outrage in any analogous circumstance.  As AMI explains further below, therefore, a decision by this Court to expand the tort of outrage on this record to include the publication of the Articles at issue would contravene established principles of federalism and, under the undisputed circumstances of this case, would violate the First Amendment.

A.  **While Plaintiff Is Entitled To Have Facts Construed In Her Favor, She Is Not Entitled To A Favorable Construction Of State Law**

Fed. R. Civ. P. 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  05/22/13 Mem. Op. at 7-9

28

(internal citation and quotations omitted).  Put differently, the relevant question is

"'whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

*Id.* at 9 (citation omitted).  It is, therefore, well-settled that the Court must favor the

non-movant with the benefit of all reasonable *factual* inferences that may be drawn

from the evidence.  *Id.*  There is, however, no similar requirement that the Court

favor the non-movant with regard to unresolved issues of  state law.  Rather, with

respect to such questions, the Court is obliged to apply the law as articulated by the

Alabama Supreme Court, including any limitations that court has imposed on the

scope of the non-movant's claim.  *See Riley v. Kennedy*, 553 U.S. 406, 409 (2008)

("[a] State's highest court is unquestionably the ultimate expositor of state law . . .

[and] the State Supreme Court's prerogative to say what Alabama law is merits

respect in federal forums") (internal quotations and citation omitted); *In re Schlein*,

8 F.3d 745, 754 (11th Cir. 1993) ("It is axiomatic that: 'the highest court of the

state is the final arbiter of what is state law. When it has spoken, its pronouncement

is to be accepted by federal courts as defining state law *unless it has later given*

*clear and persuasive indication* that its pronouncement will be modified, limited or

restricted.'") (emphasis added) (quoting *West v. American Tel. & Tel. Co.*, 311

U.S. 223, 236 (1940)).

29

Federal courts, in Alabama as elsewhere, are not merely reluctant to expand the scope of state tort law; they are prohibited from doing so. As Chief Judge Howard put it in *Angle v. Dow*, 822 F. Supp. 1530 (S.D. Ala. 1993), "the Court is without authority to expand the tort of outrage beyond its current parameters" and, where "existing case law does not cover the *precise* facts in this action," the court was required to grant summary judgment on the ground that the challenged conduct "cannot, as a matter of law, amount to conduct sufficiently extreme and outrageous as to constitute the tort of outrage." *Id.* at 1546 (emphasis added).[11]

The Court of Appeals' analysis in *United States v. Bailey*, 419 F.3d 1208 (11th Cir. 2005), underscores just how firmly the federal courts adhere to the scope of state tort law as specifically delineated by the state's highest court in analogous circumstances. The case involved a claim for civil forfeiture arising out of the

---

[11] Similarly, in *Nelson v. Chattahoochee Valley Hosp. Soc'y*, 731 F. Supp. 1217 (M.D. Ala. 2010), the plaintiff opposed her former employer's motion for summary judgment on her outrage claim on the ground that her employer's conduct constituted sexual harassment, one of the three categories that the Alabama Supreme Court historically has found sufficiently "outrageous" to support such a claim. Chief Judge Fuller, however, held that the particular conduct alleged – that the plaintiff had been discriminated against because she became pregnant – was not among the *specific* types of sexually-related misconduct previously recognized by the Alabama state courts as "outrageous." *Id.* at 1237. As the court explained, "[t]o say that th[e] kind of conduct [alleged by plaintiff] is egregious sexual harassment would be to expand the law well beyond its current bounds." *Id.* at 1238 (granting summary judgment to defendant). *See also Burden v. Int'l Longshoremen's Ass'n*, 510 F. Supp. 2d 618, 626 (S.D. Ala. 2007) (where co-employee was alleged to have repeatedly made explicit sexual invitations to, and comments to others about, plaintiff, court observed that it "has located no Alabama case endorsing a claim for [outrage] based solely on crude sexual comments, and doing so would extend the tort past its breaking point").

30

proceeds of drug transactions that turned on the elements of the tort of conversion under Florida law.  The district court had suggested that, because no Florida court had considered whether the tort reached the specific conduct at issue, it was the sort of question that a federal court ought to certify.  The Court of Appeals disagreed, observing that, even where there is a question of first impression regarding state law, it is inappropriate for federal court even to inquire whether the state wishes to expand the scope of its tort law.  *See id.* at 1217-18 & n.13 (affirming summary judgment for defendant).[12]

In this case, therefore, there is no basis on which Ms. Holloway may argue that this Court is required, or even may elect on this motion, to resolve any doubts about the *scope* of Alabama law in her favor.  To the contrary, as AMI demonstrates below, any such doubts must be resolved in favor of the Alabama Supreme Court's command that the tort of outrage should be narrowly construed.

---

[12] *See also Mosley v. Wyeth, Inc.*, 719 F. Supp. 2d 1340, 1351 & n.9 (S.D. Ala. 2010) (citing *Bailey* and "declin[ing] the plaintiff's invitation to expand" Alabama breach of warranty law to cover defendants' alleged conduct, where plaintiff could point to no Alabama case involving the same facts and circumstances); *Hazewood v. Found. Fin. Grp., LLC*, No. 07-0171-WS-B, 2007 WL 1975446, at *6 n.8 (S.D. Ala. July 2, 2007) (holding that federal court "is not empowered to cut from whole cloth a new Alabama tort" and collecting cases emphasizing that federal courts may not expand state tort law), *aff'd*, 551 F.3d 1223 (11th Cir. 2008).

**B.      The Alabama Supreme Court Has Consistently Limited
          The Tort Of Outrage To Specified Categories of *Conduct***

The Alabama Supreme Court did not recognize the tort of outrage until

1980, when it did so in order to address those rare situations in which shockingly

wrongful and intentional misconduct that produced serious harm did not otherwise

give rise to a cause of action – and it held that the facts in the case before it did not

meet this very stringent test.  *American Rd. Serv. Co. v. Inmon*, 394 So. 2d 361

(Ala. 1980).  In the 33 years since, the Alabama Supreme Court has taken great

pains to cabin the tort, and it has done so primarily by restricting the scope of

conduct that may be considered sufficiently "outrageous" to support the claim:

> By far the most significant element, normally dispositive of a
> plaintiff's prospects of recovery, is that dealing with the nature of the
> defendant's conduct as being sufficiently outrageous and extreme. . .
> . The vast majority of the cases that have reached the appellate level
> involving the tort of outrage have foundered upon the shoals of this
> particular element, with the courts finding defendants' conduct
> insufficiently extreme and outrageous.

Alabama Tort Law § 23.01.  *See also, e.g.*, *Thomas v BSE Indus. Contractors, Inc.*,

624 So. 2d 1041, 1044 (Ala. 1993) ("This Court has consistently held that the tort

of outrage is a very limited cause of action that is available only in the most

egregious circumstances.  As a consequence, this Court has held in a large majority

of the outrage cases reviewed that no jury question was presented."); *Ex Parte*

*Crawford & Co.*, 693 So.2d 458, 459, 461 (Ala. 1997) ("Traditionally, we have

applied the *Inmon* test strictly, thereby allowing an outrage claim to go to the jury

32

only in egregious cases"; that is, "only when the defendant's conduct is extreme");

*Jenkins v. U.S. Fid. & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997) (affirming

summary judgment for defendant where actions "do not begin to approach the rare

set of facts that are 'atrocious' and 'utterly intolerable in a civilized society'").

Indeed, as this Court  previously noted, the tort of outrage in Alabama

historically has been limited to three specific fact patterns:  "(1) cases involving

'wrongful *conduct* in the context of family burials'; (2) cases in which 'insurance

agents employ [] heavy-handed, barbaric means . . . to coerce . . . insured[s] into

settling . . . insurance claim[s],' and (3) cases 'involving particularly egregious

sexual harassment.'"  05/22/13 Mem. Op. at 25 (emphasis added) (quoting *Tinker*

*v. Beasley*, 429 F.3d 1324, 1330 (11th Cir. 2005)).[13]  The federal courts, in turn,

have taken careful note of Alabama's reluctance to venture into new territory when

construing the tort.  As one district judge put it, "the Alabama Supreme Court is

not predisposed to recognize that tort of outrage claims present jury questions."

*House v. Corporate Servs., Inc.*, 882 F. Supp. 161, 165 (M.D. Ala. 1995).  This

principle led another district court to observe, when it granted summary judgment

to a defendant on an outrage claim based on a series of events in a hospital that

---

[13] Most recently, the Alabama Supreme Court has held that the sexual abuse of a minor by his physician, in which the physician traded prescription narcotics for sex, was sufficiently outrageous to support the cause of action.  *O'Rear v. B.H.*, 69 So. 3d 106, 121 (Ala. 2011).

culminated in a patient's death, that, while those events were "tragic," they did not

"satisfy the formidable threshold established by Alabama courts for the tort of

outrage." *Morgan v. North Mississippi Medical Ctr., Inc.*, 458 F. Supp. 2d 1341,

1359 & n.23 (S.D. Ala. 2006), *aff'd*, 225 F. App'x 828 (11th Cir. 2007). And, as

that court further explained:

> Alabama courts have been quite reticent to validate outrage claims in the health care context, or to expand the tort beyond its extraordinarily narrow parameters, even in the most egregious of circumstances. *See, e.g.*, *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273 (Ala. 2000) (affirming summary judgment for defendant on outrage claim where nursing home restrained patient to insert a catheter and, in doing so, bent patient's leg until it popped audibly, resulting in factures to hip and pubic bones and requiring surgery, then intentionally lied to patient's family about cause of injury); *Grantham v. Vanderzyl*, 802 So.2d 1077 (Ala. 2001) (summary judgment proper on outrage claim, where doctor threw patient's blood and 'surgical refuse' in the face of operating room nurse with whom he was having a disagreement, causing nurse to live with prolonged uncertainty as to whether doctor's acts had exposed her to HIV, hepatitis or other communicable diseases); *Gallups v. Cotter*, 534 So.2d 585, 589 (Ala. 1988) (outrage claim held not actionable where physicians removed life-support equipment from brain-dead patient despite family's lack of consent).

*Id. See also Cabaniss v. Coosa Valley Med. Ctr.*, No. CV 93-PT-2710-E, 1995

WL 241937, at *29 (N.D. Ala. Mar. 20, 1995) (declining to expand category of

"outrage" involving employee sexual harassment to include different harassing

conduct at issue), *aff'd*, 116 F.3d 491 (11th Cir. 1997).

At bottom, as the Eleventh Circuit has put it, "'outrage is a very limited

cause of action that is available only in the *most* egregious circumstances.'" *Tinker*

*v. Beasley*, 429 F.3d 1324, 1330 (11th Cir. 2005) (emphasis added) (citation omitted).  In that case, the Eleventh Circuit reversed the trial court and granted summary judgment to defendant law enforcement officers on an outrage claim premised on allegations that they had threatened an (innocent) suspect with physical harm if he did not cooperate with them.  Because the Alabama Supreme Court had never had occasion to consider whether such facts could support the cause of action, the Eleventh Circuit rejected the claim precisely because the conduct in question, although "reprehensible," "falls into none" of the categories actually recognized by the Alabama Supreme Court.  *Id.* at 1130-31.  In so holding, the Eleventh Circuit rejected the plaintiff's effort to analogize the conduct at issue to that category of cases involving abusive treatment of insureds by insurance investigators.  The Eleventh Circuit emphasized that, despite the obvious parallels, the analogies were not "compelling enough to overcome the very high standard set for any recognition of this tort under Alabama law."  *Id.*

## C.   Disseminating The Articles About A Matter of Public Concern To A General Audience Is Not Outrageous As A Matter Of Law

It is Ms. Holloway's burden to persuade the Court that it can properly be deemed "extreme and outrageous" under Alabama law for AMI to publish the statements in the Articles to which she objects.  In this regard, Ms. Holloway emphasizes that she has alleged that those statements are false.  Compl. ¶¶ 34, 62-

63, 97-98, 119-120.  But the Alabama courts have rejected attempts to base outrage

claims on purportedly false statements, both in the context of news reports to the

public and even in the context of private communications.  As the Alabama Court

of Civil Appeals put it in *Hurst v. Cook*, 981 So. 2d 1143, 1157 (Ala. Civ. App.

2007), "[e]ven if [defendant's] decision to make a police report was motivated by

malice and his allegation of forgery was entirely false, such actions would not rise

to the level of being a proper basis" for an outrage claim.[14]

Moreover, regardless of whether any statement in the Articles is false (which

AMI disputes), its publication of them must be evaluated in the full context in

which publication occurred.  Simply put, AMI's act of publishing what others—

including Ms. Holloway herself—had already written and said cannot be deemed

"outrageous" as a matter of law.  *See, e.g., Grimsley*, 703 F. Supp. at 910 (plaintiff

could not maintain outrage claim based on contents of article when substantially

similar information had previously been published elsewhere); *Dotson v. Wal-Mart*

---

[14]*See also Finebaum v. Coulter,* 854 So. 2d 1120, 1122 (Ala. 2003) (dismissing outrage claim despite plaintiff's allegation that radio host had falsely accused him of performing oral sex on another man); *Fitch v. Voit,* 624 So. 2d 542, 543 (Ala. 1993) (affirming dismissal of outrage claim despite allegations that newspaper had printed misleading photograph of plaintiffs' decedent in hospital bed, without consent); *Little v. Consol. Publ'g Co.,* 83 So. 3d 517, 526 (Ala. Civ. App. 2011) (affirming dismissal of outrage claim despite plaintiff's allegation that newspaper had falsely criticized him because of his race, leading to plaintiff's receipt of death threats); *Stabler v. City of Mobile*, 844 So.2d 555, 561 (Ala. 2002) (writing letter stating that plaintiff was not qualified for job and containing "a number of inconsistencies and untruths" is not sufficiently extreme to support tort of outrage); *Green Tree Acceptance, Inc. v. Standridge*, 565 So.2d 38, 45 (Ala. 1990) (despite defendant's misrepresentations and "threatening, abusive, and insulting language," conduct was not sufficiently outrageous to sustain claim).

36

*Stores, Inc.*, No. 96-6690, 1998 WL 669940, at *1 (6th Cir. Sept. 17, 1998)

(plaintiff could not maintain outrage claim based on defendants' publication of

"investigate report on an incident in which Plaintiff allegedly shoplifted" where

local newspaper had previously reported incident); *Johnson v. McDonald*, 3 P.3d

1075, 1080 (Ariz. Ct. App. 1999) ("[r]egardless of the truth of McDonald's alleged

statements," because statements had previously appeared in public document,

repeating them was not outrageous as matter of law).

Thus, for example, Ms. Holloway complains that AMI reported (i) that Van

der Sloot said on tape that he had a friend dispose of Natalee's body without

knowing if she was dead, and (ii) that, based on this confession, investigators

believed Natalee was slipped a date-rape drug.  Compl. ¶ 67.  But this is *exactly* the

same information that Ms. Holloway herself discussed openly, often and *prior* to

AMI's publication of it.  *See, e.g.* Ex. 65 (ABC, *20/20 Special Editions*, Feb. 4,

2008) (Ms. Holloway reviews tape of Van der Sloot's confession and discusses

fact that Van der Sloot "chose to be that person himself, to decide, you know,

whether he's going to seek medical help for Natalee with her laying there in his

presence -- or is he gonna make the decision to dispose of her body? I mean, dear

God! He did! And even though he didn't know if she was alive or not … dear

God."); Ex. 27 (Fox, *On The Record*, Feb. 6, 2008) (Ms. Holloway speculated that

her daughter "could have very well been in a coma and he disposed of her body

alive.  . . . I think absolutely she had been slipped something …."); Ex. 66 (CNN, *Larry King Live*, Feb 7, 2008) (Ms. Holloway says she believes Natalee could have been buried alive).

As recently as 2011, in the premier episode of her own television series, Ms. Holloway focused on these very subjects, discussing them in great detail and stating her conclusion that "[t]hey could have just dumped her alive in the ocean, just unconscious.  I mean they don't even know."  Ex. 69 (Episode 1). Ms. Holloway cannot reasonably now claim that it was "utterly intolerable in a civilized society" for AMI to *re*publish to the public the sum and substance of what she *herself* had been saying .[15]

Similarly, Ms. Holloway contends it was "intolerable in a civilized society" for AMI to have published statements regarding investigators' attempts to determine whether a jawbone found in Aruba could have come from Natalee, or assertions that investigator Tim Miller and Natalee's father were looking into a

---

[15] In addition, it was not just Ms. Holloway who was saying these things.  Scores, if not hundreds, of media outlets all published the same information, typically *before* AMI.  *See, e.g.* Ex. 25 (Fox News, *Holloway's Anguished Mother: Tape Confession Means Natalee Could Have Been Saved*, Feb. 5, 2008) (speculating that Natalee had been drugged and buried alive); Ex. 28 (ABC, *Was Natalee Holloway Drugged?*, Feb. 15, 2008) ("On the tape, he said Holloway went into convulsions and then became limp.  Fearing she was dead, he claimed on the tapes that he called an unknown accomplice who came and took the body out to sea, where it was dumped overboard"); Ex. 22 (ABC, *Meet the Man Who Got Van Der Sloot to Talk About Holloway's Disappearance*, Feb. 4, 2008); Ex. 24 (CNN, *Van der Sloot on video: No sleep lost over Holloway's dumped body*, Feb 5, 2008); Ex. 21 (NBC 9 News, *Natalee Holloway's mother believes she's dead*, Feb. 2, 2008).

map that Van der Sloot drew of where he claimed to have buried her body.  *See, e.g.*, Compl. ¶¶ 72-73, 98.  But, once again, AMI was neither alone, nor the first, to report these developments, reporting to which Ms. Holloway herself contributed. Ex. 48 (Mobile Register, *Mother awaits news on bone found in Aruba*, Nov. 21, 2010) ("Natalee Holloway's mother said she's anxiously awaiting the news on whether a jawbone found on an Aruban beach could have been her daughter's"); Ex. 36 (HLN, *Issues with Jane Velez-Mitchell,* June 7, 2010) ("TIM MILLER, TEXAS EQUUSEARCH: Well, you know, I'm in Aruba right now, and I've actually got a map that Joran wrote and drew another map down here where Natalee's body is supposedly at"); Ex. 42 (Daily Beast, *Will Natalee's Father Find Her?*, June 28, 2010) ("Joran van der Sloot . . . drew a map last February, showing exactly where he and the Kalpoe brothers left her body").  Similarly, AMI's reporting that Van der Sloot had confessed to killing Natalee, that his father had helped him dispose of the body, and that a gravesite had been found in which it was believed Natalee had twice been buried had all been widely disseminated by other news outlets prior to AMI's publication of the same information.  *See* Ex. 39 (New York Post, *Tomato-Pasted – Peruvians Pelt Evil Sloot with Rotten Fruit*, June 12, 2010) ("Van der Sloot told [Ms. Holloway's lawyer] that Natalee died when he shoved her to the ground and she hit her head on a rock.  He also said his father later buried her body under the foundation of a house"); Ex. 1 (Fox,  *The*

39

*O'Reilly Factor*, July 19, 2005) ("I truly feel as though that site we found that we believe is a grave site, I believe that Natalee was buried in that for a day or two. Somebody hired somebody else to go ahead and dig her up and then dispose of her"); Ex. 13 (USA Today, *Aruban police eye drugs in Holloway case*, Mar. 23, 2006) ("investigators believe that someone took steps to carefully hide Holloway's body – perhaps burying her twice").

Ms. Holloway herself discussed these topics in substantially similar terms, well before AMI did so. *See* Ex. 19 at 223 (writing in her book, "Aruban police believe that . . . [Natalee] met her fate at the van der Sloot home, and that Joran called his father – or someone – and that they disposed of her body.  That's what we think may have happened"); Ex. 11 (Fox, *On The Record*, Jan. 26, 2006) (discussing arrangements for cadaver dogs to search sand dunes for body); Exs. 8, 62 (*On The Record,* Nov. 14, 2005).  In short, AMI's articles do not differ in any material respect from Ms. Holloway's own public statements and speculation about the fate of her daughter, nor from the steady stream of reporting coming from countless other media organizations, including the *Birmingham News*, NBC, CBS, ABC, CNN, FOX, HLN, MSNBC, the *Los Angeles Times*, *Newsday*, and *People* magazine.  In this context, it cannot be considered so "extreme in degree as to go

beyond all possible bounds of decency" for AMI, alone among all of these actors,

including the plaintiff herself, to have published what it did.[16]

In this respect, *Grimsley v. Guccione*, 703 F. Supp. 903 (M.D. Ala. 1988), is

particularly instructive.  There, a reporter interviewed the plaintiff after she

"unexpectedly gave birth to a second son."  *Id.* at 905.  After an article about the

surprise birth appeared in the local paper, and after the "Associated Press picked

up the story, it also appeared in several other newspapers and at least one

---

[16] Ms. Holloway may argue that one particular thing she herself never discussed publicly is the report that Natalee's body may have been hidden in a tomb.  Given all of the detailed speculation by Ms. Holloway and others about how Natalee's body may have been disposed of, *see supra* at 40 (citing examples), however, it cannot be outrageous, within the meaning of that term under Alabama law, for AMI to have published this particular speculation, based as it is on one of Van der Sloot's multiple confessions.  Ms. Holloway herself routinely scrutinized and dissected Van der Sloot's contradictory confessions in her media appearances, *see supra* at 9-11, and other media likewise reported routinely on their evolving contents, *see id.  See also* Ex. 40 (Newsday, Jun 14, 2010) (discussing Van der Sloot's conflicting confessions); Ex. 29 (Fox, Nov. 24, 2008) (Van der Sloot confessing to Greta Van Susteren that "he sold Natalee Holloway to a mysterious stranger"); Ex. 30 (CNN, Feb. 23, 2010) (reporting "Joran Van Der Sloot says he dumped the body of teen beauty, American girl Natalee Holloway in a swamp on the north tip of the island, and it`s all caught on video").  Other media similarly reported, as detailed *supra*, both that it was likely that Natalee had been buried twice and that her graveside had likely been found in various locations.  Exs. 1, 15, & 30.  *See also* Ex. 34 (HLN, *Issues with Jane Velez-Mitchell,* Mar. 22, 2010) ("Nancy Grace uncovered an underwater photo that could show human bones on the ocean floor. A couple on a cruise took the picture while snorkeling, but does it really show a skeleton? . . . But is it? Is it a corpse? We're going to know soon enough if this is Natalee's final resting place when divers head out on their secret underwater search."); Ex. 13 (KABC-TV, *Could photo show Natalee Holloway's remains?*, Mar. 19, 2010) ("Could photo show Natalee Holloway's remains? . . . 'my God that looks like a corpse.'"); Ex. 32(CBS, *Natalee Holloway's Skeleton: Did Vacationer Snap Photo of Missing Girl's Remains?*, Mar. 18, 2010) ("it has been reported that a photo taken underwater in Aruba "could be a human corpse, and that John Muldowney [who took the photo] claims he has a gut feeling it's Natalee Holloway.").  As Greta Van Susteren aptly noted, and as Ms. Holloway was herself well aware:  "As we all know by now, Joran has changed his story a number of times, and now he has changed it again. Any good investigator is going to chase down every lead. Some leads are successful. Some go nowhere." Ex. 29 (On the Record, Nov. 24, 2008).

41

magazine." *Id.*  Several months later, the story also appeared in *Penthouse,* the

"gentleman's magazine."  The mother then sued the publisher of *Penthouse* for

defamation, invasion of privacy and outrage.  In dismissing the outrage claim, the

court concluded

> that *Penthouse's* republication of the tale of Grimsley's rather
> surprising delivery simply does not constitute such egregious
> behavior as to go beyond all possible bounds of decency.  After all,
> Grimsley had assisted in the preparation of the original article for the
> *Enterprise Ledger.* She even posed with her son for a picture—the
> same picture which was later run by *Penthouse.*
>
> In addition, by the time *Penthouse* published the story, the article
> with text and headlines substantially similar to that found in
> *Penthouse,* had already appeared in newspapers in Grimsley's
> hometown and neighboring cities, in out-of-state newspapers, and in
> two national publications.

*Id.* at 907-08.  The court then addressed the plaintiff's real complaint:

> It may very well be that Grimsley's distress is not based so much on
> the content of the article and headline as it is on the content of other
> articles and photographs that also appeared in the *Penthouse* issue
> with her story.  However, the mere fact that her tale was published in
> *Penthouse* cannot fairly be described as extreme or outrageous.  As
> the First Circuit concluded in *Fudge,*
>
>> Magazines such as Penthouse are sufficiently a part of
>> the contemporary scene that their reprinting of relatively
>> innocuous news items or photographs that have already
>> appeared in other media simply cannot be characterized as
>> exceeding all possible bounds of decency, atrocious, or utterly
>> intolerable in a civilized society.

*Id.* at 909 (quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1021 (1st Cir.

1988)).

To permit Ms. Holloway to single out AMI's Articles and label them, alone among all those disseminated about her daughter's fate, "outrageous," simply because they were contained in a publication she may consider offensive, would raise serious First Amendment issues.  As the Supreme Court explained in *Snyder v. Phelps*, __ U.S. __, 131 S. Ct. 1207, 1219 (2011) (citations omitted):

> "Outrageousness[]" . . . is a highly malleable standard with an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.  In a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression.  Such a risk is unacceptable; in public debate we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.

At a minimum, this admonition reinforces the Alabama Supreme Court's instruction that the tort of outrage is not intended to be expansive, particularly where the only "conduct" at issue is dissemination to a general audience of speech about a matter of public concern.

   **D.    The Facts Of This Case Are Not
          Analogous To The "Burial Misconduct"
          <u>Cases Recognized By Alabama As Actionable</u>**

Ms. Holloway presumably will contend that, because the Articles discuss the disposition of her daughter's remains, they are actionable as "outrage" in Alabama. In adjudicating AMI's Rule 12(b)(6) motion, the Court concluded that

43

"Ms. Holloway's allegations" – *i.e.*, her contention that AMI published false "descriptions of the treatment of her daughter's corpse" – "are sufficiently similar to those previously considered 'outrageous' by Alabama courts" that she had adequately pleaded her claim because it potentially could fall within the "'family burial[]'" line of cases.  05/22/13 Mem. Op. at 25, 26-27.  Now that the Court has before it not Ms. Holloway's allegations, but the undisputed record of the context in which the Articles were published, AMI respectfully submits  that this case cannot reasonably be said to fall within the "family burial" line of authority.

In Alabama, human remains, and the place in which they are interred, are imbued with extraordinary symbolic importance in our society and the law, therefore, treats these two physical things specially.  As the Alabama Supreme Court explained in *Rollins v. Phillips*, 554 So.2d 1006, 1009 (Ala. 1989):

> A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed and thought and walked among us has passed away. . . . And the law, in its all-sufficiency, must furnish some rule, by legislative enactment or analogy, or based on some sound legal principle, by which to determine between the living questions of the disposition of the dead and rights surrounding their bodies.  In doing this the courts will not close their eyes to the customs and necessities of civilization in dealing with the dead and those sentiments connected with decently disposing of the remains of the departed which furnish one ground of difference between men and brutes.

*See also Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987) ("'Our decisions lay much stress upon the sacredness of the resting ground of the dead . . ., and the exclusive

{00638220;v1}

right of interment and possession being shown, guard the spot against unlawful invasion and give a right of action for any illegal interference'") (citation omitted).

Alabama therefore considers "extreme and outrageous" that conduct which involves abuse or loss of a corpse, or damage to a final resting place. In each and every Alabama "burial case" in which the Alabama Supreme Court has been called upon to address the question whether the defendant's conduct was sufficiently "outrageous" to support the cause of action, the claim of outrage has been sustained *only* where the conduct consisted of the direct mistreatment of a decedent's remains or burial ground, or actual disruption of a funeral in progress. *See Gray Brown-Serv. Mortuary Inc. v. Lloyd*, 729 So. 2d 280, 285-86 (Ala. 1999) (cemetery's secretive disinterment and gross abuse of corpse by opening casket, throwing acid into it, removing some remains and tossing them in woods to solve "odor problem" in mausoleum supported outrage claim); *Whitt*, 519 So. 2d at 906 (trespass on burial grounds, which desecrated burial plot, could support outrage claim); *Levite Undertakers Co. v. Griggs*, 495 So. 2d 63, 64 (Ala. 1986) (defendant's wrongful detention of remains of plaintiff's husband to force payment of funeral supported outrage claim); *Cates v. Taylor*, 428 So. 2d 637, 638-39 (Ala. 1983) (defendant's withdrawal of permission to use a burial plot thirty minutes before funeral, which disrupted it, could support outrage claim). *See also Driver v.*

45

*W.E. Pegues, Inc.*, No. 7:11-cv-1374 LSC, 2012 WL 3042939, at *3 (N.D. Ala. July 19, 2012) (child's remains wrongfully dug up in front of grandparents).

In this case, it is undisputed that AMI engaged in no such conduct. AMI had nothing to do with the actual disappearance of Natalee, the actual handling of her body, or any contact with any potential resting place. What AMI did was report to the public, in the course of continuing, intense public discussion of this apparent crime, what *others believed* might have happened to Natalee. To the extent the Alabama Supreme Court has considered any claim for outrage based on facts arguably analogous to these, it has rejected liability.

Specifically, in *Fitch v. Voit*, 624 So. 2d 542 (1993), the Alabama Supreme Court at least implicitly drew the line between actual mistreatment of the deceased (which can be actionable) and reporting – even inaccurately and without consent – about the deceased (which is not). *Fitch* presented the question whether publication in a newspaper of an allegedly false and misleading photograph of the plaintiffs' family member dying of cancer, without the family's consent and against the decedent's wishes, was sufficiently extreme to support an outrage claim. The Alabama Supreme Court unequivocally held that it was not. *Fitch v. Voit,* No. Civ. A. No. CV 92-063, 1993 WL 141588, at *6 (Ala. Cir. Ct. Jan. 6, 1993) (setting forth allegations that photo was misleading and taken without consent), *aff'd*, 624 So. 2d 542 (1993) (newspaper's conduct was not sufficiently

46

extreme or outrageous).  Thus, insofar as the Alabama Supreme Court has spoken to the question, it has drawn a distinction between mistreating the dead and *reporting* (even inaccurately) to the public *about* the dead.

This distinction also explains why *Martin v. Hodges Chapel, LLC*, 89 So. 3d 756, 763 (Ala. Civ. App. 2011), ought not carry Ms. Holloway past summary judgment:  The conduct at issue in *Martin* was that of a funeral home that allegedly breached its duty to the plaintiffs to maintain accurate records of the location within a cemetery of their loved-ones' remains – put simply, the defendant was alleged to have lost the corpses.  In the context of this unique relationship, in which one party had failed in its duty to the other party to help preserve "the sacredness of the resting ground of the dead," *Whitt*, 519 So. 2d at 901, the court concluded a claim for outrage could be stated.  In this case, in contrast, AMI played no role with respect to Natalee analogous to the duty assumed by the funeral home in *Martin*.[17]

---

[17] This also explains why *dictum* in *Inmon* in which the court quoted a passage from a law review article that included a reference to potential liability for "'unjustifiable name-calling,'" *see Inmon*, 394 So.2d at 364 (citation omitted), provides no basis on which Ms. Holloway may premise her claim.  In short, the Alabama Supreme Court has never proceeded to define the tort to include such speech and, instead, has firmly cabined its reach.  *See Little*, 83 So. 3d at 526 (observing that "tort has since [*Inmon*] been limited by case law to only a few factual situations" and refusing to "expand the cause of action to encompass situations in which a newspaper publisher, motivated by racial bias, issues libelous denunciations of a public official that cause unknown third persons to issue death threats to that public official").  Moreover, any such definition would plainly run afoul of the First Amendment.  *See Snyder*, 131 S. Ct. 1217-20; *Hustler Magazine v. Falwell*, 485 U.S. 46, 55-56 (1988).

47

While it certainly is true, as the Court noted in its prior ruling, that no statement of the Alabama Supreme Court expressly forecloses it from ever recognizing a claim for outrage based on "published words alone," 05/22/13 Mem. Op. at 26, the fact remains that, to date, whether in the "family burial" context or otherwise, it never has done so.  In addition, that court's ruling in *Fitch* signals strongly (if it cannot be said to hold directly) that dissemination of information to the general public about matters of public concern, even in the case of false or misleading speech about the dead, cannot provide a basis for the claim.  *See also Snyder*, 131 S. Ct. 1217-20 (speech clearly offensive to those attending funeral cannot consistent, with First Amendment, be made basis of outrage claim).

In the face of these authorities, recognizing Ms. Holloway's claim would constitute a palpable expansion of state tort law.  That is particularly so where, as here, the undisputed evidence establishes that Ms. Holloway *voluntarily* and very publicly discussed precisely the same topics addressed by AMI – graphically recounting on television Van der Sloot's digital penetration of her daughter, discussing the likelihood he or his accomplice buried her daughter alive, ruminating on the potential significance of a jawbone and other evidence that came to light, and speculating on whether her daughter's body was buried in the sand, laying on the bottom of the sea, or buried under someone's house.  Ms. Holloway's great and understandable anguish over her loss notwithstanding, it simply is not

48

reasonable for her now to point at AMI and declare, "Outrageous!," for having

done that which she – and countless other media – also did.

Dated:  <u>July 8, 2013</u>                                    Respectfully submitted,


 

 

*/s/ Harlan I. Prater, IV*

_____

Harlan I. Prater, IV
*One of the Attorneys for Defendants*

{00638220;v1}

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon all counsel of record through the Court's electronic filing system this <u>8th</u> day of <u>July</u>, 2013.

*/s/ Harlan I. Prater, IV*

Harlan I. Prater, IV
*One of the Attorneys for Defendants*

50

{00638220;v1}